```
 1                   UNITED STATES OF AMERICA
                   UNITED STATES DISTRICT COURT
 2                 CENTRAL DISTRICT OF CALIFORNIA
                         WESTERN DIVISION
 3
                            - - -
 4                 HONORABLE PATRICK J. WALSH,
           UNITED STATES MAGISTRATE JUDGE PRESIDING
 5                          - - -

 6
     JOHNNY BACA,                      )
 7                                     )
                   PLAINTIFF,          )
 8                                     )
     VS.                               )   CASE NO.:
 9                                     )   ED CV 08-683-MMM
     DERRAL ADAMS, WARDEN,             )
10                                     )
                   DEFENDANT.          )
11                                     )
     _____)
12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                 TUESDAY, OCTOBER 5, 2010

16                  LOS ANGELES, CALIFORNIA

17

18

19

20

21              LAURA MILLER ELIAS, CSR 10019
                FEDERAL OFFICIAL COURT REPORTER
22              312 NORTH SPRING STREET, ROOM 453
                LOS ANGELES, CALIFORNIA 90012
23                   PH:  (213)620-0890

24

25
```

```
 1
        APPEARANCES OF COUNSEL:
 2

 3
        ON BEHALF OF PLAINTIFF:
 4

 5              PATRICK J. HENNESSEY, JR., ESQ.

 6              2356 MOORE STREET

 7              SUITE 201

 8              SAN DIEGO, CALIFORNIA 92110

 9

10      ON BEHALF OF DEFENDANT:

11

12              DEPARTMENT OF JUSTICE

13              OFFICE OF THE ATTORNEY GENERAL

14              BY: DAVID DELGADO-RUCCI

15              DEPUTY ATTORNEY GENERAL

16              110 WEST A STREET

17              SUITE 1100

18              SAN DIEGO, CALIFORNIA 92186

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                           INDEX

 2

 3                  TESTIMONY OF ROBERT SPIRA

 4                        EXAMINATION

 5    BY: THE COURT.....................................6

 6    BY: MR. HENNESSEY...............................30

 7    BY: MR. DELGADO-RUCCI...........................38

 8

 9                  TESTIMONY OF JAMES SILVA

10                        EXAMINATION

11    BY: THE COURT....................................57

12    BY: MR. HENNESSEY............................71, 85

13    BY: MR. DELGADO-RUCCI...........................74

14

15                  TESTIMONY OF PAUL VINEGRAD

16                        EXAMINATION

17    BY: THE COURT....................................91

18    BY: MR. HENNESSEY...............................93

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1    LOS ANGELES, CALIFORNIA; TUESDAY, OCT. 5, 2010; 11:05  A.M.

 2                          - - -

 3              THE CLERK:  Calling Case No. ED CV 08-683-MMM.

 4              Johnny Baca versus Derral Adams, Warden.

 5              Counsel, please state your appearances for the

 6    record.

 7              MR. HENNESSEY:  Good morning, Your Honor.  Patrick

 8    Hennessey on behalf of the petitioner, Mr. Baca.

 9              MR. DELGADO-RUCCI:  David Delgado-Rucci of the

10    Attorney General for Derral Adams, respondent.

11              THE COURT:  Thanks a lot.  And who is here today?

12    Who are the witnesses here today?

13              MR. DELGADO-RUCCI:  Present I have Paul Vinegrad

14    and Robert Spira and James Silva.

15              THE COURT:  All right.  I appreciate all of you

16    coming down here and thanks a lot.  I'm going to exclude the

17    witnesses because we're talking about the same thing.  And I

18    think Mr. Silva was the first one here.  I'm gonna go with

19    him and then with Mr. Vinegrad and then with Mr. Spira, not

20    necessarily in that order.  Is that okay with everybody?  Is

21    there someone who has to get out of here first?

22              MR. DELGADO-RUCCI:  Yes, Your Honor.  Mr. Spira

23    actually has a dental appointment at 3 o'clock for a broken

24    crown.

25              THE COURT:  Okay.  My guess is, my hope is that
```

```
 1    within the hour all of you are going to be gone.  If it's
 2    okay with everybody, I'm going to let Mr. Spira testify first
 3    because he's got the problem with the tooth, and then we'll
 4    go with Mr. Silva and then Mr. Vinegrad.  Is that all right?
 5              MR. DELGADO-RUCCI:  That's fine.
 6              THE COURT:  Okay.
 7              MR. HENNESSEY:  No objection, Your Honor.
 8              THE COURT:  All right.  Mr. Spira, please come
 9    forward.  Thanks, folks.  I'm sorry it's not the most
10    comfortable place, but you can sit out in the witness room or
11    in the hallway.  We'll get to you as soon as we can.
12              THE CLERK:  Please raise your right hand.
13                        (Witness sworn.)
14              THE CLERK:  Please be seated.  State your full name
15    and spell your last name for the record.
16              THE WITNESS:  Robert A. Spira, S-p-i-r-a.
17              THE COURT:  I want to start by thanking you for
18    coming down today on short notice without a subpoena.  I
19    appreciate it.  I'm sorry you're having the problem with the
20    tooth.  We're gonna get you out of here as soon as we can.
21              THE WITNESS:  Thank you.
22              THE COURT:  I can do it any way you folks would
23    like me to do it.  I have some questions I want to ask him.
24    I can go first.  Mr. Hennessey, you want to go first or the
25    Deputy AG, however you want to do it.
```

1        MR. HENNESSEY:  Your Honor, I would think it would

2   be fine if the Court would like to go ahead because you have

3   some questions.

4        THE COURT:  Yeah, I have some questions and then

5   you guys can follow-up.  Okay.

6                          EXAMINATION

7   BY THE COURT:

8   Q.   Tell me about your relationship with former Deputy

9   District Attorney Paul Vinegrad.

10  A.   We were members of the same office, although

11  Mr. Vinegrad was in the Indio office in the Eastern Division.

12  I was assigned to downtown Riverside.  I know and knew

13  Mr. Vinegrad, but generally speaking, our interactions would

14  be minimal because we were physically assigned to different

15  offices.

16  Q.   When you did training and things for the office, was it

17  the entire County deputy district attorneys who trained

18  together or -- in the Indio -- you were in the main office in

19  Riverside; correct?

20  A.   Yes.

21  Q.   And he was in the Indio office which is like the Eastern

22  Division?

23  A.   Yes.

24  Q.   And did you interact in that process?

25  A.   The only time I would have involvement with Eastern

```
 1    Division attorneys by and large would be when we had new
 2    training classes.  The training of new hires would take place
 3    in downtown Riverside and there would be people within that
 4    new hire class who would then be assigned to the Eastern
 5    Division.  And from time to time, I would have communications
 6    with people in the Eastern Division, but that would be the
 7    exception not the rule.
 8    Q.   Did you consider him -- he was a supervisor out there in
 9    Indio from what I understand at some point.  Did you know
10    that?
11    A.   I -- I knew that he became a supervisor.
12    Q.   At any time did you consider him your supervisor or the
13    fact that he was a supervisor in the Indio office meant you
14    had to do what he told you to do?
15    A.   No.
16    Q.   You operated independently of other prosecutors in the
17    Riverside office?
18    A.   Yes.  I had my own chain of command, my supervisors.
19    Q.   Now, I think you're familiar with the facts of this
20    case, are you?  This is the case where Mr. Baca was being
21    prosecuted by Mr. Vinegrad and you were prosecuting
22    Mr. Melendez about the same time.  Do you remember that?
23    A.   I was familiar with the facts and the circumstances of
24    the Melendez case.  I was not familiar until recently when I
25    read the Court of Appeals opinion about the Baca case.  I
```

1  knew it was a double homicide, but that was pretty much the

2  extent of my knowledge about that case.

3  Q.   And then you're talking about the State Appellate

4  Court's decision in the Baca case?

5  A.   Correct.

6  Q.   And that came out sometime in 2004 I think?

7  A.   Yes, but I personally did not read that decision until

8  the last few days.

9  Q.   You know, I'm a curious as to why and I'll tell you why.

10  You've now read it and they were critical of your testimony

11  at that trial and felt that you had said some things that

12  weren't accurate; correct?

13  A.   I discerned that unhappiness, yes.

14  Q.   And you didn't know that that existed out there in the

15  record?

16  A.   I was aware that the Court of Appeals opinion was

17  critical of me.  I had received that information from other

18  sources, but I had not personally read the opinion.

19  Q.   What were the other sources?

20  A.   If I'm not mistaken, I think Mr. Delgado-Rucci was one

21  of those sources and Paul Vinegrad was also one of those

22  sources.

23  Q.   Well, let me ask you this and again, this is more

24  curious.  We'll get to the details.  Isn't there a process

25  when you're a prosecutor and the Appellate Court criticizes

1    your work, doesn't somebody get ahold of that, call you up,

2    sit you down and say, hey, this is what they said you did.  I

3    want you to respond.

4            And let's assume you agreed with the appellate

5    court, then they would say let's not do that again or let's

6    do something different the next time or let's have a

7    supervisor talk to you when you're going to testify the next

8    time.

9            Anything like that ever happen?

10   A.   No, not to my recollection.

11   Q.   Because I guess, you know, as a part of this system, it

12   just seems that that would be the best way to correct errors

13   in these very serious -- this guy got 75 years to life, I

14   think and they called it a close case.  They almost reversed

15   it a second time.  And I guess there's no mechanism in place

16   in the Riverside County District Attorney's Office to make

17   sure that doesn't happen in the future.  Am I right?

18   A.   I don't know that there is or isn't a mechanism.  If

19   there is a mechanism, I was not drawn into it.

20   Q.   All right.  Now, let's just go back to your case.

21   You're prosecuting Melendez.  He's involved in a gang murder.

22   He may be the trigger man, may not be the trigger man.  There

23   may be a couple people that's shot and he agrees to a plea

24   deal in which he is going to get 16 years.  He's gonna get

25   upper 11 years plus five for a gun 16 years; correct?

1    A.    Yes.

2    Q.    He wants less.  He wanted nine years; right?

3    A.    I think as negotiations, if my recollection is correct,

4    as negotiations got underway, I believe Mr. Guleserian his

5    attorney initially made an offer of nine years.

6    Q.    And you rejected that?

7    A.    Correct.

8    Q.    And then there were some other negotiations.  At some

9    point he said I think it was Mr. Gomez who was murdered in

10   your case.  Do you remember the name of the victim?

11   A.    It was Mario -- it might have been Gomez.  I would have

12   to look.

13   Q.    And I understand that.  And so if there's a mistake,

14   it's my mistake.  But Mr. Melendez at some point through his

15   counsel approached you with an offer that he would cooperate

16   in the prosecution of the other defendants, the other

17   suspects in that Gomez murder; correct?

18   A.    Ultimately, Mr. Guleserian did that make that offer,

19   yes.

20   Q.    And the deal was that he was going to get down to

21   14 years; correct?

22   A.    Ultimately, that is correct.  That he would get 14 years

23   for his cooperation in providing additional information

24   concerning the Mario Gomez homicide.

25   Q.    All right.  Now, at some point during that process, you

```
 1    learned that Mr. Melendez is also cooperating or considering
 2    cooperation or talking with Mr. Vinegrad; correct?
 3    A.   At some point I did learn that Mr. Melendez was speaking
 4    to a person who at the time was my DA investigator Dan
 5    Frederick and that Mr. Melendez was providing information
 6    about a -- another homicide, yes.
 7    Q.   All right.  And then Mr. Melendez agreed to testify for
 8    Mr. Vinegrad in that other case?
 9    A.   Yes.
10    Q.   All right.  Did you testify in the first trial?
11    A.   The first Baca trial?
12    Q.   Yes.
13    A.   Yes, I did.
14    Q.   And so what happened is you were called by Mr. Vinegrad
15    to testify and your testimony essentially was that
16    Mr. Melendez is not getting any consideration for his
17    testimony in the Baca case.  Am I right?
18    A.   Sum and substance that is correct, yes.
19    Q.   And I know there was more, but that's what we're
20    focusing on in this habeas corpus proceeding.  Now, did you
21    at any time have a discussion with Mr. Vinegrad that maybe he
22    should get consideration for this.  Maybe Mr. Melendez should
23    get a lower sentence than the 14 years because he is
24    cooperating in the Baca case?
25    A.   No.  To my knowledge, Mr. Vinegrad and I never had such
```

1    a conversation.  I think the only conversation to my

2    recollection that I had with Mr. Vinegrad was that

3    Mr. Melendez was willing to testify in his case, the Baca

4    case, and that he was accepting the deal of 14 years state

5    prison which was the work down that we had agreed to in my

6    case, the Mario Gomez case, based upon the information that

7    Mr. Melendez was providing in the Mario Gomez case.

8            One, in addition and I can't remember whether that

9    came up at this moment.  I can't remember if it came up

10   before or after I learned of Mr. Melendez's cooperation in

11   the Baca case, but that Mr. Melendez wanted state prison

12   housing that he felt would be more secure for himself.

13   Q.   He wanted to go to up to San Luis Obispo; correct?

14   A.   Yes.

15   Q.   And that would be something that you would consider as

16   part of the testimony in Gomez, but also in consideration for

17   his help in the Baca case?

18   A.   Yeah, I believed that the knowledge that Mr. Melendez

19   was cooperating in the Baca case was part of the equation in

20   terms of my office, the Riverside office, being willing to

21   recommend housing at San Luis Obispo.

22   Q.   All right.  Now, what happened in the first trial was

23   you testified that Melendez was not getting any consideration

24   for Baca.  Then Melendez testified that he wasn't getting any

25   consideration for Baca.  And Mr. Vinegrad argued to the jury

1    that he wasn't getting any consideration for Baca.  And so

2    that was the deal, that was -- that was the government's

3    position in the first trial; correct?

4    A.    Yes.

5    Q.    Now, after that conviction, Mr. Baca is convicted in

6    1998.  In February of 1998, Mr. Melendez gets sentenced;

7    correct?

8    A.    I believe that is correct.

9    Q.    Now, at that time Mr. Baca is appealing his first

10   conviction.  It's in front of the Appellate Court; right?

11   A.    I assume it was.  I mean, I know those convictions are

12   automatically appealed.  I assume there was an appeal

13   pending.

14   Q.    Well, did you read the transcript from the sentencing of

15   Mr. Melendez in February of '98?

16   A.    Recently I did.

17   Q.    And did you -- do you remember seeing in that transcript

18   that there was discussions about the fact that we had already

19   represented to this court that he wasn't getting any time for

20   the Baca testimony and it's on appeal.  And essentially, and

21   you can correct me if I'm wrong, don't let me put words in

22   your mouth, but we can't go back on that now.  After we get

23   him convicted based on Melendez not getting any

24   consideration, then give him consideration two weeks or two

25   months later; right?

1   A.    I believe those were the words of, and I may be wrong,

2   but I believe those were the words of supervising Deputy

3   District Attorney Kevin Ruddy who was participating.  And the

4   reason I say that is because my marching orders from my

5   office Riverside was always that this is the deal that

6   Melendez is getting.  He is getting 14 years and he is

7   getting a favorable recommendation for housing at San Luis

8   Obispo.  That I have no authority to extend any other, you

9   know, consideration to Mr. Melendez, period.  And that my

10  scope of authority is restricted to the Mario Gomez homicide.

11  Q.    Well, from my reading of all these transcripts and that

12  sentencing here is what it suggests to me is only

13  Mr. Vinegrad could initiate a reduction for the testimony in

14  Baca.  That would have been something that was generated from

15  him and his office; correct?

16  A.    Well, at least in terms of my authority I can -- I don't

17  mean to use a negative pregnant.  I can only tell you I did

18  not have authority to change anything from the 14 years and

19  the San Luis Obispo.

20  Q.    I understand that, but this was your life's work.  You

21  knew how to get if Vinegrad wanted to get a reduction for

22  Melendez for testifying in Baca, could he have done that?

23  A.    I don't know the answer to that.  I know he could have

24  initiated a request for it.

25  Q.    He could have asked somebody, maybe a supervisor in the

1   Indio office or the Riverside office, he could have asked and
2   they would have acted on it?
3   A.   Yes.
4   Q.   Yes or no.  But they would have said yes or no, but they
5   would have decided; correct?
6   A.   Correct.
7   Q.   But what's clear to me from this transcript is it had to
8   come from him.  You couldn't go in and get a reduction for
9   the Baca testimony on your own.
10   A.   That is absolutely correct.  I could not have gotten a
11   reduction in the Melendez sentence for the Baca testimony.
12   Q.   Now, it also appears from this transcript that you and
13   Mr. Vinegrad were having conversations before that sentencing
14   hearing and that he provided you with Melendez's testimony
15   and he talked to you about what he had said and not said in
16   the trial court in the Baca case so that you understood that
17   you were not supposed to be getting a reduction for
18   Mr. Melendez based on the Baca testimony.
19   A.   I'm gonna have to ask you to break down that question a
20   little bit.
21   Q.   Sure.
22   A.   I don't believe I ever or at least at the time of the
23   Baca trial, I -- I did not know what Melendez had testified
24   to and I don't believe I was ever provided with a transcript
25   of Melendez's testimony in the Baca trial so I was not

```
 1   familiar with what he said.

 2   Q.   Okay.

 3   A.   If memory serves me correctly.

 4   Q.   Okay.  I'm a going to read you to from the transcript

 5   and I'm not trying to challenge your memory or anything.  I

 6   know you just kind of boned up on this for this hearing, but

 7   this is what you testified to and let me show it to you.

 8   This is Lodgement No. 201 and it's the February 26, 1998 and

 9   June 26, 2002.  It's People versus Melendez.

10           Counsel, do you have a chance to get to that?

11           MR. HENNESSEY:  Yes.

12           THE COURT:  And I'm looking at page 14.  There is a

13   discussion here and I'm not going to make you read through

14   that, but this is the court, Mr. Spira.  "It also would be

15   important to add that I do have in my possession a transcript

16   which I requested of Mr. Melendez's testimony in the Baca

17   case in Indio."

18   Q.   So you asked for a transcript?

19   A.   Yeah.

20   Q.   And who did you ask?

21   A.   I believe I asked the court reporter.

22   Q.   Okay.  You didn't ask Mr. Vinegrad?

23   A.   If memory serves me correctly, I believe that there were

24   requests from Mr. Vinegrad that I ordered a transcript so

25   that he could use that transcript.
```

1   Q.   That Mr. Vinegrad could use it?

2   A.   So he could provide it I think to defense counsel so I

3   had ordered the transcript.

4   Q.   Okay.  Do you know when you did that?

5   A.   Offhand, I don't recall.

6   Q.   But this was at his sentencing in 1998 is what you're

7   talking about?

8   A.   That appears to be the context that it was.

9   Q.   Well, I think we're confused and I'll tell you why.

10  Because what you wanted was this transcript from the

11  sentencing hearing to give to Mr. Vinegrad for the second

12  trial; correct?

13       Because here's what happened.  Trial one Melendez

14  testifies.  Couple weeks later he is sentenced, Mr. Melendez

15  is sentenced.  And then trial two comes up and they were

16  asking for this transcript to find out what happened at

17  sentencing.  And there were representations, and we'll get to

18  that, that you were going to get the transcript and bring it

19  down with you.  But this is from Mr. Melendez's testimony not

20  the sentencing hearing.

21       You requested a copy of the transcript from his

22  testimony in the Baca trial?

23  A.   Uh-huh.

24  Q.   Now, you didn't call up the Indio office court reporter

25  and ask her for a copy of a transcript for Mr. Vinegrad's

1   trial, did you?  He gave it to you, didn't he?

2   A.   I have -- I do not have a recollection of how I came

3   into possession of that transcript or why I have it.  If I

4   read on, it might be helpful.  I don't know.

5   Q.   Let's do it.  The next word is, "But contained within

6   that is a representation by Paul Vinegrad, the Deputy

7   District Attorney in that case to the court that spells out

8   his understanding of the arrangement with Mr. Melendez in the

9   same fashion that I have outlined it to the court.

10          "So Mr. Vinegrad has also made the representation,

11   the trier of fact there, that his understanding of what was

12   promised to Mr. Melendez is the 14 years.  The letter of

13   recommendation, et cetera, and that there was nothing further

14   beyond that.

15          "As I also understand the testimony of Mr. Melendez

16   in Indio it -- his testimony, Mr. Melendez's testimony in the

17   Indio case also corresponds to that understanding of the

18   deal."

19          Okay.  But you don't remember -- what I'm trying to

20   figure out is did you have a discussion with Mr. Vinegrad in

21   which he told you you cannot ask for a reduction in

22   Melendez's testimony based on the Baca trial.  We have

23   already -- the trial is done.  We have already made a

24   representation.  Melendez has already testified.  Don't do

25   it.  Did you have that discussion with him?

1    A.    I don't believe I had a discussion with Mr. Vinegrad in

2    that fashion.  It appears to me that what I'm talking about

3    in that, in that excerpt is that Mr. Vinegrad was making the

4    same representation to the Baca court as I was making to

5    Judge Myers as opposed to the substance of what Mr. Melendez

6    testified to.  I seem to be more addressing what Mr. Vinegrad

7    had represented to the court in that Baca case as opposed to

8    what Mr. Melendez had testified to.  I think the only

9    conversations that I had with Mr. Vinegrad to my knowledge

10   was simply that, you know, to the effect of Paul, my

11   authority extends only to the Mario Gomez homicide.  My

12   authority ends at 14 years and the housing.

13   Q.    Let me just point to another part.  Now, this is your

14   supervisor you were talking about Mr. Ruddy.  And correct me

15   if I'm wrong, but Mr. Ruddy was there in case you had to

16   testify at the Melendez trial about any representation or the

17   sentencing hearing about any representations you had made to

18   him.  Then Mr. Ruddy would be representing interests of your

19   office if you had to testify.  It says it in here.

20   A.    I think that was part of it, but it was also because

21   Mr. Ruddy was a supervisor.  He would be the only one who

22   would have authority to change the terms of the deal so to

23   speak with Mr. Melendez.

24   Q.    And I'm just gonna, this is continual Mr. Ruddy's

25   testimony on pages 19 and 20.  And page 20 at line 15 I'm

just going to read for you what I have highlighted here.

So Your Honor, this is Mr. Ruddy speaking, we are -- we cannot really stipulate to anything else because members of this office have made good faith representations to another judge and another jury, accurate representations, from the knowledge that they had.  So Your Honor, we're kind of stuck in the middle here.  The court and then you were cut off.

The impression I draw from this is that you weren't really opposing another three-year reduction or another reduction from the 14 years, but you had no authority to do it.  And if the trial court said we're going to do it, you weren't going to appeal.  And it was going to be fine; is that right?

A.   I think that is Mr. Ruddy's representation to the court and I believe that's Mr. Ruddy speaking to the court.

Q.   It is.

A.   That if the court chose to take a different path, that our office, the Riverside office, the District Attorney's Office would not appeal that sentencing decision.  That is correct.

Q.   All right.  Now, let's turn now to the trial, the second trial.  As you understand it, and I'll just represent this for you.  I don't expect you to be an expert on this other trial.  Baca went up on appeal and he won.  The Appellate

```
 1   Court reversed 3-0.  Said go back and retry the case.  And it
 2   was based on ineffective assistance of counsel in that
 3   defense counsel asked a question at that second trial which
 4   Mr. Vinegrad believed opened the door to question the
 5   defendant about whether he had been arrested for raping and
 6   sodomizing a seven-year-old girl.  That's what the case came
 7   back for for the first time.
 8             Now, it's Trial II.  In Trial II, Mr. Baca is given
 9   new counsel or has new counsel.  I'm not sure how that
10   worked.  But the new counsel was requesting the copy of this
11   transcript from the Melendez sentencing.
12             Did you become aware that they were looking for the
13   transcript, that defendant's counsel was looking for the
14   transcript, and that -- did Mr. Vinegrad ask you to obtain a
15   copy and provide it to them?
16   A.    While my recollection is hazy, I believe Mr. Vinegrad
17   requested the DA file in Melendez which would have included
18   the transcript of the sentencing hearing.  That would be the
19   best of my recollection.
20   Q.    Tell me why it would include the transcript of the
21   sentencing hearing.  Is that a standard operating procedure?
22   A.    Um, I don't know if it's standard operating procedure,
23   but I think that everyone recognized that there was an issue
24   with the circumstances of the sentencing and that it would be
25   prudent to have that transcript in the file.
```

1    Q.   All right.  Do you remember conversations with

2    Mr. Vinegrad prior to the trial?  The second trial occurred

3    in the fall, October of 2002.  Do you remember having

4    conversations?  Well first of all, he asked you to testify in

5    the second trial; correct?

6    A.   Yes.

7    Q.   And you knew Mr. Melendez was going to testify in the

8    second trial; right?

9    A.   Yes, I was aware of that.

10   Q.   Did you have a conversation with Mr. Vinegrad in which

11   he said when you come down, first, the defense counsel wants

12   a copy of the sentencing transcript.  Do you remember that?

13   A.   I don't have a specific recollection of that.  I would

14   have no reason to think that, you know, that such a request

15   was not made, but I don't have a specific recollection of it.

16   Q.   Your recollection was more in the context of they want

17   to see the file, the prosecutor's file in the Melendez case;

18   correct?

19   A.   Yes.

20   Q.   Which contained the transcript from the sentencing

21   hearing; right?

22   A.   If it was in there, yes.

23   Q.   Well, let's get to that.  You understand as a prosecutor

24   that when they're going to cross-examine your informant, they

25   want to see what happened at sentencing; right?

1    A.    I'm sure they would want to see everything in the file.

2    Q.    To the best of your recollection is because this was

3    slightly unusual in your view, perhaps, the sentencing of

4    Melendez that you obtained the transcript, you put it in your

5    prosecutor's file.  And did you bring the file down to

6    defense counsel?

7    A.    I believe both times that I testified I brought whatever

8    DA files I had.

9    Q.    Okay.  Do you remember if you looked for the transcript?

10   A.    I don't remember.

11   Q.    You know, when I looked at this transcript from the Baca

12   trial and I'm looking the reporter's transcript and I'm gonna

13   read this to you.  You're welcome to look it if you have any

14   questions.

15          Counsel, I'm at Volume I of the trial at page 13.

16   And I'm just gonna shorten this and the court reporter is

17   going to tell me if I'm talking to fast for her.  "That was

18   all subsequent to the deal Mr. Melendez cut in Riverside.  So

19   everything that was promised" -- this is Mr. Vinegrad

20   talking -- "everything that was promised in connection with

21   this file was set forth in the transcript of Mr. Melendez's

22   prior testimony.  After Mr. Baca's trial, I told Mr. Silva

23   the other day, Mr. Melendez went up for sentencing in

24   Riverside and the prosecutor up there Mr. Spira appeared on

25   that.

1          "And I spoke to him and he told me at that time

2     Mr. Melendez requested a modification of sentence.  There is

3     a transcript of that in Riverside which I haven't seen yet

4     and the judge in Riverside felt that a sentence of ten years

5     would be appropriate for Mr. Melendez, but that was not done

6     in connection or changed for anything in the case and the

7     transcript of that should be available.  Mr. Silva's welcome

8     to like at Mr. Spira's entire file on Mr. Melendez.  He is on

9     parole currently."

10          Does that help refresh your recollection?  This was

11     in October of 2002 when Mr. Vinegrad made this representation

12     to the court.

13     A.   It doesn't refresh my recollection as to whether the

14     transcript of Melendez's sentencing was in the DA file.

15     Q.   All right.  Let's just talk a little bit about

16     transcripts.  How did you get a transcript when you're the

17     prosecutor at Mr. Melendez's sentencing?  You just tell the

18     court reporter I need a copy and she gives it to you?

19     A.   She prepares it.  Basically, the court reporters in this

20     case, I think all of our court reporters with the exception

21     of one were female.  Generally speaking, they would -- you

22     would make a request that a transcript be prepared and

23     essentially they would do it as they had the time to do it,

24     whatever their schedule allowed.

25     Q.   What do you think in general terms in your experience

```
 1    what does it take a week or two generally to get a transcript
 2    from a sentencing hearing?
 3    A.   Generally, at times it can be considerably longer than
 4    that.
 5    Q.   Okay.  Do you have any recollection of the fact that
 6    perhaps Mr. Vinegrad and probably Mr. Silva defense counsel
 7    were waiting for you to bring the transcript with you when
 8    you came down to testify?
 9    A.   I don't have a current recollection of that.
10    Q.   Okay.  There is one other place where that transcript
11    comes up and that is at page, Counsel, at page 16 of the same
12    volume.  Mr. Silva says to the court and you weren't there of
13    course.
14            "There was an issue on the Melendez testimony.
15    They were going to provide me with the transcript."
16            "MR. VINEGRAD:  I'm in the process of that.
17    Mr. Melendez is one of our last witnesses and we won't get
18    him for another week."
19            And then he talks about the fact that he just
20    assumed that they needed the transcript for
21    cross-examination.
22            So I guess, the issue that I'm -- one of the issues
23    I'm wrestling with that you're not really clear on because it
24    happened eight years ago in someone else's case is what
25    happened on this transcript.  The issue kind of on this
```

```
 1   habeas right now is what happened with this transcript.  And
 2   I think best response you can tell me is you don't really
 3   remember exactly.  You knew that you were supposed to bring
 4   your file or you planned on bringing your file.  You assumed
 5   that the transcript would be in there.  You thought that you
 6   had ordered the transcript because it was an unusual
 7   sentencing proceeding and that he was going to testify, but
 8   you don't have a recollection.
 9   A.   Yeah, at the risk of speculating, it would have seemed
10   to me that sentencing transcript would have made its way into
11   the DA file closer to 1998 than 2002, the time of the second
12   trial.  Now, it may very well have not been located for
13   whatever reason and another request was made for, you know,
14   that same transcript, but I don't have a current
15   recollection.
16   Q.   Let me ask you to take a look at it.  It's Lodgement
17   No. 21.  You recognize that as the transcript from that
18   sentencing hearing; correct?
19   A.   Yes.  This does appear to be the sentencing transcript.
20   Q.   Take a look at the last page and tell me what that is.
21   A.   That's the reporter's certificate.
22   Q.   And what is the reporter's certificate?
23   A.   That is the certified shorthand reporter's certificate
24   that she reported the proceedings and it constitutes a
25   complete and accurate transcription.
```

1    Q.    What's the date on that?

2    A.    May 2, 2003.

3    Q.    So that was six months after the second trial in Baca?

4    A.    This certification is May 2, 2003.

5    Q.    And they certify it when they issue the transcript;

6    right?  When you get a transcript from a court reporter, she

7    sends it to your office.  But when you opened and looked at

8    that certification, it was certified the day she transcribed

9    it; correct?

10   A.    Yes.  I assume so, yes.

11   Q.    So the transcript at least according to Lodgement

12   No. 21, didn't exist in October of 2002?

13   A.    Again, I don't know that that would be the case because

14   that transcription may have been previously ordered.

15   Q.    Okay.  I understand that, but let's say that you ordered

16   the transcript in 1998 and she transcribed it and she put it

17   in the file and you lost it.  And you asked her for another

18   copy.  The copy she gave you would be a copy of the 1998

19   transcription.  It would be certified in 1998; right?

20   A.    I don't know the answer to that.

21   Q.    Well, you have on occasion ordered transcripts from

22   prior cases, haven't you?

23   A.    Yes.

24   Q.    And they don't give you a certification, for example, if

25   you ordered a transcript today from your 1998 trial, assuming

1    that transcript existed, they wouldn't recertify it 2010.

2    They would just give you a copy of the ten-year-old

3    transcript and it would be certified on that date; correct?

4    A.   I don't know the answer to that question.

5    Q.   They don't go back and retranscribe a sentencing hearing

6    because you asked for it a couple years later?

7    A.   I assume if the transcription existed, they would

8    provide the existing transcription.

9    Q.   What happened when you showed up at trial?  You didn't

10   have the transcript, did you?

11   A.   I do not recall having the transcript.

12   Q.   And what did defense counsel say to you, if anything?

13   A.   I do not recall that anything was said to me about the

14   transcript.

15   Q.   You did allow him to look through your file; correct?

16   Do you remember?  There's some representation and I'm just

17   gonna tell you.  There is some representation in the record

18   that I think by Mr. Vinegrad that he believes he saw you

19   looking through -- that he saw the defense counsel looking

20   through your file or they had access to your file or

21   whatever.

22   A.   I don't have a specific recollection.  My policy would

23   be my file is an open book and defense counsel could spend

24   whatever time counsel wished.

25   Q.   All right.  Let me ask you this question.  There's no

```
 1   reason why you would not have made this available to the

 2   other side in the Baca case; correct?

 3   A.   There is no reason why I would not have made it

 4   available.

 5   Q.   Here's what the problem is for the Court.  The defense

 6   counsel in Baca was asking for this transcript because they

 7   wanted to cross-examine Melendez and show that he had gotten

 8   a deal in your case.  Okay?  For testifying in Baca.  You

 9   testified and according to the Appellate Court not accurately

10   that he didn't.  The only evidence of that was this

11   transcript and it never got down to that court.

12          And I'm just wondering did you either consciously

13   or unconsciously realize that if no one ever saw that

14   transcript, they would not know what happened at that

15   sentencing hearing and not only would Melendez not get

16   cross-examined for what he said, but you wouldn't either?

17   A.   I would absolutely have no desire that defense counsel

18   not have full access to anything that was in the district

19   attorney file.  I would not, would not cover up anything that

20   I did.  I would have no reason to prevent access or to

21   restrict cross-examination of myself or any other witness.

22   Q.   But they would have shown -- you testified that there

23   was no deal and they pulled out this transcript.  And the

24   trial judge in the trial court or the jury and the trial

25   court came to the same conclusion the other court, the
```

```
 1    Appellate Court did, your testimony was essentially sheer
 2    fantasy.  That would have made you look bad at that trial not
 3    just to that jury, but to Mr. Vinegrad.  And you would have
 4    been subject to some retribution.  Am I right?
 5    A.   There are many occasions in my life that I have quote,
 6    unquote "looked bad."  If this were one more such instance,
 7    that's okay.  I mean that's just part of, you know, being a
 8    prosecutor, I mean, one tries to approach perfection as well
 9    as one can, but at times one falls short.  And if, you know,
10    this was one of those instances, I would not seek to protect
11    myself or any other witness.  That's just the way, you know,
12    things fall out.
13              THE COURT:  Okay.  I'm going to turn this over now
14    and I'm gonna allow Mr. Hennessey you can follow-up with
15    anything you want.
16              MR. HENNESSEY:  Yes, Your Honor, very briefly.
17              THE COURT:  You can come up to lectern.
18              MR. HENNESSEY:  That was going to be my first
19    question what the Court's preference was in that regard.
20                        EXAMINATION
21    BY MR. HENNESSEY:
22    Q.   Now, Mr. Spira, you knew at the time you testified,
23    let's refer to it as Baca II, that your testimony was
24    incorrect.  That Mr. Melendez received no benefit for his
25    testimony in the first trial.  Is that a fair statement?
```

1   A.   I think you'll have to repeat the question or break it

2   down.  I'm not sure I understand it.

3   Q.   All right.  You were present obviously at the sentencing

4   for Mr. Melendez; is that correct?

5   A.   Yes.

6   Q.   All right.  And the Court has previously discussed with

7   you some of the statements made by your supervisor at that

8   time Mr. Ruddy.  And if you recall those statements, that the

9   clear import of that was that if Mr. Melendez was to receive

10  an additional reduction in his sentence for his testimony at

11  the first Baca trial, your office would not to quote, "we

12  would not appeal the court's decision."  You were present

13  when that statement was made by Mr. Ruddy?

14  A.   Yes.  I think a matter of clarification, if memory

15  serves me correctly, Mr. Ruddy was not my supervisor, but he

16  was a supervisor in the office.  But I was present when

17  Mr. Ruddy made that representation to the court that if the

18  court saw fit to change the sentence from that which was

19  agreed, then that our office would not appeal it.  That is

20  true.

21  Q.   So you knew that in fact Mr. Melendez received an

22  additional benefit as a result of his testimony at the first

23  Baca trial; is that correct?

24          Let me ask it a different way.  You were there when

25  the court imposed a sentence three years lower then the one

1    that was supposedly agreed upon; is that correct?

2    A.    Yes.

3    Q.    And that was also, as I said, you were present when

4    Mr. Ruddy made the statement to the court that they would not

5    appeal the court's decision if the court went below the

6    14 years; is that correct?

7    A.    Yes.

8    Q.    So when you testified at the second trial, you knew that

9    in fact Mr. Melendez had in fact received a reduction in his

10   sentence when he was sentenced on that date in February; is

11   that correct?

12   A.    Yes.

13   Q.    All right.  So you would know at that time that in fact

14   that there was some benefit received for that testimony; is

15   that correct?

16   A.    Not exactly.  It's -- all I can say, it's more

17   complicated than that or at least in terms of my recollection

18   of events of what occurred and in part why they occurred.

19   Q.    All right.  But that wasn't offered during your

20   testimony during the second Baca trial, was it?

21   A.    I think it actually was.

22   Q.    All right.  Now, just a quick question on the open file

23   policy.  Mr. Melendez obviously was not Mr. Joe Citizen for

24   lack of a better description.  He was charged with originally

25   with, I believe, the charge of murder; is that correct?

1    A.    Yes.

2    Q.    And it was originally charged as first degree?

3    A.    I don't think a degree was alleged, but I couldn't tell

4    you for certain.

5    Q.    And you were the prosecutor on that case?

6    A.    I was assigned to prosecute the case.

7    Q.    Right.  So that if the defense attorney wanted to come

8    in and just walk into your office, you would hand him your

9    file, your reports, your witness interviews and everything.

10   You would just put it out there for him or would you go

11   through those records to remove what you considered to be

12   work product or other things that you felt were somewhat

13   sensitive?

14   A.    Well, I mean, assuming the attorney had a legitimate

15   reason for, you know, gaining access to the file, if anything

16   were, you know, removed from that, I suppose there could be

17   circumstances where there might be some work product

18   information that, you know. . .

19   Q.    Well, isn't reality more a question of if I was the

20   defense attorney and there was something in particular I was

21   looking for, I would ask you if you had it in your file and

22   you would go look for it.  And if in fact it was there, and

23   wasn't some other evidentiary reason, for example, that you

24   couldn't disclose it, you would turn that over to me; is that

25   correct?

```
 1   A.    I think, well, again, I think there was a couple of
 2   questions.  There are times where a defense attorney would
 3   ask for a specific thing and I would seek to locate that for
 4   them just for time saving purpose.  But if that request were
 5   not made to locate a specific thing, I would just simply say
 6   here are the files.  You know, take your time, look at them.
 7             MR. HENNESSEY:  All right.  Fine.  Thank you.
 8   Nothing further, Your Honor.
 9             THE COURT:  Thank you.  Counsel.
10             MR. DELGADO-RUCCI:  Yes, Your Honor.  I was going
11   to make an usual request.  There's something I need to inform
12   the Court of if we can have him step out for a minute.
13   Counsel is aware of what I'm about to say.
14             THE COURT:  I'm sorry, Mr. Spira.  Will you step
15   out one moment?  We'll get you right back in here.
16             MR. HENNESSEY:  I would note the reporter's
17   transcript, the cover sheet says February 26th and June 26th.
18   However, the top of the actual sentencing proceeding as to
19   Mr. Melendez is February 20th.
20             THE COURT:  You know, there is a lot of mistakes on
21   these dates and thanks for pointing that one out.  I hadn't
22   seen it.  But when we're done with the witnesses, I think
23   since this might drag on a little, I'll let you guys go to
24   lunch and come back and continue our hearing.  We'll go
25   through and come to some agreement, some understanding on
```

UNITED STATES DISTRICT COURT

```
 1    those dates.  Mr. Delgado-Rucci.

 2              MR. DELGADO-RUCCI:  Yes, Your Honor.  I believe the

 3    Court asking if Mr. Spira ever had the transcript and gave it

 4    to counsel Silva.  Silva's actually gonna come in and testify

 5    he had a copy of the transcript.

 6              THE COURT:  Great.

 7              ATTY2:  So I wanted to let the Court know that so I

 8    would be kind of short-circuiting all the questioning as to

 9    whether or not because in my view, the reason why it kind of

10    stops in the reporter's transcript as to requesting the

11    transcripts is because Silva obtained a copy of that

12    transcript.

13              THE COURT:  At the time of trial.

14              MR. DELGADO-RUCCI:  At the time of trial.  There's

15    some reason he didn't do certain other things, but I wanted

16    you to be aware of that so when we go through this, it's not

17    like, well, gee, it would have been nice if you told me in

18    the beginning.

19              THE COURT:  I appreciate you doing that.  I should

20    have let you talked first.  Did he get it from Mr. Spira?

21              MR. HENNESSEY:  We don't know.

22              MR. DELGADO-RUCCI:  There are other things that I

23    have that Mr. Spira wrote down to refresh his recollection

24    and I can represent to the Court right now this is

25    November 5th, 2002 these are his notes.  Mr. Spira does not
```

```
 1    have a good memory therefore he writes down notes on all of
 2    his cases.  This is 11-05-02 RAS which stands for Robert
 3    Spira.  Testified in trial of P versus Johnny Baca retrial in
 4    Indio.  On 11-8-02 is when he received the transcripts we are
 5    talking about from court reporter Donya Wagner.
 6              So he received them three days after he testified
 7    in the Baca case and the Baca No. 2 is already over which is
 8    why he did not have them at the time of Baca II.  And I am
 9    going to ask him about that.  I wanted the Court to be aware.
10    I have copies also for the Court of his -- what I just read
11    to you so that the Court can take a look at that as well.
12              THE COURT:  And then one of the things will be
13    cleared up with Mr. Silva, this must be a mistake.  This
14    Lodgement No. 21 is the same as you that she certified it in
15    '03.
16              MR. DELGADO-RUCCI:  Well, that's the thing.  Unless
17    you have a court reporter here who says this is what we do,
18    certification doesn't mean that either party requested it.
19              THE COURT:  It's when she finished transcribing it.
20              MR. DELGADO-RUCCI:  And the reason I bring it up is
21    not everything is automatically put on paper unless someone
22    transcribes it.  I can represent to the Court that I will not
23    get a reporter's transcript on certain things because the
24    court reporter may have typed it in, but there is no actual
25    physical transcription until someone requests it.
```

1        Now, the May 2003, you will see there are two

2   reporter's certificates from two different reporters in this

3   case.  They were done on May 6, 2003.  That's one year after

4   the trial's already done, but it doesn't indicate who

5   requested the transcript so that they actually prepared it on

6   May 26th.  Mr. Vinegrad actually did not receive this

7   transcript until our office sent it to him.  Which means our

8   office may have requested a copy of this transcript which is

9   why it was prepared on May 26, 2003 or some other party.

10        THE COURT:  I think Mr. Hennessey did.

11        MR. DELGADO-RUCCI:  Or it may have been Mr.

12   Hennessey which is why the May 26, 2003 date shows up.  The

13   court don't automatically put these on paper and send them

14   out to the parties unless the party asks, hey, I need a copy

15   of the hearing on this date.  And I have run into that in

16   other federal habeas matters where there is no transcript and

17   I have to ask more time and an order from this court to me so

18   I can send it to the superior court to order that court

19   reporter to go back and make a physical copy of that

20   transcript.

21        THE COURT:  Okay.

22        MR. DELGADO-RUCCI:  So I just wanted the Court to

23   be aware of that.

24        THE COURT:  Let's bring him in.  You question him

25   any way you want.

```
 1              MR. DELGADO-RUCCI:  Questioning is going to be a
 2    little long.
 3              THE COURT:  We'll bring Mr. Spira in right now.
 4              MR. DELGADO-RUCCI:  Yes.
 5              THE COURT:  Okay.  Mr. Delgado-Rucci, please
 6    proceed.
 7                        EXAMINATION
 8    BY MR. DELGADO-RUCCI:
 9    Q.   Mr. Spira, Mr. Melendez was convicted of what?
10    A.   Voluntary manslaughter and use of a firearm.
11    Q.   And that occurred before Baca I?
12    A.   Yes.  I believe if memory serves me correctly, the plea
13    was entered before Baca I.
14    Q.   There was a plea is what you're referring to.  He
15    entered into a guilty plea for voluntary manslaughter in a
16    separate case?
17    A.   Yes.
18    Q.   Was that the Gomez case?
19    A.   I believe, Gomez, yes.  Mario Gomez.
20    Q.   And that's the Gomez case that's mentioned in the
21    sentencing hearing 1998 where he went from 16 years and he
22    was asking for a reduction of two years to 14?
23    A.   Well, I think by the time we got to the sentencing
24    hearing, we had already -- we, the office, the Riverside
25    office, had already agreed to the two-year reduction for the
```

```
 1   information that Mr. Melendez had provided in connection with
 2   the Mario Gomez case.
 3   Q.   So 16 to 14 was based on the Mario Gomez case?
 4   A.   Yes.
 5   Q.   And the sentencing hearing in 1998, that's after Baca I?
 6   A.   I believe it was after Baca I.
 7   Q.   And Melendez testified in Baca I and provided some
 8   information against Mr. Baca?
 9   A.   That's my understanding, yes.
10   Q.   And then we have sentencing hearing in February of 1998;
11   correct?
12   A.   Yes.
13   Q.   And at the sentencing hearing, opposing counsel was
14   Mr. Guleserian?
15   A.   Guleserian.
16   Q.   Guleserian.  My mistake.  And Mr. Guleserian was
17   requesting what from the court at this hearing?  Do you know?
18   A.   He was requesting from the court a further what he
19   characterized I believe as a further equitable reduction in
20   the sentence.
21   Q.   And why was he requesting that reduction?  Do you know
22   why Mr. Guleserian would request that?
23   A.   I think there were a number of reasons that were both on
24   and off the record.  The reasons that were on the record was
25   due to Mr. Melendez's providing information to law
```

```
 1    enforcement on a number of different cases.

 2    Q.    Other than Baca?

 3    A.    Yes, other than Baca.

 4    Q.    Okay.  So when Mr. Guleserian is speaking at the hearing

 5    and I'm on page 4 of the sentencing transcript beginning at

 6    line 15.  This is Mr. Guleserian stating.  "I spoke to

 7    Mr. Spira about that and Mr. Spira said that his office in

 8    Riverside would not make any recommendations based on his

 9    performance in Indio."

10            Do you know what he was referring to when he says

11    in Indio?

12    A.    That I believe would be to the Baca case.

13    Q.    That was the Baca case.  So that you would not be making

14    a recommendation in terms of a downward departure from the

15    14 years based on his performance in Indio?

16    A.    That is correct.

17    Q.    And Mr. Guleserian knew this, but he was requesting that

18    the court do something instead?

19    A.    Yes.

20    Q.    Okay.  And then beginning on line 22 on the same page,

21    page 4, Mr. Guleserian says, Now, what's happened is that the

22    office in Indio doesn't want to make a recommendation because

23    the case, the Baca case was a -- is a case that is probably

24    going to be appealed and I think there is an appeal that's

25    present now.  And the appeal is going to be based on the
```

1   witness, the testimony from my client.  And they feel that

2   they would compromise, it would compromise their case if they

3   made a recommendation."

4          So Indio you were not going to give a

5   recommendation to lower it from 14 based on his testimony in

6   Baca I?

7   A.   That is correct.

8   Q.   Indio was not going to make a recommendation based on

9   his testimony in Baca I because it was on appeal and they

10  didn't want to jeopardize their case; is that correct?

11  A.   That was my understanding, yes.

12  Q.   Okay.  So we're here at this sentencing hearing, who was

13  requesting the lowering down from 14 years then?

14  A.   Mr. Guleserian.

15  Q.   And was the trial court aware that it had no authority

16  to do so on its own?

17  A.   I believe the trial court indicated that.

18  Q.   Okay.  And you had indicated that you had no authority

19  to lower it down and that Indio itself would also not lower

20  it down?

21  A.   That was my understanding.  Our office, the Riverside

22  District Attorney's Office would not lower it.

23  Q.   So there was no actual deal to lower this based on his

24  testimony in Baca I.  It was simply Mr. Guleserian trying to

25  seek some type of downward departure?

1  A.    Yes.

2  Q.    Okay.  Moving on to page 14 of the same transcript

3  looking at line 26.  This is you speaking.  "It would also be

4  important to add that I do have in my possession a transcript

5  which I requested of Mr. Melendez's testimony in the Baca

6  case in Indio."

7          When you are referring to the transcript of

8  Mr. Melendez, you are referring to his testimony in Baca I?

9  A.    Presumably, that's what I'm referring to.

10 Q.    And contained within that transcript is a representation

11 by Paul Vinegrad to the court that spells out his

12 understanding of the arrangement with Mr. Melendez in the

13 same fashion I have outlined it to the court.  So the

14 representation you made to the sentencing court is that you

15 would not make a -- you would not go to a downward departure

16 based on Melendez's testimony in Baca I?

17 A.    That's correct.

18 Q.    And that Vinegrad also would not be going to make a

19 recommendation based on Melendez's testimony in Baca I

20 because in your mind there was no deal?

21 A.    Correct.

22 Q.    And you also had no authority to do so; correct?

23 A.    That's also correct.

24 Q.    And so we were here based on equities of this case

25 because Mr. Guleserian was seeking some type of reward for

1    Melendez's testimony in Baca I, if you know?

2    A.    I think that was part of it, but I don't think that was

3    all of it.

4    Q.    When you say you don't think that's all of it, what do

5    you mean, if you recall?

6    A.    I believe that Mr. Guleserian also mentioned in passing

7    that Mr. Melendez was providing information concerning other

8    crimes both unrelated to Mr. Baca and unrelated to the Mario

9    Gomez case.

10   Q.    And you're telling us that there were other instances in

11   which Mr. Melendez is providing information?

12   A.    I was informed that there were other instances in which

13   Mr. Melendez was providing information.

14   Q.    Okay.  And looking at pages 2 to 3 on the same

15   transcript.  In fact we have Mr. Guleserian saying the

16   following starting at line 27.

17        THE COURT:  You've got to slow down a little,

18   Counsel.  The court reporter is going to throw something at

19   one of us.

20        MR. DELGADO-RUCCI:  I apologize to the Court.  I'm

21   from New Jersey.  We tend to go faster and faster and faster

22   after a while.

23        THE COURT:  I'm not gonna cut you off.

24        MR. DELGADO-RUCCI:  No, just yell at me,

25   Your Honor.  I tend to think well, I'm speaking at a normal

1  rate.  I don't understand why everyone else is having

2  problems.

3         Looking at line 27, Mr. Guleserian says, "While

4  that investigation" -- which he is referring to the Gomez

5  investigation that was going on -- "my client got involved in

6  another investigation, several other investigations.  One of

7  them had to do with a Deputy Sheriff who was bringing in

8  drugs to the jail and who was ultimately terminated and

9  prosecuted for that crime.

10  Q.   Were you aware of that other case?  Not specifically

11  were you intimately aware of it, but were you aware of this

12  other case?

13  A.   At some point I became aware of it.  I don't recall if

14  it was Mr. Guleserian who told me about it first or I learned

15  from other sources about it.

16  Q.   So Mr. Melendez was seeking a reduction based not only

17  on Gomez, which is the one you handled, but also on other

18  cases?

19  A.   Yes.  As I said, I think that the bigger picture was

20  there were other reasons that Mr. Guleserian was asking for

21  an equitable reduction.

22  Q.   Did you ever believe that there was agreement between

23  yourself or your office and the other party or the trial

24  court for a reduction in this case at this sentencing

25  hearing?

1    A.   I did not believe that there was such an agreement.

2    Q.   And if there were such agreement as found by this

3    California Court of Appeal which basically said that you

4    conflated two distinct hearings into one, that you were

5    incorrect at that time?

6    A.   I -- I'm not going to quibble whether there were

7    inaccuracies, but I did not believe that there was any deal

8    with the court between my office and the court to further

9    reduce Mr. Melendez's sentence.

10   Q.   Okay.  Now, let's assume the following.  The California

11   Court of Appeal found that your testimony in Melendez -- I'm

12   sorry.  See, here I go again.

13        The California Court of Appeal found that in Baca

14   II, your testimony was not correct because you had testified

15   that the reduction from 14 years to 11 years was based on

16   credits and that the reduction from 11 years to 10 years was

17   also based on credits.  When in fact the California Court of

18   Appeal construed the February hearing as a wink and nod

19   agreement between your office and the trial court.

20   A.   Here it gets a little bit more complex and this is based

21   on my recollection.  And as I said, I am not perfect and one

22   of the things that went wrong from the Melendez case out of

23   the gate is that --

24   Q.   Excuse me.  When you say Melendez case, are you

25   referring to Gomez?

1    A.    I'm referring to Gomez.

2    Q.    Thank you.

3    A.    Sorry.

4    Q.    That's all right.

5    A.    The prosecution of Mr. Melendez in connection with the

6    death of Mario Gomez.  When the plea deal for the voluntary

7    manslaughter upper term and upper term use of firearm was

8    entered into which was staffed by my office, we were under

9    two misapprehensions me, myself, my office, Mr. Guleserian at

10   the time and the court.  We did not realize that --

11   Q.    Excuse me.  Let me interrupt.  I hate to be very picky,

12   but since there is Baca I, Baca II, and Gomez, I need you

13   state for court whether it's Gomez court, Baca I court or

14   Baca II court.

15   A.    The Gomez court.

16   Q.    Thank you.

17   A.    Sorry.  We had not realized that there was urgency

18   legislation that had been enacted that had already taken

19   effect before the Gomez homicide, if I recall correctly, took

20   place in December.

21   Q.    Of what year?

22   A.    I believe it was 1994.  And there was urgency

23   legislation that was implemented in September and November of

24   1994 that changed the punishments for use of a firearm and

25   changed the credit calculations for violent felonies.  And at

1     the time the plea agreement was entered into, we believed

2     that the upper term for use of a firearm was five years.  And

3     at the time that plea agreement was entered into we believed

4     that Mr. Melendez would receive one-for-one good time

5     credits, 50 percent good time credits in state prison as

6     opposed to the 80 percent minimum that would have to be

7     served for violent felonies under the new legislation which

8     had already taken effect.

9           So we were all working under this misapprehension,

10    the belief that with a 16-year term, Mr. Melendez would in

11    fact be released from custody roughly speaking after serving

12    roughly eight years in state prison.  Assuming good time

13    credits were earned.  And that just became kind of an ongoing

14    matter of contention.

15          Once we learned that we were wrong, in the way we

16    were calculating things.  So that was always an undercurrent

17    and even though that was not explicitly discussed in the

18    sentencing hearing, the February '98 sentencing hearing, that

19    was also a matter that Mr. Guleserian had been complaining

20    about so to speak that it wasn't fair what was happening to

21    his client.

22    Q.   So what you're saying is he received a sentence of 16

23    years.  The understanding was he would be out in eight based

24    on 50 percent credit, but since California law changed so he

25    had to serve 80 percent credit, Mr. Guleserian was not happy

```
 1    with that and wanted a downward departure to get you back to
 2    where he would be released according to the original
 3    agreement; is that correct?
 4    A.   That was one more reason that kind of entered into, you
 5    know, the complex of reasons that was being offered.  And --
 6    Q.   So let me ask you looking at page 30 of the reporter's
 7    transcript of the sentencing hearing so beginning at line 8,
 8    this is the court, the Gomez court resentencing.  The court
 9    says, "After listening to at least all of the evidence that
10    was presented to the court and to some extent trying to look
11    at the equities of the whole thing, and with the
12    understanding that the court is not in any way saying that
13    the people made any particular representations or promises in
14    the Indio case and I so find, I still think that the court
15    since it's being asked to look from the standpoint of a
16    downward departure does in somewhat look at the overall
17    occurrence here and what had occurred."
18              Do you see that?
19    A.   I'm sorry.
20    Q.   Page 30 beginning at line 8.  I won't read it again.
21    Let me know when you have read it.  Do you know what the
22    trial court meant by look at the equities of the whole thing?
23    Well, let me rephrase.  What do you think the trial court
24    meant?
25    A.   I -- I thought one of the things that the trial court
```

```
1    was taking into account was the previous screw up and I'll

2    call it that, that all of us had in terms of how good time

3    credits were being calculated.  That was my interpretation

4    and it probably means that I'm engaging in some mind reading

5    on the part of the court, but it was my interpretation that

6    one of the equities that the court was looking at was the

7    problem with the credit calculations.

8    Q.   Okay.  Let's move on to Baca II.  Okay.  We have a --

9    were you asked by anyone to bring in your file on Melendez to

10   Baca II or rather, yes, from Melendez to Baca II?  Do you

11   recall?

12   A.   I don't have a specific recollection, but that would

13   have been my practice and I assume that that was the case.

14   Q.   And your practice encompasses having an open file

15   policy?

16   A.   Yes.

17   Q.   What does that mean to you?

18   A.   That any of the investigative materials or the reports

19   or anything that's been prepared in connection with the

20   investigation of a case are available to counsel to look at.

21   Q.   So would counsel's only manner of obtaining this be

22   simply go to you and you physically look into the file or

23   would you permit them or anyone from their office to look at

24   that file?

25   A.   If they sent an investigator to look at my file, the
```

```
 1    investigator would access to it.  If they --
 2    Q.   When you say access, what do you specifically mean?
 3    A.   The file would be physically present and the person
 4    whether it be the investigator or defense attorney could go
 5    through the file, physically go through the file.
 6    Q.   It wouldn't be that you were the one looking through the
 7    file and saying no, I don't have that or yes, I have that,
 8    here you go.  They could actually physically look at the file
 9    themselves?
10    A.   Yes.
11    Q.   And that has been part of your open file policy?
12    A.   Yes.  I wouldn't presume as to what counsel or their
13    investigator would want or not want.
14    Q.   Okay.  When you -- how's your memory?  How is your
15    memory?
16    A.   Not as good as I wish it were.
17    Q.   How has your memory been?  I don't know if that's the
18    correct English.
19    A.   I would give it the same characterization.  My memory
20    has never been as good as I would like it to be.
21    Q.   So in compensating for that, is there anything that you
22    do with your cases?
23    A.   Yes.
24    Q.   To help you remember things?
25    A.   Yes.
```

```
 1    Q.    What would that be?
 2    A.    Whenever I handle a case, I try to take contemporaneous
 3    notes of what has occurred, you know, either at the time it's
 4    happening or shortly thereafter.  I would take notes and I
 5    would incorporate those notes into generally speaking into
 6    either handwritten notes in the file or I prepared and would
 7    keep on an ongoing basis what I called my trial book where I
 8    would make a computer entry into a physical document that I
 9    would keep on a running basis.
10    Q.    Okay.  Now, when did I speak to you about this case?
11    Was that last week?
12    A.    Yes, last week.
13    Q.    And did you contact me back and inform me that you had
14    some type of written notes as to Melendez?
15    A.    Yes, I did.
16    Q.    And is that something that you did in the Melendez case?
17    A.    Yes.
18          MR. DELGADO-RUCCI:  Your Honor, I have some copies
19    for both the court and opposing counsel on this.
20          THE COURT:  We'll mark them as Exhibit 1.
21          MR. DELGADO-RUCCI:  Your Honor, if I may approach?
22          THE COURT:  Please do.
23    BY MR. DELGADO-RUCCI:
24    Q.    Mr. Spira, do you have the original of that with you in
25    your possession?
```

1    A.    I would not call it the original because --

2    Q.    Well, older.

3    A.    -- it's just the printout.

4    Q.    Do you have a copy of the printout?

5    A.    I do have a copy of the printout and physically is older

6    than --

7    Q.    Older than the ones I asked for.  Can you look at the

8    printout that's dated April 7, 1998?

9    A.    Yes.

10   Q.    Okay.  That's a letter on the front; correct?

11   A.    Yes.

12   Q.    I need to flip seven pages.  They're not chronologically

13   numbered at the bottom, Your Honor.  The one I'm looking at

14   specifically says at the top Daniel Richard Melendez

15   Chronology 11-4-02.

16          THE COURT:  Any objection to these being received

17   in evidence?

18          MR. HENNESSEY:  No, Your Honor.

19          THE COURT:  Go ahead.  They're received.

20             (Exhibit 1 was admitted.)

21   BY MR. DELGADO-RUCCI:

22   Q.    Looking at the entry that says 11-5-02, RAS what does

23   that stand for?

24   A.    Robert A. Spira.

25   Q.    So you testified in Baca II retrial.  Is that Baca II?

UNITED STATES DISTRICT COURT

```
 1   A.   Yes, retrial.
 2   Q.   Looking up above that, you have this in reverse
 3   chronological order; is that correct?
 4   A.   Yes.
 5   Q.   So we have to read from the bottom and go forward up?
 6   A.   Yes.  It's in reverse chronological order.
 7   Q.   What's the next entry date?
 8   A.   11-8-02.
 9   Q.   And that entry describes what?
10   A.   Transcripts of hearing from February 20 and 22, 1996 and
11   February 8th and June 26, 2002 received from court reporter
12   Donya Wagner.
13   Q.   So you would have requested this transcript?
14   A.   Apparently, I did.
15   Q.   But you did not receive it until three days after your
16   testimony in Baca II; is that correct?
17   A.   That would appear to be the case.
18           THE COURT:  Let me see the transcript one second
19   from the sentencing, the Melendez.  Hang on one second,
20   Counsel, would you please.  This transcript and the notes
21   you're talking about 11-08-02 transcripts of hearing from
22   February 20th, oh, I see and 22, 1996.  February 8th,
23   June 26, 2002.  The transcripts in the sentencing hearing has
24   two dates.  We haven't figured out which one is the right one
25   yet.  One is February 26th of 1998.  Now, that's not any of
```

1  the dates identified under 11-8-02.  Right?  And the other is

2  from -- the next page says Friday, February 20, 1998.  Again,

3  it is the wrong year they have got there.

4          MR. DELGADO-RUCCI:  I was about to get to that.

5  Q.   Mr. Spira, your entry says 1996.  Is that a correct

6  date?

7  A.   Presumably, it is not.  It is a typo.  I mean, there

8  are, I see there are typos throughout the document.

9  Q.   So when it says 1996, what year were you actually

10 referring to or meant to refer to?

11 A.   I believe that would have been the 1998 sentencing date.

12 Q.   And the June 26, 2002, that is the second part of the

13 Melendez resentencing?

14 A.   I'm assuming that's the case.

15 Q.   So when you went to trial in Baca II, did you have the

16 transcript of the sentencing hearing of 1998 and 2002?

17 A.   It appears that --

18 Q.   Do you recall?

19 A.   It appears that I don't -- I don't recall having it or

20 not having it.  I don't believe -- I don't recall ever having

21 looked at the transcript -- transcripts before I testified.

22 Q.   Okay.  One last thing.  On the certificates, that's in

23 the sentencing hearings, they're dated May 2003; correct?

24 A.   I'm sorry.  Can you repeat that, please?

25 Q.   The certificates by the court reporters on the

1    sentencing hearing?

2    A.   That is what appears to be the case.

3    Q.   2003.  But you have no idea what the procedures are for

4    a court reporter to make an actual physical copy of a

5    transcript of a hearing?

6    A.   I do not know the court reporter's own procedures.

7    Q.   And you don't know anything about the date May 2003 as

8    to whether that was the date you ordered or that was the date

9    anyone ordered it in this case?

10   A.   I do not know.  I don't have any recollection about

11   that.

12   Q.   Okay.  Did you ever talk to Mr. Silva in Baca II about

13   the transcripts?

14   A.   I do not recall ever having a conversation with

15   Mr. Silva about the transcripts.

16   Q.   Did Mr. Silva ever approach you in Baca II and say I

17   don't have this transcript.  Where is it?  Do you recall?

18   A.   I do not recall ever having been approached by Mr. Silva

19   saying I don't have the transcripts.  I need them.  Do you

20   have them?  I don't recall any such conversations.

21   Q.   Do you recall Mr. Silva actually ever going to your

22   office and looking at your file?

23   A.   I do not recall that either.  I do not recall that

24   having happened.

25             MR. DELGADO-RUCCI:  Okay.  Thank you.

```
 1              THE COURT:  Mr. Hennessey, anything further?

 2              MR. HENNESSEY:  No, Your Honor.

 3              THE COURT:  Thank you.  I appreciate your time, I

 4    really do.  Thanks so much and good luck with the tooth.  I'm

 5    going to release the witness unless there's any objection.

 6              MR. DELGADO-RUCCI:  No objection.

 7              THE WITNESS:  I very much appreciate the Court

 8    taking me first so I could address this issue.

 9              THE COURT:  Let's bring in Mr. Silva.  And we'll

10    mark these letters Exhibit 1.  They're received into

11    evidence.

12              Mr. Silva, how are you, sir?  Come forward, sir.

13    Thanks for your patience.  Come on up here to be sworn.  I

14    know you're not used to this, but you've probably seen it

15    done enough.

16              THE CLERK:  Please raise your right hand.

17                        (Witness sworn.)

18              THE CLERK:  Please state your full name and spell

19    your last name for the record.

20              THE WITNESS:  My name is James Silva.  Last name

21    spelled S-i-l-v-a.

22              THE COURT:  And I think we'll proceed the same way

23    unless there is an objection.

24              MR. HENNESSEY:  No objection.

25
```

```
 1                          EXAMINATION
 2   BY THE COURT:
 3   Q.    All right.  Mr. Silva, there was a bombshell before you
 4   came.  I understand that you had the transcript from the
 5   sentencing at the second Baca trial; is that correct?
 6   A.    That's correct.
 7   Q.    Talk to me about it.  How did you get it?  When did you
 8   get it?
 9   A.    I probably got it when I was court appointed to
10   represent Mr. Baca.  I believe either the public defender
11   brought it over or Mr. Cabrerra brought it over.  And I don't
12   know if he was working for public defender at the time or he
13   was private counsel at the time, but he brought it over in a
14   huge box.
15   Q.    Do you have it with you?
16   A.    Yes, I do.
17   Q.    Can I take a look at it, please?
18   A.    Certainly.
19   Q.    Thanks for bringing it down.
20              THE COURT:  Do you have a copy of this, Counsel?
21              MR. DELGADO-RUCCI:  If it's the same one we're all
22   looking at.
23              THE COURT:  It's the same transcript, but it's
24   certified on a different date.  I'll make a copy of this for
25   everybody and mark it as Exhibit 2 to today's proceeding.
```

```
 1   Okay.  Well, that solves a lot of issues that we had with the
 2   case.  Let me explain to you what's been going on up to this
 3   point.  What's been going on up to this point is that the
 4   petitioner in this case, Mr. Baca has been complaining that
 5   this was not provided to defense from the government and that
 6   the government's witness Mr. Melendez and Mr. Spira testified
 7   things that weren't -- to things that were not exactly
 8   accurate when they testified in Baca's second trial.  Okay?
 9   And -- but you had this.
10   Q.   You had this transcript?
11   A.   That's correct.
12   Q.   So there is no -- and you had it when the trial began?
13   A.   That's correct.
14   Q.   So there can't be a Brady claim there for withholding
15   this evidence if you had it; right?
16   A.   Yes.
17   Q.   You know Brady probably as well as anybody; right?
18   A.   Yes, I hope so.
19   Q.   Do you still practice law?
20   A.   Yes, I do.
21   Q.   And how long have you been practicing?
22   A.   I think I'm going on my 29th, 29 years.
23   Q.   All right.  This trial, the second trial was in October
24   of 2002, eight years ago.  So you had been practicing for
25   21 years at the time?
```

```
 1    A.    Yes.
 2    Q.    And it was criminal defense work that you were doing?
 3    A.    Yes.
 4    Q.    Okay.  And tell me about this case.  When you got this
 5    case, did you see what the government's position was is that
 6    your client allegedly was involved in a murder for hire
 7    essentially; right?
 8    A.    Yes.
 9    Q.    That he was gonna murder Jack Adair and Tom Mix so that
10    Tom Adair could inherit the proceeds of his will and
11    insurance policies and they were going to split the money;
12    right?
13    A.    That's correct.
14    Q.    Okay.  From -- how much reviewing of this file have you
15    done before you came in today?
16    A.    I got a call from District Attorney Delgado, Attorney
17    General Delgado about, I don't know, it's been a couple
18    months.  I indicated to him I didn't recall the things that
19    he was asking me.  That I would check into it and get back to
20    him and I did.  I took off on vacation and so I never did
21    look up the file to see if I still had it or if there was any
22    documents still there.
23          Then the next thing I think I got another call from
24    Attorney General Delgado.  He called again and left a message
25    and it just happened I got a message from Attorney Hennessey.
```

1    Back up.  I did get a call from your clerk indicating that

2    they want to know if I would be available either by phone or

3    to be here, but that he was -- more than likely he would like

4    me to be here personally so I said no, I'll be here.

5            I did return the calls.  At that time, I went to

6    look for the file and see if the appellate attorney, and I

7    don't know who it was at the time, had come and picked up the

8    file and the box, whether or not he picked up everything.

9    Evidently, he didn't and I looked through the -- another box

10   that was there.  That document was in that box.  So I

11   reviewed that document, the sentencing for Mr. Melendez dated

12   I believe back in '98.  I then returned a call to

13   Mr. Hennessey, and then I returned the call to Mr. Delgado.

14   And that's the extent of my review of this case.

15   Q.   Okay.  Can you think back, I'm sure you were doing a lot

16   of cases when you did this one.  When you think back to this

17   case, do you remember this case?

18   A.   Yes, I do.

19   Q.   Do you remember approaching trial preparation for the

20   trial that occurred in October of 2002.  Do you remember that

21   time?

22   A.   Yes.

23   Q.   All right.  Now, their case was essentially, and I'm

24   gonna summarize it.  You correct me if my memory is wrong.

25   That the police showed up about 20 minutes after the shooting

1    and Mr. Jack Adair told the police that Baca had shot him.

2    And there's some question about how clear it was and how well

3    he said it and whether it was understandable, but that was

4    the evidence.  That Jack Adair told the police on the day of

5    the shooting that your client had shot him; correct?

6    A.   That's correct.

7    Q.   Now, the other evidence that I think was critical in

8    this case was there was evidence from a jailhouse informant

9    named Melendez.  And Melendez said that your client had

10   confessed to the crime while they were housed together at

11   county jail for about three days in August right after the

12   crime; correct?

13   A.   I don't recall the dates, but yes, he indicated that he

14   had talked to my client, Mr. Baca.

15   Q.   All right.  Now, at the trial, Mr. Spira testified that

16   Mr. Melendez did not receive any credit for testifying in the

17   Baca case and Mr. Melendez testified that he had not received

18   any credit for testifying in the Baca case.

19        Having read the transcript from Mr. Melendez's

20   sentencing in 1998, did you see that there was -- that that

21   arguably was not accurate to what those two gentlemen were

22   testifying about?

23   A.   When I prepared myself to cross-examine Mr. Melendez, I

24   knew that was going to be an issue whether or not he was a

25   snitch that was doing it for a purpose of leniency regarding

1  his pending case and sentencing or anything.  Whether or not

2  he wanted something quid pro quo for his testimony.  I

3  remember talking with the District Attorney Mr. Vinegrad and

4  he explained exactly what it was.  I reviewed the transcript

5  and it was, as he explained it to me, that he did not give

6  any compensation or any leniency to Mr. Baca for his

7  testimony.

8          However, there was a case out of Riverside where he

9  had worked out some kind of compensation that he would

10  receive.  I think that he would have the ability to go back

11  to the judge and see if he could get his sentenced lowered

12  and there was something about a letter regarding some kind of

13  housing and that was the extent.  Basically, indicated he was

14  not given any type of quid pro quo for his testimony.

15  Q.    Okay.  And -- but that's inconsistent with the

16  transcript.  Would you agree?  You didn't think so?

17  A.    No, I didn't really think so.  The way he explained it

18  and the way it came down.  What I gleaned from the transcript

19  was that when Mr. Melendez went for sentencing, he was

20  basically being sentenced pursuant to some kind of negotiated

21  disposition where he could come down a couple of years or

22  something like that, some kind of adjustment.

23  Q.    Right.  He pleaded to voluntary manslaughter so he got

24  11 upper term plus five for the gun.  He got 16 years.  He

25  testified in his own case or he cooperated in the murder of

```
1    Gomez in his own case and the government agreed to drop him
2    down to 14 and that was the agreement.
3            Then he went in for sentencing and his counsel
4    asked the court to give him credit for Baca and the
5    government said we can't because we've already agreed, we
6    already testified at the first trial we wouldn't do it and
7    it's up on appeal.  But if you give him a reduced sentence,
8    we won't appeal your decision.  Okay?  And then the judge
9    gave him 11 years.  Do you remember that?
10   A.   Yes.  In reading that, I felt it was more that the DA
11   was not giving him any negotiated disposition as to Baca, but
12   however, when they went to sentence Mr. Melendez, I think the
13   court was indicating, well, you know, the equities here seem
14   to go that I should do something.  And the judge didn't
15   really know what to do at that time, but ultimately he
16   reduced it I think substantially from 16 to 11 as I recall.
17   Q.   Yeah, you're right.  When did you first get assigned to
18   this case?  It was tried in October of '02.  When did you
19   first get that box, get assigned and get that box from the
20   public defender?
21   A.   Probably, you know, I can't really say, but it had to be
22   at least two years before the trial.
23   Q.   Okay.  So maybe 2000, somewhere around 2000?
24   A.   Maybe.
25   Q.   I'm going to read something to you from the transcript
```

```
 1   and you can take a look at it.  I'll show it to you when

 2   you're done.  But this is the transcript from your trial I

 3   imagine you probably haven't read that.  And I'm gonna read

 4   your part.  "There was a discussion prior to trial," now this

 5   is on October 28th of 2002.  I think.  I'm going to go and

 6   get the right date.  I'm sorry.  I think it's October 25th of

 7   2002.  The court reporter has written November 25th, but it's

 8   clear it was before trial.  And there was discussions between

 9   you and the court and Mr. Vinegrad about the trial.

10           And if I turn, Counsel, to page 13 of that

11   transcript, there is a discussion here because you have asked

12   Mr. Vinegrad to turn over this sentencing transcript and you

13   have told him you have never seen it?

14   A.   Right.

15   Q.   And they haven't produced it?

16   A.   Right.

17   Q.   And what the conflict is here, maybe we can resolve it,

18   maybe we can't, is that in effect you had this in your

19   possession for two years?

20   A.   That's correct.

21   Q.   Do you know what I'm talking about?

22   A.   Yes.

23   Q.   What was going on?

24   A.   What happened is I had two boxes.  I had boxes from the

25   public defender in which the transcript was in and all of the
```

1    material that I was given of the D.A. Then I had all the

2    material I was given from the D A.  It was sitting in the

3    other box regarding my discovery requests.  And so that's

4    what happened.

5           As I was preparing, I went through the prior

6    materials, kept them in that box.  I went through my

7    materials and kept them in that box.  And somewhere along the

8    line, I just did not recall, because it took so long to go to

9    trial that when Mr. Melendez came up, I was asking -- we were

10   talking about transcripts and I didn't really find it at that

11   time.

12   Q.   So you didn't remember in October 25th of '02 that maybe

13   as long as two years ago, you had actually in a big box of

14   other materials from the PD actually received the transcript?

15   A.   That's correct.

16   Q.   And now, but this is right up on the eve of trial now?

17   A.   Right.

18   Q.   And so I suppose because you asked for it another day,

19   too soon after that.  A couple days after October 29th, I

20   think Tuesday, October 29th you asked for it and that's at

21   the reporter's transcript pages 16 and 17.

22          "MR. SILVA:  There wasn't an issue on the Melendez

23   testimony.  They are going to provide me with a transcript.

24          "MR. VINEGRAD:  I'm in the process of that.

25   Mr. Melendez is one of our last witnesses.  We won't get him

```
 1    for another week."
 2              THE WITNESS:  That's correct.
 3    BY THE COURT:
 4    Q.   So now this is the day of trial.  I think the day trial
 5    begins.  You had not at that time realized you had the
 6    Melendez transcript?
 7    A.   That's correct.  It wasn't until that day that I said,
 8    you know, we had met and talked about the transcript in the
 9    hallway somewhere.  I recall that.  And I said, you know, it
10    sounds so familiar, but don't know what you're talking about.
11    I'll go back and I'll check again.  Otherwise, just have the
12    transcript ready for me and I'll go pick it up in your
13    office.
14    Q.   Okay.
15    A.   Because he indicated he would provide me with a copy of
16    the transcript.
17    Q.   And then you found it?
18    A.   Then I found it.
19    Q.   And did you later communicate to Mr. Vinegrad that you
20    had it?
21    A.   I did not.  For some reason, we just didn't talk about
22    it.  As I said, I'm not gonna call -- I'm not gonna
23    cross-examine as to Mr. Melendez as to whether or not he got
24    any --
25    Q.   Any deal in your case.
```

```
 1   A.   Any deal in my case.  Because I felt that it was really

 2   the judge in that case that gave Mr. Melendez -- I guess he

 3   exercised discretion and gave him a lighter sentence than

 4   what he had originally said he was going to do.

 5   Q.   So that would have been a tactical decision on your

 6   part.  That's the way you're going to approach

 7   cross-examination?

 8   A.   That's correct.  Because I was going to put Mr. Baca on

 9   as to the decisions.  I mean, the where or when he got this

10   information from Mr. Baca.  Mr. Baca -- I don't know if I

11   have attorney/client waivers yet.

12   Q.   Okay.  You don't have to tell me the details, but you

13   were gonna say something about Mr. Baca in his defense where

14   he was at the time of the murder or why he wasn't able to

15   Melendez something.  Is that what it was?

16   A.   Correct.

17   Q.   Okay.  According to the transcript, you called Mr. Baca

18   as a witness and Mr. Bettancourt.  Do you remember that?

19           THE COURT REPORTER:  I'm sorry, Judge.  Mr. --

20           THE COURT:  Bettancourt B-e-t-t-a-n-c-o-u-r-t.

21           THE WITNESS:  That's correct.

22   BY THE COURT:

23   Q.   And do you remember that or are you just thinking I want

24   to try and trick you?

25   A.   No.
```

```
 1    Q.   I'm gonna show you the transcript and it's the master
 2    chronological witness index for the defense Johnny Baca and
 3    Edward Betancourt.   And for the court reporter, I spelled
 4    Betancourt wrong.   There is one T in Betancourt.
 5              Okay.   So you called two witnesses.   Why not any
 6    other witnesses?
 7    A.   I felt that those were the only two witnesses that were
 8    that could support our defense at the time.
 9    Q.   All right.   Let me talk to you about it.   Did you read
10    the appellate decision from the first trial, after the first
11    trial before you tried the case?
12    A.   I did.
13    Q.   In the appellate court decision after the first trial,
14    the court points out that there were three witnesses.   The
15    defense had three witnesses who were going to impeach
16    Melendez.   And I guess essentially say that he could not have
17    gotten the story from Mr. Baca.   But because the defense, the
18    first defense counsel, not you, failed to disclose early
19    enough and provide discovery the judge blocked them.   Who
20    were those witnesses and why didn't you call them?
21    A.   I can't remember that.   That's why I didn't.
22    Q.   You can't remember what?
23    A.   Those witnesses or why I did not call them.
24    Q.   But did you notice that in that first decision that the
25    court had pointed out those witnesses were there?
```

1    A.    Honestly, I can't remember that part of the decision.

2    Q.    I'm going to read from page 4 of the concurrence in that

3    first decision.  "Defendant also contends that the prosecutor

4    committed misconduct in closing argument when he emphasized

5    that the defense had not produced any witnesses to impeach

6    the testimony of the jailhouse informant Mr. Melendez.  At

7    the time the prosecutor knew that such evidence existed, but

8    that three witnesses had been excluded by the trial court

9    because of late discovery and alleged time limitations in the

10   conduct of the trial."

11          Did you investigate who those three witnesses were

12   and make a tactical decision that you would not call them in

13   your case?

14   A.    I did not.

15   Q.    Did you call the attorney that tried the case the first

16   time and speak with him or her about who these three

17   witnesses were?

18   A.    I did not.

19   Q.    In the first case, the defense was that it was a lover's

20   quarrel Mr. Adair and Mr. Mix and Mr. Adair was depressed and

21   he had some issues.  And that he shot, that they shot each

22   other.  One shot the other, and then committed suicide.  Do

23   you remember that?

24   A.    Yes.

25   Q.    In that case they called Jack Adair's psychiatrist and

```
 1    another psychiatrist who had treated Jack Adair and they both
 2    testified that Mr. Adair was depressed, histrionic, suicidal
 3    and had tried to kill himself.
 4              Why didn't you call those psychiatrists in the
 5    second trial to develop your defense that was this was --
 6    that was the same defense you used in the second trial;
 7    right?  That Jack Adair had shot Tom Mix and had tried to
 8    kill himself or vice versa?
 9    A.   Somewhat, yes.
10    Q.   Why didn't you call those psychiatrists to bolster that
11    defense?
12    A.   I don't think, in my opinion, I don't think there was
13    sufficient evidence to say that there was a lover's quarrel
14    and there was a murder suicide because of certain things that
15    were said to me.  And so I don't think it was a defense that
16    I could honestly pursue.
17    Q.   All right.  In the first trial, the defense established
18    that Jack Adair's blood alcohol level was .25 at the time of
19    the shooting.  Why not introduce that evidence in the second
20    trial?
21    A.   I don't recall if I made a motion to introduce that or
22    not.  I can't recall.
23    Q.   I could be wrong.  I didn't see it in that transcript.
24    I did read the whole transcript.  Some of it I read a while
25    ago, but I didn't see it in there.
```

```
1    A.    I may not have, but basically my position would have

2    been that the intoxication of the victim was really not a

3    defense or issue that I could present.

4    Q.    But if you were going to argue that, you know, that this

5    was -- that one of the other shot -- if they shot each other?

6    A.    Right.

7    Q.    That intoxication might play into that.  Am I right?

8    A.    That's correct, but I didn't argue that.

9              THE COURT:  All right.

10             Mr. Hennessey, you want to follow-up on anything,

11   please.

12             MR. HENNESSEY:  Briefly, Your Honor.  Thank you.

13                          EXAMINATION

14   BY MR. HENNESSEY:

15   Q.    The defense attorney in Baca I was Peter Cabrerra; is

16   that correct?

17   A.    That's correct.

18   Q.    And you've known Mr. Cabrerra for a long time, haven't

19   you?

20   A.    I have.

21   Q.    Both professionally and personally?

22   A.    That's correct.

23   Q.    And was he actually with the Public Defender's Office at

24   the time of the first trial?

25   A.    I believe he was.  I may be wrong, but I know that he
```

```
 1   was working with the public defender at that time and it may
 2   have been that when he left, he took that case with him.  I
 3   don't really know, but I think he was with the public
 4   defender at the time.
 5   Q.   The sentencing on Melendez followed the first Baca trial
 6   where defense counsel was Mr. Cabrerra; is that correct?
 7   A.   Yes.
 8   Q.   All right.  So if you got your files from Mr. Cabrerra
 9   or the Public Defender's Office, can you explain how a
10   transcript of Melendez's sentencing that was after the trial
11   was over would have ended up in that box?
12   A.   I don't know.  It's -- I don't know how it ended up in
13   that box, but it was there when I received it.  I did
14   bring -- it was attached to the transcript a discovery
15   request form that was signed I believe by Mr. Vinegrad and
16   Attorney Cabrerra.  His name is on that request and the date
17   of 4-16-98.
18   Q.   So that would have been actually after the first trial
19   was completed?
20   A.   That's correct.
21   Q.   Now, I'm reading from the Court of Appeals opinion in
22   Baca II, the opinion of December 2nd, 2004.
23          Would you agree with the court where the Appellate
24   Court concluded that "By conflating two separate events,"
25   those events being the original Melendez sentencing where he
```

```
1    had his sentence reduced from 14 years to 11 years, and then

2    the hearing some four years later in February 2002 where

3    there were supposedly quote "credit adjustments made."

4            "By conflating these separate events, Spira managed

5    to conceal the only facts that were favorable to the defense

6    at the second trial.  That the trial court unilaterally

7    reduced the informant's plea bargain as a reward for

8    testifying against Mr. Baca, your client."

9            Now, would you agree that's a fair statement of the

10   state of the testimony at the time of the second Baca trial,

11   that being the testimony of Mr. Spira and Mr. Melendez?

12   A.   I'll agree with that.

13   Q.   All right.  So in other words, it's a fair statement

14   that the court did in fact give him a three-year reduction

15   off his sentence at his request based upon his performance in

16   the first Baca trial?

17   A.   I think there was a -- it was 16 years that he was

18   sentenced with a possibility of a reduction of two years

19   after some other case that he testified to.  And then there

20   was another three, as I read the transcript, it seemed like

21   he kinda of told everybody, well, I'm willing to use my

22   discretion to make this equitable to all parties and he

23   unilaterally reduced it from 16 to 11, I believe or maybe

24   from 14 to 11.

25   Q.   Let's assume it's 14 to 11.  But would you agree that
```

1    the fair import of that transcript is that the Court of

2    Appeals suggests that the trial court unilaterally reduced

3    the informant's plea bargain as a reward for testifying

4    against defendant after assurances from the prosecution that

5    it would not seek review to enforce the terms of the

6    agreement.

7            Is that a fair -- is that your understanding what

8    that transcript said?

9    A.   That's my understanding, yes.

10           MR. HENNESSEY:  Thank you.  Nothing further,

11   Your Honor.

12           THE COURT:  Counsel.

13                         EXAMINATION

14   BY MR. DELGADO-RUCCI:

15   Q.   Mr. Silva, you said you received the transcript from the

16   public defender or Peter Cabrerra, but you don't recall who?

17   A.   I have feeling it was from the public defender, but I

18   can't recall.  It has to be one or the other.

19   Q.   Okay.  But that transcript was something you had prior

20   to Mr. Spira and Mr. Melendez testifying in Baca II?

21   A.   That's correct.  As I indicated, I had it misplaced, but

22   I had it.

23   Q.   So you had two boxes.  One from the Public Defender's

24   Office and a box from the District Attorney's Office on

25   discovery.  And the box from the DA's office, you did not see

1    the transcript which is why you were requesting it from

2    Mr. Vinegrad in Baca II?

3    A.   That's correct.

4    Q.   And then later on you discovered the transcript in the

5    public defender box?

6    A.   Well, that's correct, yes.  But it's not that I

7    discovered it then.  I kinda remembered I could have placed

8    it there.

9    Q.   Okay.  So you recalled at some time that there's a box

10   because it sounded familiar to you when you spoke to

11   Mr. Vinegrad?

12   A.   That's correct.

13   Q.   Okay.  And so when you looked at that sentencing

14   transcript of 1998; is that correct?

15   A.   Yes.

16   Q.   And when you looked at it, you came of the mind that it

17   was the trial court exercising its discretion to reduce the

18   sentence.  It wasn't a negotiated plea by the DA's office?

19   A.   That's correct.

20   Q.   And so when it came time for Mr. Spira to testify in

21   Baca II, your reason for not asking him about this reduction

22   was because it was your belief at that time that the DA had

23   not entered into a negotiated plea, but rather it was the

24   trial court who had unilaterally reduced the sentence?

25   A.   That's correct.  And that's, I believe, pretty explicit

```
 1   in the transcript.  In fact the DA was telling the court
 2   we're not entering -- we never offered him anything.  We did
 3   not come to agreement with him to testify in the Baca case.
 4   Q.   Okay.  And you chose not to cross-examine Mr. Spira on
 5   that point; correct?
 6   A.   That's correct.
 7   Q.   And you chose not to cross-examine Mr. Melendez on that
 8   point?
 9   A.   That's correct.
10   Q.   Is there another reason why you chose not to
11   cross-examine either one of those gentlemen in Baca II?  Did
12   you have some tactical reason?
13   A.   My tactical reason is I think it would have given more
14   credibility toward the testimony of Mr. Melendez.
15   Q.   How so?
16   A.   That he was not given any -- that I think that it would
17   open the doors to the DA saying, well, isn't it true that we
18   did not give you any -- we did not make an agreement with you
19   to testify.  I think it would give Mr. Melendez's testimony
20   more credence that he was actually just testifying as a
21   citizen of the state.
22   Q.   So was it also a concern that the jury in Baca II would
23   learn that a trial judge had reduced his sentence
24   unilaterally?
25   A.   That's correct.  That it gives it more credence that
```

```
 1    they felt he was doing a good job.
 2    Q.    Okay.  Did you and I speak by telephone yesterday?
 3    A.    Yes, we did.
 4    Q.    Did you mention another reason to me as to why, if you
 5    recall, why you did not want to get into that area?
 6    A.    I think I indicated that it would open the door to allow
 7    more testimony regarding the testimony of Mr. Melendez.
 8    Q.    When you mean that in other cases, that it would open
 9    the door to show that Mr. Melendez was helping in other cases
10    as well?
11    A.    That's correct.
12    Q.    And you didn't want that in front of the jury?
13    A.    Correct.
14    Q.    So that was a tactical decision on your part not to get
15    into that?
16    A.    Yes.
17    Q.    Would there also have been a tactical decision on your
18    part not to raise that issue because then the jury would find
19    out there was a Baca I trial?
20    A.    Well, that's part of it, but I thought it would be more
21    damaging than probative.
22    Q.    Okay.  Now, there were other witnesses that were called
23    in Baca I; correct?
24    A.    Yes.
25    Q.    In fact there were three and you chose not to call them.
```

1    Was that a tactical decision?

2    A.   Um, I don't know if that was as tactical as . . .

3    Q.   Did you think that those witnesses had credibility

4    problems?

5    A.   Yes, they had credibility problems, but I still didn't

6    feel that they would be very helpful toward Mr. Baca.

7    Q.   Okay.  So one of the reasons was you did not feel their

8    testimony would have been helpful to Mr. Baca; correct?

9    A.   That's part of it, certainly.

10   Q.   And you had been practicing for 21 years at that time?

11   A.   Approximately 21 years.

12   Q.   So you would not necessarily have conducted the trial

13   the same way Mr. Cabrerra had conducted the trial?

14   A.   No.  I saw a lot of factual evidentiary problems with

15   presenting that type of defense.

16   Q.   Okay.  Were you afraid that if you called those other

17   witnesses that the DA would be able to call other witnesses

18   to show how cooperative Melendez had been?

19   A.   Well, that certainly open the door because I don't know

20   what the DA would --

21   Q.   Because those witnesses would have attacked Melendez --

22             THE COURT:  Hang on a second.  You're stepping on

23   each other.

24             MR. DELGADO-RUCCI:  I'm sorry.  My fault.

25             THE WITNESS:  That would certainly open the door

```
 1    for the district attorney to bring in other witnesses.
 2    BY MR. DELGADO-RUCCI:
 3    Q.    Because these three other witnesses would have tried to
 4    attack the credibility of Melendez; correct?
 5    A.    It certainly would.
 6    Q.    And the DA -- it was your concern that there was a
 7    possibility then that other witnesses from the DA's Office
 8    would come in to bolster Mr. Melendez's credibility?
 9    A.    Well, that's always possible, yes.
10    Q.    You recalled in the -- if you recall, do you recall
11    there being a suicide defense in the first trial?
12    A.    Yes.
13    Q.    And you stated that there just simply wasn't enough
14    evidence to you to merit raising such a defense?
15    A.    That's correct.
16    Q.    So you were selecting a specific type of defense in your
17    case?
18    A.    Yes.
19    Q.    And in your case wasn't your defense simply that he was
20    not the shooter?
21    A.    That's correct.
22    Q.    So suicide wouldn't have entered in because that would
23    not have been two contrary defenses?
24    A.    Very contradictory.
25    Q.    And would that also have been contradictory to Adair
```

1  telling the police officers Baca, Baca, Baca?

2  A.    Correct.

3  Q.    So you found that to be rather problematic?

4  A.    Exactly.

5  Q.    And did you find any suicide notes to support a suicide

6  defense?

7  A.    No.

8  Q.    And without going into attorney/client privilege, did

9  you find any other evidence that would have supported his

10  suicide defense?  Just yes or no on that.

11  A.    That it would not support suicide?

12  Q.    No.  Did you find any other evidence, without going into

13  attorney/client privilege, did you find any other evidence

14  that would have supported a suicide defense?

15  A.    No, I did not.

16  Q.    Okay.  Now, you also heard that there was testimony

17  involving the alcohol level of Mr. Baca in Baca I?

18  A.    Yes.

19  Q.    Again, what was your defense in Baca II?  That he simply

20  was not the shooter?

21  A.    Correct.

22  Q.    Would that have been inconsistent with your defense to

23  present alcohol levels of Mr. Baca?

24  A.    Well, it's inconsistent, but I don't think it's

25  probative of any defense I was presenting.

1          THE COURT:  Well, how about the fact that -- you

2     wanted to claim that he either didn't say or was mistaken

3     when he told the police Baca; correct?

4          THE WITNESS:  Well, I did want to indicate that,

5     but it just didn't come out that way.

6          THE COURT:  Well, how about if you told the jury

7     that he was legally three times the legal alcohol limit when

8     he spoke to the police?  Would that have had any impact on

9     the credibility of his statement assuming it was that that

10    Baca did it?

11         THE WITNESS:  Looking back now, yes, probably.

12         THE COURT:  What about the fact that there were

13    three forest reserve officers that showed up first?  After

14    the murder happened, there's a 911 call went out and I don't

15    exactly know what their official title was, but three law

16    enforcement officers showed up at the house first and Baca

17    and Jack Adair never said to them Baca did it.  He never said

18    who did it.  You didn't call those witnesses.

19         THE WITNESS:  I did not, but they would have

20    given -- they would have supported the DA's position.

21         THE COURT:  About what?

22         THE WITNESS:  About Baca.

23         THE COURT:  How about the fact that when he called

24    911, the operator asked him, "Who shot you?"  And he said, "I

25    don't know."  He didn't say Baca.

```
 1              THE WITNESS:  That's correct.
 2              THE COURT:  And that would have supported your
 3   theory as well; correct?
 4              THE WITNESS:  I think I did go through that in the
 5   trial.
 6              THE COURT:  Please go ahead, Counsel.
 7              MR. HENNESSEY:  Your Honor, I did want to clarify.
 8   There was a reference to the blood alcohol level .25.  I
 9   believe that was Mr. Adair we were talking about rather than
10   Mr. Baca.
11              THE COURT:  You're right.  Jack Adair.  I made a
12   mistake if I misspoke.
13              MR. DELGADO-RUCCI:  That clarifies certain things
14   because your questions I wasn't following.
15              THE COURT:  You guys can object to my questions
16   when I'm doing it.  I know that's not, you know, you're
17   always wondering how that's going to look, but let's make the
18   record clear.  In the first trial it was established that the
19   victim Jack Adair his blood alcohol level was .25 at the time
20   he got shot which is in California more than three times the
21   legal limit to drive.  He was intoxicated.
22              Go ahead, Counsel.
23   BY MR. DELGADO-RUCCI:
24   Q.   Okay.  Adair wasn't there evidence presented that Adair
25   had written the name Baca with his blood and pointed to it?
```

1   A.   There was some evidence to that, yes.

2   Q.   So that would of kinda undercut any type of argument he

3   was alcoholic, he was impaired by alcohol?  Would that have

4   been a reason not to present such a defense?

5   A.   Well, there was a lot of evidence that they could have

6   presented to show that in fact Mr. Adair was coherent and was

7   responding to questions.

8   Q.   So responding appropriately to questions poised to him?

9   A.   That's correct.

10  Q.   So you made a tactical decision not to go that route

11  because you felt it wasn't worth following?

12  A.   That's correct.

13          THE COURT:  Let me interrupt for a second.  I don't

14  understand what the defense was that if Jack Adair said Baca

15  did it and you don't want to challenge or undercut that, what

16  is your defense to the victim ID'ing your client as the

17  murder?

18          THE WITNESS:  I didn't want to bring in other

19  witnesses that would say that he was very coherent.

20          THE COURT:  I understand.  But what was your theory

21  going into that trial how do you respond to the victim ID'ing

22  your client as the murderer?

23          THE WITNESS:  Our position was that Mr. Baca was

24  there, but that he did not do any of the shooting.  He was

25  incorrect as to that.

1          THE COURT:  Okay.  That Mr. Adair made a mistake

2    when he said that Baca shot me?

3          THE WITNESS:  That's correct.

4          THE COURT:  All right.  And so if you're trying to

5    show that he made a mistake and they're showing that he is

6    clear and he is thinking right and things like that and when

7    he went to the hospital, he responded to concern neurological

8    exams, don't you want to undercut that and say but he was

9    three times the legal limit?  I mean among other things, it

10   shows he could have made a mistake, but also if he's

11   appropriately responding to neurological exams after being

12   shot and being drunk, it kind of undermines the validity of

13   the neurological exams, doesn't it?

14         THE WITNESS:  But the witnesses that I interviewed

15   were very steadfast that he was coherent, that he was

16   responding.  So whether or not the alcohol affected

17   Mr. Adair, I didn't see that was a viable defense at that

18   time.

19         THE COURT:  Thank you.  Please go ahead, Counsel.

20   BY MR. DELGADO-RUCCI:

21   Q.   In fact the .25 is three times the legal limit for

22   driving; correct?

23   A.   That's correct.

24   Q.   And this occurred in a house so we weren't dealing with

25   the issue of driving.  So in your mind was the alcohol that

1    much less important?

2    A.    Well, of course.   I think Mr. Adair was an individual

3    that did in fact drink heavily.

4    Q.    Okay.   And so you found also that there were other

5    witness that provided some evidence to you that such a

6    defense would not be very viable?

7    A.    Correct.

8    Q.    And that would have been a tactical decision on your

9    part?

10   A.    Yes.

11          MR. DELGADO-RUCCI:   Okay.   Nothing further.

12          THE COURT:   Thank you.   Mr. Hennessey, any

13   follow-up?

14          MR. HENNESSEY:   Yes, Your Honor.   Just a few

15   questions.

16          THE COURT:   Sure.

17                      EXAMINATION

18   BY MR. HENNESSEY:

19   Q.    Mr. Silva, you were aware from reading the proceedings

20   of the first trial and opinion of the Court of Appeal that

21   Mr. Adair had in fact attempted suicide on one prior

22   occasion?

23   A.    Yes.

24   Q.    Now, you refer to the witnesses who you did not feel

25   were particularly credible as to their ability to impeach

```
 1    Mr. Melendez.  Do you remember the names of those witnesses?
 2    A.    No.  There were actually three or four --
 3    Q.    Did you personally interview --
 4    A.    -- of those individuals that were in prison somewhere.
 5    They could have placed Mr. Melendez at a different unit or at
 6    a different time and we did not call them.
 7    Q.    Did you interview those witnesses?
 8    A.    My -- I believe my investigator did or I did.
 9    Q.    All right.  You're certain all those witnesses were
10    interviewed by you or someone from your investigative staff?
11    A.    I remember the witnesses.  I don't know who interviewed
12    them so I can't say.
13    Q.    Did you personally interview any of them if they were in
14    state prisons?
15    A.    No, if they were in state prison, I did not.
16    Q.    How many of the three or four were in state prison to
17    the best you can remember?
18    A.    I can't remember.  I think maybe one or two.
19    Q.    So you obviously did not speak to those two?
20    A.    That's correct.
21    Q.    And you recall specifically sending an investigator to
22    the state prison to interview those people?
23    A.    No, I don't.
24              THE COURT:  Go ahead.  You finish your thought.
25              THE WITNESS:  It went out.
```

1      THE COURT:  Okay.  Sounds like me.  Somewhere in

2   this record of this transcript or the transcripts I have

3   read, I got the impression that when Mr. Melendez and

4   Mr. Baca were housed together in the County Jail, they

5   weren't in two-man cell, they more in an eight or nine or ten

6   man cell.  Is that the way you understood it?

7      THE WITNESS:  Yes.

8      THE COURT:  And were the witnesses that the first

9   defense counsel had identified, were those other inmates that

10  were in the same cell with Mr. Baca and Mr. Melendez?

11     THE WITNESS:  I think there was one or two in that

12  group.  I think there was another group at another place

13  where Mr. Melendez was where Mr. Baca had been either kept

14  that day or two days or -- and that where he indicated they

15  had talked.

16     THE COURT:  Okay.  Please go ahead, Mr. Hennessey.

17     MR. HENNESSEY:  One final question.

18  Q.   You had stated that you had reviewed the transcript of

19  the Melendez sentencing on at least one occasion before the

20  trial?

21  A.   That's correct.

22  Q.   All right.  Do you recall that during that transcript,

23  I'm referring specifically to page 5 that Mr. Melendez's

24  attorney at the time Guleserian had told the court that an

25  investigator from the District Attorney's Office had made

```
 1   representations to Mr. Melendez that if he testified against
 2   Mr. Baca, that he would expect to receive some benefit from
 3   that?
 4   A.   That's correct.  Yes.
 5   Q.   All right.  So you understood that to mean that as far
 6   as Melendez was concerned, he expected something in return
 7   all along because of representations by someone on the staff
 8   of the District Attorney's Office?
 9   A.   I think there was an investigator that made a statement.
10   Q.   And that investigator was with the Riverside County
11   District Attorney's Office?
12   A.   I think so.
13            MR. HENNESSEY:  Thank you, Your Honor.
14            THE COURT:  Counsel, anything you want to follow-up
15   on?
16   BY MR. DELGADO-RUCCI:
17   Q.   As to the last point where we had the investigator make
18   promises to Mr. Melendez saying well, it couldn't hurt if he
19   testified in the Baca II case, do you recall in that same
20   transcript the DA saying that should not have occurred?
21   A.   That's correct.
22   Q.   Okay.
23   A.   But I didn't understand that statement by the
24   investigator to be some kind of agreement.
25   Q.   So you didn't find that statement to be binding?
```

```
 1              THE COURT:  Hang on.  You can ask that in a second.
 2     You didn't find that statement to be?
 3              THE WITNESS:  An agreement that they were actually
 4     going to provide some kind of assistance to Mr. Melendez for
 5     testifying.
 6              MR. DELGADO-RUCCI:  Okay.  Thank you.
 7              THE COURT:  Did you want to add anything else?
 8              THE WITNESS:  I'm done.
 9              THE COURT:  Mr. Hennessey, anything you want to
10     follow-up on?  I can't thank you enough for being so patient
11     with me today.  I appreciate you coming down to court.
12     You're excused, sir.
13              THE WITNESS:  Thank you.
14              THE COURT:  I'm going to have my staff, if you can
15     give me one of your business cards, I'll have them mail this
16     back to you just in case you want it for your records.
17              Counsel, I'm going to call -- we're going to take a
18     break.  Give the court reporter a few minutes and then call
19     Mr. Vinegrad.  I'm just wondering out loud do we even need
20     Mr. Vinegrad?  Mr. Hennessey, he's here.
21              MR. HENNESSEY:  We were just discussing that,
22     Your Honor.
23              THE COURT:  You tell me if I'm wrong, but I don't
24     know that there is a valid Brady claim at this time because
25     the whole issue is whether they withheld this evidence and
```

1    it's clear to me after this testimony they did not.  I'm not

2    foreclosing you from filing a brief and arguing I

3    misunderstood or misconstrued the testimony or there is

4    another line that we haven't investigated, but at this point,

5    I think all three of us until we told Mr. Silva to come down

6    here assumed that that transcript was not given to defense

7    counsel prior to trial.  Now we find out that the opposite is

8    true.  Go ahead, Mr. Hennessey.

9             MR. HENNESSEY:  Very briefly.  The only thing I

10    would be interested in, Your Honor, and somewhat suggested in

11    the tentative is whether in fact Mr. Vinegrad had personally

12    read that transcript before the second trial.

13             THE COURT:  I have no problem.  He is here.  I

14    think Mr. Vinegrad has been taking abuse from the appellate

15    court.  He wants to have an opportunity to speak and let's

16    bring him.

17             MR. HENNESSEY:  Unless it's agreed that he read the

18    transcript.  That's the only issue not answered.

19             THE COURT:  He didn't.

20             MR. DELGADO-RUCCI:  If I may, Your Honor, it wasn't

21    Mr. Vinegrad that took the heat of the Court of Appeal.  It

22    was actually Mr. Spira.

23             THE COURT:  In the first trial in that concurring

24    opinion, the judge was pretty hard on Mr. Vinegrad.

25             MR. DELGADO-RUCCI:  I thought you were referring to

```
 1   Baca II.
 2            THE COURT:  No.  I think that the appellate court
 3   was I think critical of Mr. Vinegrad in the second.  I know
 4   they were focused mostly on Mr. Spira.
 5            MR. DELGADO-RUCCI:  If I may, I don't understand
 6   what the relevance of the question whether Mr. Vinegrad read
 7   the transcript.
 8            THE COURT:  We're going to go off the record and
 9   I'm going to let her take a break.  You can put anything that
10   we say off the record on when we come back.  Let's come back
11   in 10 minutes.
12                        (Recess taken.)
13            THE COURT:  Mr. Vinegrad, would you come forward,
14   please.  Come right up here.  I know you don't testify
15   probably very often, but you've seen it done 100 times.
16            THE CLERK:  Please raise your right hand.
17                        (Witness sworn.)
18            THE CLERK:  Thank you.  Please be seated.
19                          EXAMINATION
20   BY THE COURT:
21   Q.   Okay.  Mr. Vinegrad, I think a lot of things were
22   cleared today up in this process.  And that the mystery was
23   why didn't defense counsel get a copy of the transcript
24   before Melendez and Spira testified and the answer is he got
25   it.  He got it on his own.  In your declaration you had never
```

1    read the transcript before the trial, the second trial;

2    correct?

3    A.    Correct.

4    Q.    And did you talk to Spira -- you talked to Spira about

5    the sentencing for Melendez which occurred after the first

6    trial; correct?

7    A.    Yes.

8    Q.    And you told him that he had to come to court and

9    explain why he got the sentence he got; correct?

10   A.    Yes.

11   Q.    Now, according to the appellate court, Mr. Spira's

12   testimony was sheer fantasy.  Did you read that decision?

13   A.    I read the opinion.

14   Q.    But you didn't know that when you put him on the stand;

15   am I right?

16   A.    When I put him on the stand, did I know that the

17   testimony was giving or could be viewed by someone as being

18   inconsistent with the actual transcript?  No, I didn't know

19   that in advance.

20   Q.    You don't consider him part of your office; am I right?

21   A.    Well, I consider him part of the Riverside County's

22   District Attorney's Office.  It's unique in that I worked in

23   Indio and it's approximately 65, 70 miles to Riverside.  The

24   entities have always been separate, almost like two separate

25   district attorney offices.

1          We handle our Indio cases at least during this

2     period of time in history of the office, we handled our cases

3     completely independently of the cases they handled up in

4     Riverside.  So I didn't have any day-to-day contact with him.

5     I didn't have any week-to-week contact.  I didn't have any

6     month-to-month contact.  I would see, for example, Mr. Spira

7     or any other Riverside prosecutor at an annual award ceremony

8     or something like that.

9          THE COURT:  All right.  Mr. Hennessey, do you have

10    any questions you want to ask?

11         MR. HENNESSEY:  Yes, Your Honor, just a few.  Thank

12    you.

13                         EXAMINATION

14    BY MR. HENNESSEY:

15    Q.   Mr. Vinegrad, did you read the opinion of the Court of

16    Appeal in Baca I, the first Baca trial where it was reversed?

17    A.   I did in fact.  I saw one of the footnotes you put in

18    your most recent brief that Mr. Delgado-Rucci gave that to me

19    and I read there that you made reference in the Baca I

20    opinion that got reversed on the grounds of IAC of

21    Mr. Cabrerra, that there was some sort of a reference in

22    there to the issue of the Melendez transcript.  And so I

23    didn't have access to that opinion until just recently.  I

24    requested that from one of the prosecutors in Riverside.

25    They emailed it over and I read it over again.

1          Because I was thinking I don't remember anything

2     about the Melendez sentencing transcript being part of that

3     original opinion.  And I again read it over and there was

4     nothing in there to that effect.  But to answer your

5     question, yes, I did read that opinion from Baca I reversing

6     Baca I before the commencement of Baca II.

7     Q.   So Baca I was -- would it be fair to state an

8     interesting case factually for you as a prosecutor?

9     A.   It was interesting.

10    Q.   All right.  And that you were naturally pleased when you

11    obtained the verdicts you did after the first trial?

12    A.   Yes.

13    Q.   And were you interested enough to follow the case

14    knowing that it was on appeal to the Court of Appeal in

15    Riverside?

16    A.   I was to some extent.  However, the problem was at that

17    time, and I don't know if they have fixed the problem in the

18    DA's Office, after you obtained a conviction, you kind of

19    lose track of the case to some extent depending on what's

20    happening in your personal and professional life.  So for

21    example if I tried a case and I obtained a conviction, there

22    would instances where the appellate briefs they were filed by

23    both the Attorney General and the defense counsel would go to

24    the office in Riverside because our appellate bureau was

25    located physically in Riverside.

1          And on occasion would get sent from the Riverside
2     office to the Indio office.  And then once in the Indio
3     office would get routed to the person who tried the
4     particular case.  However, that system was not foolproof and
5     there instances where I had tried a case, case would go up on
6     appeal and I never learned or did I see any of the appellate
7     briefs that got filed in that particular case.
8     Q.   So you're saying you never read any of the briefs in the
9     Baca case?
10    A.   The briefs Baca I?
11    Q.   Yes.
12    A.   I don't recollect seeing any of the briefs in Baca I.
13    In fact if I remember correctly and it goes back a number of
14    years now, I remember the Deputy Attorney General and I think
15    her name was Leslie Flemming who handled the case.  And I
16    remember being kind of perturbed because I learned of what
17    happened in Baca I from the Court of Appeal when I read the
18    opinion and hadn't learned about it before.  And I think if I
19    remember correctly, I contacted Ms. Flemming and said well,
20    why wasn't I given any of the briefs or given some kind of
21    heads up on this thing in advance of this thing kinda coming
22    in through the back door.
23    Q.   Okay.  Did anybody in your office discuss that aspect of
24    Baca I's opinion particularly Justice Hollenhorst's
25    concurring opinion that was somewhat critical of you?  Did

1    anybody from your office discuss that with you?

2    A.   No one from the office discussed with me.  I was kind

3    of -- and I think that was one of the reasons I was more

4    perturbed.  I don't think the Deputy Attorney General

5    Ms. Flemming had contacted me and given me some heads up that

6    there was a potential issue of my name being disparaged in my

7    words by Justice Hollenhorst in his concurring opinion.  And

8    I kinda down it oh, that's nice to see Judge Hollenhorst made

9    those comments about me.

10            I would have liked to have had an opportunity to

11   discuss with Mrs. Flemming if I knew that was on the radar

12   screen and suggest to her perhaps some arguments that could

13   be made as to why my conduct wasn't inappropriate according

14   to Justice Hollenhorst.

15   Q.   And finally even though you don't recall having read the

16   transcript of the Melendez sentencing before the second

17   trial, had you discussed with Mr. Spira what had transpired

18   during that sentencing hearing?

19   A.   Didn't discuss the details.  As I indicated in my

20   declaration, before the commencement of Baca II, I did learn

21   from Mr. Spira that Mr. Melendez's sentence had been reduced

22   to something less than 14 years.  As I said on the record at

23   the beginning of Baca II, I learned it was 14 years I think I

24   said to ten years.  I didn't ask Mr. Spira why.  He just

25   indicated it was a sentencing modification.

1    If I had learned that it had been reduced for some

2    reason other than what Mr. Spira had testified to, I would

3    have corrected that testimony when he was testifying on the

4    witness stand or would have tried to refresh his recollection

5    if it was something different.

6          MR. HENNESSEY:  Okay.  Thank you.

7          THE COURT:  Hang on, Mr. Hennessey, in case you

8    want to follow-up.  You know that's one of the questions I

9    had for Mr. Spira.  You know, there were a lot of things you

10   could have asked to have been done in the Baca I decision

11   from the appellate court.  You could have asked them to

12   reconsider it had you known about it.  You could have asked

13   them to take your name out of the decision and just leave

14   deputy district attorney or something like that.

15          And I think just as a training tool, you were a

16   trainer.  I think it would be beneficial that when a deputy

17   district attorney is criticized by the appellate court,

18   someone sits down and says what happened.  You give your

19   explanation.  Maybe they agree with you, maybe they don't and

20   it's like a learning exercise, but apparently that doesn't

21   happen in Riverside.

22          THE WITNESS:  Well, not necessarily, Your Honor.

23   To be honest with you and I don't want to sound presumptuous

24   in this way, but my reputation in the office as a trial

25   attorney and a good trial attorney was good.  And in fact the

1    people who were supervising me, I don't think looked upon it

2    as being a training moment for me in terms of when

3    Mr. Cabrerra asked those questions and opened the door and

4    Justice Hollenhorst said the door might have been opened, but

5    Mr. Vinegrad probably should have stepped back the better

6    part of valor and not gone through the door.

7              It's easy to say in retrospect, but when you're in

8    the middle of a trial, a trial that's contingent upon the

9    spontaneous statements from a dying victim and a trial that's

10   contingent upon the testimony of a jailhouse informant, you

11   probably get a little bit more caught up in the moment and

12   the dynamics of the trial that you say okay, he opened up the

13   door.  There's no problem in going through that door and I

14   went through the door.  And Justice Hollenhorst obviously in

15   retrospect with hindsight said the prosecutor probably

16   shouldn't have gone through that door.

17             THE COURT:  But what the Justice also said was when

18   you cross-examined Tom Adair about his prior arrest, there

19   was no door opened.  And that you had violated the rules

20   there.

21             THE WITNESS:  I forgot specifically what it was

22   with respect to Tom Adair.

23             THE COURT:  You asked Tom Adair about his prior

24   arrest and Justice pointed out you can never ask someone

25   about prior arrests.  That's not impeachment.  That's under

```
 1   the federal rules which I know and I'm sure you know the
 2   State rules much better than I do.  And another thing he was
 3   critical about was that you had presented testimony about --
 4   you had asked your witnesses remember when we talked over the
 5   weekend and you asked me why did they keep asking these
 6   questions and you said because they just throw up against the
 7   wall whatever they can and this is what they're doing here.
 8   And he had been critical of those things.
 9          And although I would agree with you that, you know,
10   there is arguably when defense counsel opens the door to
11   prior arrests with the defendant and you go into it, there
12   was no opening the door on these other things.  And I'm just
13   suggesting that I'm just surprised that no one sat down said
14   what happened and you say it didn't happen that way and they
15   say okay.
16          THE WITNESS:  That's my recollection.  To the best
17   of my recollection, no supervisor in the office sat down and
18   said hey, Paul, you know, what happened here?  Let's talk
19   about it.  I do know the following.  A number of years later
20   I had to appear in front of Justice Hollenhorst in a capital
21   case that I was handling.  There was a lot of pretrial
22   litigation of the case and I argued the case in front of him.
23   And thereafter he made specific comments to the head of the
24   Indio Office that praised the great work I had done.
25          And maybe I just learned on my own.  Trust me, I
```

 1    take things to heart.  I always prided myself on doing a good

 2    job on a case.  So I didn't go home that night and take

 3    Justice Hollenhorst's opinion and throw it in the trash.  I

 4    took it to heart and I thought about it and I learned

 5    something from it on my own initiative in terms of the arrest

 6    issue and also perhaps being a little bit less aggressive and

 7    a little bit more circumspect which sometimes is easier said

 8    than done when you're in the heat of the battle and you're

 9    trying to secure a conviction of someone who you truly

10    believe is guilty.

11              THE COURT:  Let me go on to the next thing because

12    this is something that we're kind of exploring here.  There's

13    a claim of ineffective assistance of counsel by Mr. Silva in

14    the second trial.  And Mr. Silva just got done testifying.  I

15    read the trial transcript.  I don't know what his defense

16    was.  What was his defense?  Could you tell?

17              THE WITNESS:  Well, his client testified, Mr. Baca

18    testified in the second trial.  And Mr. Baca best of my

19    recollection said that I was at the house, that an argument

20    ensued.  I heard something in the back bedroom.  I said I'm

21    out of here.  I didn't know how to get out of there so took

22    the car that was in the garage and I went off down to I think

23    it was somewhere in Orange County.

24              THE COURT:  Right.

25              THE WITNESS:  So his defense was basically putting

```
 1   his client on the stand and having his client say I had
 2   nothing to do with his murder.  It wasn't a defense that I
 3   killed him, but was heat of passion or I killed him and it
 4   was imperfect self-defense.  It was just simply I didn't kill
 5   anybody.  I heard the argument.  I think his defense was
 6   relying upon his client's credibility in the eyes of the jury
 7   and client's version of the events.  And I have seen other
 8   defense attorneys do that in the past.
 9            THE COURT:  When you contrast that with the first
10   trial, in the first trial, they pointed out that the victim
11   was drunk at the time.  That he was depressed and suicidal.
12   That he was on depression medicine.  That he had tried to
13   kill himself.  You had none of that in the second trial.
14            THE WITNESS:  I guess in retrospect, you would say
15   that all didn't work.  So Mr. Cabrerra, personally, I felt
16   that Mr. Cabrerra, I thought he did a very good job on the
17   first trial.  I thought he spent a lot of time on the case.
18   He had the audiotape enhanced so you could hear the 911 call
19   that the victim made to the 911 operator.  He really went
20   above and beyond.  And then when the opinion came down and
21   they reversed it on the grounds of IAC for his opening up the
22   door and my going through the door, I thought he got kind of
23   a raw deal from the Appellate Court analysis because I
24   thought he did a pretty good job on his first trial.
25            I mean, you know, from the perspective of a defense
```

1    attorney, and I haven't been on that side of the table, but

2    you're faced with a case where you have a victim making

3    essentially a dying declaration or spontaneous statements as

4    to who did it.  Baca, Baca.  And then giving the police

5    direction to a piece of paper that had Baca information.  You

6    have the car being stolen.  You have the flight by Baca.  You

7    have the fact that Baca never came back to pick up his

8    paycheck from the Chinese food restaurant, a number of other

9    circumstantial evidence.

10        The fact he gave false identification when he was

11   contacted by the officers, I think it was down in Fullerton,

12   whom he immediately gave a false name.  And you couple that

13   together with the testimony of Melendez about being housed

14   with Mr. Baca which was corroborated.  They were housed

15   together at the same time.  The only issue became with

16   respect to Melendez did they have the conversation or not.

17        So from a defense attorney's perspective, you have

18   a pretty, tough uphill battle.  Mr. Cabrerra made the

19   decision to go with the victim had suicidal tendencies or

20   this was a murder suicide, but I believe we had testimony

21   from the victim, Victim Adair's surviving brother who was I

22   think a CPA back in Pennsylvania, said I had just spoken to

23   my brother recently and with no indication of any kind of

24   suicidal tendencies.  So I think from a defense attorney's

25   perspective, you have a tough situation.  One may say suicide

```
 1   defense, one may say putting my client on the stand and

 2   saying he didn't do it.

 3           THE COURT:  You know, as far as, and I don't know

 4   if you have read my tentative decision which, of course, is

 5   going to be changed a lot as a result of this hearing, but I

 6   agree with your position and the AG's position there was more

 7   than sufficient evidence that this defendant shot these

 8   people, that he murdered them.  Okay.  The question was the

 9   tie in with Melendez.

10           In the first trial, Mr. Cabrerra wanted to

11   introduce three witnesses.  I'm learning and suspecting that

12   these were three people in jail with Melendez and Baca who

13   were gonna undermine Melendez's testimony.  And you were

14   successful in blocking them because he didn't turn the names

15   over soon enough before trial.  Do you remember that?

16           THE WITNESS:  I do faintly remember the judge

17   exercised a discovery sanction for failing to hand the

18   information over earlier.

19           THE COURT:  Right.  He's required to tell you

20   advance here's what we're doing so you get a chance to talk

21   to them before trial; right?

22           THE WITNESS:  Correct.

23           THE COURT:  Those witnesses never showed up in the

24   second trial.  And so really what I don't understand and I

25   guess you probably aren't the best person to ask, but I
```

1    didn't get a lot from Mr. Silva was how was he trying to

2    undercut Mr. Melendez's testimony?  That's what I -- so Jack

3    Adair is confused and he said Baca did it and he's wrong, but

4    Melendez's testimony essentially was unchallenged at the

5    second trial.

6            THE WITNESS:  Well, I guess Mr. Cabrerra's game

7    plan was to undercut it with these three other witnesses.  I

8    forgot who those witnesses were.  If I had time, I could

9    probably determine what we, the District Attorney's Office

10   and I determined with respect to their credibility and any

11   issues and what my planned cross-examine would have been.

12           THE COURT:  Well, they were all in the same cell

13   together.  So whatever, you know, they were all, you know,

14   birds of a feather.  I suppose they were all going to look

15   bad.

16           THE WITNESS:  And I would have obviously, if they

17   were going to testify, you know really got specific in terms

18   of okay when these guys housed, were they actually there

19   together, what are their backgrounds, what are their

20   connections to Melendez, what are their connection to Baca,

21   did they have any ax to grind against Melendez.  I didn't

22   have to go into all those things because the judge precluded

23   that testimony.

24           Back to your original question what did Mr. Silva

25   do to undermine the credibility of Mr. Melendez?  I don't

 1    know.  Personally, you can gather a lot about someone by

 2    seeing them face-to-face.  I handled appeals.  I handled them

 3    back in New York.  I did appellate work here in California.

 4    So I know the difference between the dynamic of a courtroom

 5    where you're seeing someone face to face and the dynamic of

 6    reading just a transcript where you're reading things in a

 7    more academic sense with a more law school like or law

 8    professor flare on the thing.  That's why I was always glad I

 9    had the appellate experience before I did trial work.

10         Melendez you have to see him on stand as to how

11    he's coming across.  Sometimes witnesses come across and

12    they're awful.  Their body language, their -- the way they

13    answer questions and sometimes witnesses get on the stand and

14    they come across great.  And something I found in the past,

15    sometimes people with criminal records get up there and make

16    the most credible at least from a visual perspective witness.

17    And if I remember Mr. Melendez correctly, he came across in

18    that latter category as very credible.  So I don't know what

19    Mr. Silva could have done to attack Melendez's credibility.

20         The jury already knew that Melendez was charged

21    with murder.  They knew that the murder was reduced in

22    Riverside to voluntary manslaughter because of the apparent

23    weakness of the case.  They knew that the sentence was gonna

24    be 16 years.  They knew that the sentence had been reduced to

25    14 years.  The jury learned the sentence thereafter was

```
1    reduced from 14 years to the 11 years.  The crux of Mr. --

2    the only issue became well, why was that.  Why did it get

3    reduced from the 14 to the 11.

4             And Mr. Spira's explanation there was some credit

5    calculation as opposed to someone's reading the transcript

6    saying oh, no, that wasn't a credit calculation.  It was the

7    judge giving Mr. Melendez three years off the sentence

8    because he took it upon himself to go down to Indio and help

9    out the prosecutors in Baca I.  Now, personally if the jury

10   in Baca II learned that, I don't know if that would actually

11   help or hurt Mr. Melendez's credibility.  In a certain sense

12   from my perspective, it could have hurt his credibility if

13   the jury were to learn that Judge Majors reduced Mr.

14   Melendez's sentence from 14 years to 11 years because

15   Mr. Melendez had testified in Baca I.

16            The jury would have said oh, the guy testified in

17   the earlier trial, which they weren't suppose to learn about

18   an earlier trial, and by the way after he testified in the

19   earlier trial, the judge, quote, unquote "unilaterally" gave

20   him three more years off the sentence.  The judge must have

21   thought he did a pretty good job down there.  The jury might

22   have come away and said that makes the guy more credible.

23            And I read your tentative opinion and with all due

24   respect, I think one can argue reasonably that perhaps that

25   makes him less credible, but it can also make him more
```

1    credible.  A lot of those things you can take, you know,

2    there's two interpretations of the evidence, two reasonable

3    interpretation.  It's which one you grab on to.  Both can be

4    reasonable.  And then the jury also learned that his sentence

5    thereafter went down to ten years.

6            So they had enough if the jury didn't believe

7    Mr. Melendez and they also had Mr. Baca's testimony who

8    basically said Melendez is a liar.  This conversation never

9    took place.  I never killed anybody.  I took off from the

10   house after I heard the argument.  And I think Mr. Baca might

11   have thrown in a few additional things about Melendez in the

12   past designed to undermine Melendez's credibility.

13           Sure, you know, in hindsight you can go through and

14   say well, I would have done something differently.  But under

15   the circumstances, I don't think Mr. Silva could have really

16   done too much more in attacking Melendez's credibility.  And

17   we also did have the fact that Mr. Melendez had been

18   cooperating with the authorities, District Attorney's Office

19   in connection with a Riverside case, in other matters.  He

20   provided information about his own murder case and other

21   people involved in that, the one that was reduced to

22   voluntary manslaughter.  I think there were a number of other

23   cases that he was cooperating with the district attorney

24   investigators on to solve.

25           And I think one of the witnesses I called at the

```
 1    trial O'Hara, a sergeant, said, yeah, Melendez was housed in
 2    the jail and he provided us with confidential information
 3    about drugs coming into the jail.  And I asked him did that
 4    information pan out?  He said yeah, it was right on.  We
 5    intercepted drugs.  So I did a number of things to bolster
 6    his credibility.  In reality the guy just came across as a
 7    credible witness.  Personally, I had no reason to believe
 8    that Melendez was telling us anything other than the truth
 9    about his conversations with Baca.  And I don't know what
10    Mr. Silva could have done to answer your question in a
11    long-winded way to really undermine the guy.
12            THE COURT:  All right.  I appreciate that.
13            Mr. Hennessey, anything you want to follow-up on?
14            MR. HENNESSEY:  No, Your Honor.
15            THE COURT:  Mr. Delgado-Rucci, anything you want to
16    add?
17            MR. DELGADO-RUCCI:  No, Your Honor.
18            THE COURT:  Thank you for your patience.
19            Okay.  You don't have to leave now.  You can if you
20    want.  We're going to have some argument.  Okay.
21    Mr. Hennessey, come up to the lectern and let's talk for a
22    little bit.  Tell me what you want to do.  Mr. Delgado-Rucci,
23    you can have a seat, sir.
24            All right.  Here's my proposal.  I'm gonna order
25    the transcript.  It's going to take a couple weeks.  14 days.
```

```
 1    Everybody is going to get a copy.  And I'm going to allow
 2    further briefing on the issue based on the transcript.
 3    That's what I plan to do.
 4          There are three issues, I believe.  There is the
 5    Brady issue whether or not the government failed to produce
 6    this transcript prior to trial.  And I think that I'm going
 7    to have to rule in favor of the Attorney General on that
 8    issue because it's clear to me that they have no obligation
 9    to turn over something that defense counsel already has.
10          Next, we go to the ineffective assistance of
11    counsel claim.  The way the ineffective assistance of counsel
12    claim is T'ed up at the point is that counsel was ineffective
13    for failing to get the transcript.  Well, he got it so that
14    can't be the case.  And I'm wondering out loud if we can
15    shift gears now.  If you can say instead that hey, actually,
16    I do think it's in there that there was some argument that
17    assuming he got it, didn't use that it was ineffective as
18    well.  I believe based on Mr. Silva's testimony and you folks
19    can tell me that I'm wrong that it sounds to me like
20    Mr. Silva did not really mount much of a defense at all.
21          I remember this term in the old days this was a
22    walking plea almost.  There was no defense.  I read his
23    closing argument.  He just repeated all the evidence that
24    came in and said, well, maybe there's reasonable doubts.  You
25    have the victim positively ID the defendant and the jailhouse
```

```
 1    informant introduce a confession from the defendant.  I did
 2    it and here's how I did and here's why I did it.  There were
 3    obvious things that weren't raised and we talked about them
 4    here.
 5              And as far as Mr. Silva well, that would be
 6    inconsistent with my defense.  My defense was I didn't do it.
 7    His defense was Jack Adair and Tom Mix were fighting with
 8    each other in a bedroom with the door closed and the
 9    defendant got in the car and drove away.  He doesn't have any
10    idea.  His defense is I don't know what happened after that
11    whether a third party showed up and shot them, whether they
12    killed themselves, whatever it is.  But I don't think that
13    you just leave that there and then that's your defense.
14              And I don't -- I do not believe for a second that
15    Tom Mix and Jack Adair were in a lover's quarrel and one shot
16    the other and killed himself or tried to.  That's not
17    inconsistent with they were fighting in the bedroom with the
18    door closed and I left.  They were fighting for 20 minutes.
19    It's not inconsistent with the victim's blood alcohol was
20    .25.  Particularly, a victim who identified the defendant as
21    the shooter.  You know, a victim who is suicidal or had been
22    suicidal, was depressed and there was depression medication
23    in his system.
24              As far as Melendez goes, Mr. Silva has the same
25    analysis of the Spira Melendez testimony that the AG has.
```

1    There was nothing.  This was just -- there was nothing.  The

2    trial judge on his own making a decision to reduce the

3    sentence to 11 years.  I think I am bound by what the

4    Appellate Court found.  The Appellate Court found that

5    testimony was sheer fantasy and it gave the jury the

6    unwavering, I forget the language of the decision.

7         "Unfortunately," reading from page 13, "the

8    testimony from the second trial bears only a superficial

9    resemblance to reality.  While it is true that an 11-year

10   sentence was imposed on the informant in February '98, the

11   CDC eventually noted an error in calculating credits those

12   two events were wholly unrelated.

13        "As we have previously described, the informant was

14   actually sentenced for the first time to 11 years in

15   February '98.  While the credit calculation error did not

16   even arise until February 2002, four years later.  And we

17   find it difficult to believe that Spira accidentally confused

18   the hearings.  Spira was actively involved in both hearings.

19   The February '98 sentencing hearing was peculiarly memorable.

20   There was a lengthy gap of four years between the two

21   hearings and the February 2002 modification occurred just

22   eight months before Spira testified at defendant's second

23   trial.

24        "By conflating these two entirely separate events,

25   Spira managed to conceal the only facts that were favorable

1    to defense at the second trial that the trial court

2    unilaterally reduced the informant's plea bargain as reward

3    for testifying against defense after assurances to the

4    prosecution that it would not seek review to enforce the

5    terms of the plea bargain.

6         "Furthermore, the claim the informant never

7    requested leniency for testifying against defendant is sheer

8    fantasy for the simple reason that he actually got just that

9    which never would have happened if he had not actively

10   pursued it.

11        "The sort of hypertechnical parsing that the

12   government presented on appeal does not dispel the highly

13   misleading nature of the testimony which sent a single,

14   unwavering, blatantly false message to the jury that the

15   informant sought nothing and got nothing for testifying

16   against defendant.  The testimony concealed the fact there

17   was a wink and nod agreement between the prosecution and the

18   court."

19        Okay.  I think I have to -- that's the fact that I

20   have to find unless I find that there is no basis that the

21   Appellate Court's finding there was unreasonable and I have

22   to find that that was I think false testimony might be too

23   strong a term.  You can tell me what you think I should use

24   or maybe I should just quote it.  And when a defense counsel

25   fails to cross-examine witnesses who are testifying falsely

```
1   and he calls that strategy, I think there is a problem there.

2   Now, whether or not it's a constitutional problem, whether or

3   not it's reversible I don't know and maybe that will be the

4   focus.

5        The next issue that is here is this Napu claim.

6   And under Napu prosecutors are not allowed to present false

7   testimony at a trial.  And they are charged with the

8   knowledge of people in the prosecutor's office.  I am

9   assuming that although Mr. Spira and Mr. Vinegrad were in

10  separate Riverside Deputy District Attorney's Offices that

11  they're all one office for purposes of this analysis.  And if

12  I follow what the Appellate Court says and Mr. Spira

13  testified falsely at the second trial, do I impute that to

14  the prosecutor and the burden?  Do I impute that to

15  Mr. Vinegrad?  Again, you can tell me what you think on that,

16  but there is a Napu claim.

17       And I guess there's a couple ways you could come at

18  it, Mr. Delgado-Rucci.  The first is you could say that

19  Mr. Vinegrad is not responsible when Prosecutor Spira

20  testifies falsely and Melendez testifies falsely at trial

21  because he's not -- that knowledge is not imputed to him

22  because they're in different divisions of that office.  I

23  think the argument you want to make is it wasn't false, but

24  you have to tell me the standard for overruling that

25  Appellate Court's decision.  You have to tell me that when
```

```
1    they make a factual finding like that, that it was contrary

2    to or involved unreasonable application clearly established

3    federal law as determined by the U.S. or resulted in a

4    decision that was based on an unreasonable determination of

5    the facts in light of the evidence presented in the state

6    court.

7            So I don't know if you're there.  Mr. Hennessey,

8    tell me how you want to proceed and the timing.

9            MR. HENNESSEY:  Well, I think, Your Honor, now that

10   the record is complete or pretty much complete, I would ask

11   that as the Court suggests we go ahead and have a transcript

12   prepared, and then I would imagine that we could give this at

13   least 30 days to submit additional briefing.

14           THE COURT:  Why don't we do this.  Why don't I give

15   you 30 days you file your brief.  I'm gonna give the

16   government 30 days to respond.  I'm gonna give you three

17   weeks.  We're coming up on the holidays.  So let's say we're

18   going to have the transcript today is October 5th?

19           MR. HENNESSEY:  Yes, Your Honor.

20           THE COURT:  Thanks.  And it's going to take till

21   two weeks to get transcript October 19th ballpark, somewhere

22   in that week.  And then I'm gonna give you a month to file

23   your brief.  I'm gonna have you file it on the Wednesday

24   before Thanksgiving.  Are you okay with that?

25           MR. HENNESSEY:  My daughter is getting married that
```

```
 1    Friday.

 2              THE COURT:  December 3rd and I'm not gonna jam the

 3    AG now because he's going to be over the holidays.

 4              MR. HENNESSEY:  That's okay.  They only just work,

 5    Your Honor.

 6              THE COURT:  That's what I like hear.  January 7th

 7    okay, Mr. Delgado-Rucci?

 8              MR. DELGADO-RUCCI:  January 7th is fine.

 9              THE COURT:  Give you until January 28th, give you

10    three weeks to file your reply.

11              MR. HENNESSEY:  Very well.

12              THE COURT:  And then my plan right now is this.

13    I'm going to issue a tentative decision.  I'm going to allow

14    you folks to argue.  Since you're both from San Diego, I'll

15    allow you to argue over the phone, and then I'll issue my

16    decision.  Assuming I'm going to go along with the AG in this

17    case, certainly on the Brady issue at this point unless you

18    tell me I'm wrong, I would probably certify that for appeal.

19              And the ineffective assistance of counsel claim, I

20    gotta tell you if I had to decide that today, I would

21    probably decide against you and I would decide against you

22    because as bad as I think it was, I think it was, you know,

23    with the testimony we have is those were tactical decisions.

24    Were they reasoned, tactical decisions?  I don't know.

25    There's an argument to be had there, but I would really have
```

```
 1    to, you know, I have some those hurdles to rule in your favor
 2    that I'm pointing out to Mr. Delgado-Rucci about the findings
 3    of the Appellate Court regarding Mr. Spira's testimony.
 4            And then the Napu claim, I think there is some --
 5    it's not completely clear where we stand on that.  The
 6    confrontation clause claim regarding whether or not they
 7    should have allowed Jack Adair's dying declaration or
 8    spontaneous utterance, however it's described, regarding
 9    Baca, I don't think the law was clearly established at the
10    time that that came in.  I don't think if you retried that
11    case, you could get it in.  I think Jiles II has foreclosed
12    that.  Do you agree, Mr. Hennessey?
13            MR. HENNESSEY:  I do, Your Honor.
14            THE COURT:  So I think the stakes are somewhat high
15    in this case because although if we ever grant habeas, we
16    send it back to the trial court and let the prosecutor retry
17    the case, maybe not Mr. Vinegrad in this one because I think
18    he's retired.  If you can't have Jack Adair's statement come
19    in and there's gonna be perhaps different consideration of
20    Melendez's testimony, I think it makes it a harder case on
21    the murder.  Okay.  So that's the timing.  I expect sometime
22    in the Spring to get the decision to you, probably within a
23    month after you file your briefs and get on the phone with
24    you a week later and let you argue as to your position.
25            MR. HENNESSEY:  Very well, Your Honor.  The trip up
```

```
 1    on the train was very pleasant so we could do this again very
 2    easily.
 3              THE COURT:  You know what?  I love that train.
 4    It's a great ride down to San Diego.
 5              Mr. Delgado-Rucci, tell me what you think.  Would
 6    you agree with me that you believe there is no Brady claim
 7    any longer?
 8              MR. DELGADO-RUCCI:  There is absolutely no Brady
 9    claim in this case.
10              THE COURT:  All right.  Let's talk about -- Napu is
11    the false evidence claim.  What they're saying is that
12    Mr. Spira and Mr. Melendez introduced false evidence into
13    this trial.  And it's the knowing use by the prosecutor of
14    false evidence and can Mr. Spira -- first of all, do you
15    agree with me that I should be accepting the Appellate
16    Court's decision that it is false evidence?
17              MR. DELGADO-RUCCI:  No.  I disagree with the Court
18    and because the Court has stated that in its tentative it
19    disagreed already with various parts of the Court of Appeal
20    opinion being an unreasonable applications --
21              THE COURT:  Let's focus on this one.
22              MR. DELGADO-RUCCI:  On this one you've got the --
23              THE COURT:  And let me tell you one of the problems
24    that we have here and I talked about it with Mr. Vinegrad
25    when he was testifying.  There were ways to undo this.  You
```

```
 1    could have asked the Appellate Court to reconsider it, you

 2    could have asked them to reissue their decision and change

 3    it, and I don't know if you had a right to go to the Supreme

 4    Court.  I mean they did ultimately rule against you on one

 5    issue, on the sentencing issue; right?  You could have

 6    appealed that issue to the Supreme Court.

 7              MR. DELGADO-RUCCI:  Well, it's easy to say that,

 8    but that's not exactly the way things work.  One, we can't

 9    tell the Court of Appeal take Vinegrad's name out of it

10    because that's in the record.  That's not a basis for a

11    petition for rehearing.

12              THE COURT:  Well, we have those requests come to

13    the federal courts all the time.  File a letter brief after

14    it.  You say, you know, this is going to hurt his reputation

15    in the community.  He's been here 30 years.  He's done a good

16    job.  Would you consider taking his name out.  The 9th

17    Circuit does it routinely.

18              MR. DELGADO-RUCCI:  I understand that for there,

19    but that's not necessarily the way that works in the Court of

20    Appeals nor is that something that our office would

21    necessarily do.  I wouldn't have done it.  Despite my liking

22    of Mr. Vinegrad, I certainly would not have done a petition

23    for rehearing requesting removal of Mr. Vinegrad's name.

24    That's not really a legal basis.  Or Mr. Spira's name.  It's

25    not a legal basis for me to do that because it's not an
```

```
 1    error.  It's not saying it wasn't Spira.  It was Joe Shmoo.

 2    The court would have said no, I can't do that.  It's not a

 3    legal basis for me to say let's make this a generic the

 4    prosecutor either.

 5              THE COURT:  Have you ever done that?

 6              MR. DELGADO-RUCCI:  No, I haven't and I wouldn't.

 7    I've done petitions for rehearing.

 8              THE COURT:  We're getting all mixed up and it's all

 9    convoluted and getting collapsed.  One, you have never done

10    it and two, is you wouldn't do it.  That's not our issue

11    here.  Our issue is could you have done it.  And you're

12    saying that the law provides you cannot ask the state

13    appellate court to reconsider and remove someone's name from

14    a decision.  And I want to tell you I don't think that's the

15    law.

16              MR. DELGADO-RUCCI:  My understanding of the law for

17    petition for rehearing under the rules of court of California

18    is you petition for a rehearing either on the basis of an

19    error in the law or an error in the facts and that you bring

20    those up to the court.  Now, we do send letters of errata

21    where the word we may have been inserted instead of the

22    singular I, but for the petition for rehearing, we do not do

23    that because those things are not errors of law or fact.

24              THE COURT:  Well, you think they made a mistake

25    when they found that Spira and Melendez's testimony was
```

```
 1   untrue.

 2              MR. DELGADO-RUCCI:  Yes, and if I can get into

 3   that.

 4              THE COURT:  Go ahead.

 5              MR. DELGADO-RUCCI:  The Court of Appeal did not

 6   hold a hearing.  The Court of Appeal never brought in Spira

 7   to explain it.  Never brought in Mr. Silva to explain it.

 8   Therefore under the second portion where it's an unreasonable

 9   determination of facts presented to the state court, that's

10   the issue I have with the disagreement with this court.

11   Those facts weren't presented to the Court of Appeal.  The

12   Court of Appeal simply looked at two transcripts and decided

13   based on these transcripts, we're going to make this

14   decision.

15              THE COURT:  That's a finding of fact.

16              MR. DELGADO-RUCCI:  That may be a finding of fact,

17   but it's not based on any presentation of evidence.

18              THE COURT:  Doesn't have to be based on evidence.

19   That's not what it says.  The fact of this record and what is

20   tied to this record from here on out, from in this court and

21   in the 9th Circuit if you get there is they have determined

22   as a matter of fact that Spira's testimony was not accurate.

23   That's a fact.  You can't change that.  You can't fix it.

24              In fact what you argued in the Appellate Court and

25   I'm not saying you.  I'm saying the Attorney General's Office
```

```
 1    is they weren't allowed to even consider the transcript.  You

 2    recognized that there was a problem there and in fact they

 3    addressed that in what the State of California argued in that

 4    brief was you can't take judicial notice of a transcript from

 5    Melendez's sentencing hearing.  That was your argument and

 6    they said no, we are.  We're reading it, we're interpreting

 7    and Melendez and Spira's testimony was untrue.

 8              MR. DELGADO-RUCCI:  Well, Your Honor, I have to

 9    disagree with that because if that were the case, then why

10    did we have Spira here if we simply were going to go with the

11    facts as determined by the California Court of Appeal?

12              THE COURT:  Because we had to find out what

13    happened.  In other words, our transcript is void until we

14    set this evidentiary hearing, you and me and Mr. Hennessey

15    had no idea what happened with that transcript.

16              MR. DELGADO-RUCCI:  That was my point and that's

17    the problem with the Court of Appeal opinion is because it

18    never made those requests, in my view is the following.  If

19    they had requested evidentiary hearing in superior court,

20    that Court of Appeal opinion after Baca II would be

21    completely different particularly on the Brady because it

22    would have said why are we even dealing with this?  He had

23    the transcript.  End of discussion.  If they had the hearing

24    on that --

25              THE COURT:  As much as you criticize the federal
```

```
 1    court for getting involved in your cases, now, there's a

 2    benefit to you.  You get back on that training and now there

 3    is a finding that there was no Brady violation.

 4              MR. DELGADO-RUCCI:  Well, actually, not to be

 5    cheeky with the Court, there never was because it's a public

 6    document.  That's as far as it should have gone.  Regardless

 7    of whether it was given to him by the DA or anyone else.  As

 8    you read in my supplemental brief, before we had Silva drop

 9    that statement on us, my position always was there never was

10    a Brady violation simply because anyone could obtain this

11    document.

12              THE COURT:  You know you talk about the practical

13    aspects of your job and what you do in the Appellate Court, I

14    think that the practical aspects of the trial lawyer and the

15    defense lawyer and when you're a defense lawyer and you're

16    coming up on the eve of trial and you ask the prosecutor for

17    a transcript and he tells you and the court he's going to

18    bring it, if the defense lawyer doesn't say, you know, what?

19    They're going to give it to me anyway, but I'm gonna drive

20    65 miles out to the other court and I'm gonna get a

21    transcript because I don't have anything else to do with my

22    time before trial.  You know and I know what happened.

23              When the other side tells you and it goes both

24    ways.  When the defense tells the prosecutor I've got these

25    witnesses.  I'm going to give you the discovery.  They accept
```

```
 1    that and they take the discovery.  They don't go and reinvent
 2    the wheel.  And so I do agree with you that -- and I saw that
 3    case before you had filed it.  In fact it came out in the
 4    advance sheets two weeks ago and I had prepared to change my
 5    tentative based on that.  But I think it's fair to say that
 6    when you're a defense lawyer on the eve of trial and the
 7    other side says they're gonna give you a transcript, that you
 8    don't drive out to Indio and get it.
 9               MR. DELGADO-RUCCI:  I have to disagree with the
10    Court.
11               THE COURT:  All right.
12               MR. DELGADO-RUCCI:  And the reason on that is Brady
13    isn't -- Brady is not cast in those terms.  Brady simply says
14    that it's a public document.  Now, he could have called the
15    court instead of driven out there and say, hey, I need a copy
16    of that transcript.  Can you send it to me?  Is it possible
17    to do via email?  But Brady doesn't take in to consideration
18    while any defense attorney wouldn't have driven out 65 miles
19    to get a copy of a transcript.  Okay.  Brady doesn't deal
20    with that.  Brady simply says if it is available and you
21    could have found it through alternate means, there is Brady
22    violation.
23               THE COURT:  The line of cases under Brady also say
24    this.  When a prosecutor tells you there is no Brady, that's
25    enough.  You can rely on that.
```

1          MR. DELGADO-RUCCI:  But we didn't have that in this

2     case.  There is nowhere in the record that says there is no

3     Brady.

4          THE COURT:  There is a statement by Mr. Vinegrad --

5     there is more than one statement.  I'll read them to you if

6     you want.  I have spoken with Mr. Spira, I have never read

7     the transcript, but he tells me that Mr. Melendez's reduction

8     had nothing to do with his testimony in this case and

9     Mr. Spira is going to bring his entire file.  That's a

10    statement that there is nothing in that transcript, that's

11    Brady.  Now, you can parse it some different way and say no,

12    you know, that's just the prosecutor talking or whatever.

13          When the government tells the court and defense

14    that there is no Brady in that transcript, that's it.  That's

15    saying there is no Brady.  There is no -- and so you keep

16    putting the obligation on the defense and I'm gonna tell you

17    there is certainly an equal burden on the defense to do this,

18    but the case law that I have read says that when you tell

19    them there is no Brady, there is no Brady, they don't -- you

20    know, for example, let's talk about in this case.

21          The investigator told Melendez in some vague terms

22    it certainly won't hurt you if you testify in the Baca case.

23    There is no way for Mr. Silva to know what happened.  He

24    asked the prosecutor.  The prosecutor says it doesn't happen

25    that's it.  Mr. Silva doesn't get to cross-examine the

```
 1    investigator or go talk to him or come on, is it really?

 2    Didn't you say something close to that?  It's done.  The

 3    prosecutor's word that there is no Brady ends the inquiry.

 4              MR. DELGADO-RUCCI:  I respectfully disagree with

 5    that completely because there are other cases that point out

 6    the fact that if you could still obtain this document which

 7    would be premised on either one, you didn't it get from the

 8    prosecutor or even assuming the prosecutor has told you there

 9    is no Brady, there is still other documents that you can

10    obtain there is no Brady.

11              THE COURT:  I agree with you.  Ultimately, I agree

12    with you.  But I'm telling you that the case that you and I

13    both read last week Towilliger or whatever it was where it

14    says that if it's a public document, I think it's a little

15    different here and a distinction without a difference.  In

16    that one, the defense lawyer was told there is no Brady in

17    there and two, the defense lawyer was told we're going to

18    give you the transcript.  Now, it's all for not because he

19    already had the transcript.  So we don't have to go off on

20    that tangent.

21              What you want me to do is ignore the appellate's

22    court finding Spira and Melendez's testimony was sheer

23    fantasy?

24              MR. DELGADO-RUCCI:  Absolutely.

25              THE COURT:  Okay.  The basis is.
```

1        MR. DELGADO-RUCCI:  The basis is these facts were

2   not developed in the state court at that time.

3        THE COURT:  So the state court didn't do a good

4   enough job to develop the record?

5        MR. DELGADO-RUCCI:  Yes.

6        THE COURT:  All right.  Tell me a case where I can

7   do that?  Where I can just on my own determine that because

8   he wants me to find that the state court's ruling that there

9   was no prejudice is wrong and you want me to find that their

10   factual predicate is wrong.  So you're both asking me to find

11   that the state appellate court was wrong; right?

12        MR. DELGADO-RUCCI:  In a certain way, yes, for

13   different reasons.

14        THE COURT:  Okay.

15        MR. DELGADO-RUCCI:  I mean if we look at this case

16   from itself under the Brady part where the Court of Appeal

17   was analyzing that, this is changed by the simple fact that

18   Silva said I had it which shows that the Court of Appeals

19   opinion is completely unreasonable because it never developed

20   the facts to make that determination.

21        THE COURT:  Well, do I carry that for just the one

22   part?  Because they said they never turned it over or Silva

23   never got it and that was wrong.  And then they made other

24   rulings and so because I find they were wrong on that fact,

25   then I just spread it over whole decision, whole decision is

1    wrong.

2            MR. DELGADO-RUCCI:  But you've done that with other

3    parts of that where this Court disagreed with the Court of

4    Appeal on that Brady issue.  Again, saying he abandoned it

5    and this court said that's an unreasonable application of the

6    facts in this case.  So we have already done that on a

7    different part.  We have got other evidence coming in now,

8    that on the IAC claim and on the Napu claim as well, but they

9    never developed any of those facts.  In fact when you look at

10   the Napu claim, that was kinda of a one liner by counsel down

11   below and by the Court of Appeal.

12           The main issue only there was Brady, but since this

13   Court already said, look, we're not giving you any deference

14   on part of Brady in terms of him abandoning the request, and

15   now we're saying well, it's clear that there never was a

16   Brady violation so we don't give deference to that part of

17   the Court of Appeal as well.  The only reason we don't give

18   deference on the second part is we now have new additional

19   facts.  But those facts were never developed in the state

20   court.

21           Now, I can't really argue with the Court because I

22   don't have 2254 in front of me to make the argument of what

23   do they mean by unreasonable determination of facts presented

24   to the state court which I tried to write down as quickly as

25   I could.

```
 1              THE COURT:  I'm going to read it to you and you can
 2   save it for your brief, but it resulted in the decision that
 3   was based on an unreasonable determination of the facts in
 4   light of the evidence presented in the state court
 5   proceeding.
 6              MR. DELGADO-RUCCI:  Yes.  And the only state court
 7   proceeding we had were the direct appeal and two transcripts.
 8   They never developed the facts.
 9              THE COURT:  That's all they ever have.  Appellate
10   courts don't develop facts.
11              MR. DELGADO-RUCCI:  Well, they can send back for an
12   evidentiary hearing.
13              THE COURT:  Well, yeah, they can, but I've dealt
14   with a thousand habeas petitions in the last ten years and
15   that's not what they're doing.  They're deciding, they're
16   reading the transcripts and making rulings.  They did read
17   the Melendez transcript and the Baca transcript and they made
18   certain rulings.
19              MR. DELGADO-RUCCI:  They made certain rulings, but
20   if what we have here is those rulings were not what Mr. Spira
21   was believing, they are entering into mind of Spira and
22   saying you are creating a sheer fantasy.  Now, whether we
23   agreed --
24              THE COURT:  They tried to avoid saying what he was
25   thinking and just said, you know, what they believed it
```

```
1    shows.
2            MR. DELGADO-RUCCI:  I disagree particularly where
3    they say he conflated two different things that they're
4    looking at it and saying we're going to look through your
5    eyes and we're telling you what you concocted is sheer
6    fantasy.  Whether we agree with reasonableness of Mr. Spira's
7    testimony here, that is what he truly believed.  Now, we can
8    say that's great, Mr. Spira, but you know what?  You're
9    wrong.  But that is not the testimony.  What he said is this
10   is what I truly believed happened.  I still believe that.
11   And we had Mr. Silva's testimony saying yeah, it kinda of
12   looked like there wasn't a negotiated plea here between the
13   DA, it was actually the court.  So that completely undermines
14   the decision of the Court of Appeal saying no, no.  This was
15   a wink and a nod.
16           We have two attorneys from two different places,
17   usually opposing attorneys, both coming up to about the same
18   thing saying this was a unilateral act by the superior court
19   not by the DA's office.  To give deference here, no, there
20   isn't because they never developed these facts.  In fact what
21   they did on this was this was a habeas corpus proceeding.
22   They should have sent it back to the Riverside Superior Court
23   for a hearing much as what we did here.  Because had they
24   done so, this would be completely different.  So the fact
25   that this Court already given these determination of their
```

```
 1   portions that are unreasonable by the Court of Appeal, I
 2   think yes, we can extend that to other parts of the opinion.
 3           THE COURT:   Okay.  All right.  You can argue the
 4   rest in your brief.  I don't have a problem.  I'm not going
 5   to put any page limit.  Do the best job you want and you're
 6   not going to be limited to it.  Mr. Hennessey is going to
 7   essentially define the issues that he wants to continue to
 8   pursue.  You're not limited to those, but if he's not
 9   pursuing them you know.
10           MR. DELGADO-RUCCI:   One other thing just for
11   clarification.  You did want to find out about imputing false
12   evidence from Spira to Vinegrad so you want that addressed?
13           THE COURT:   I think he's still claiming Napu.
14           MR. HENNESSEY:   Absolutely, Your Honor.
15           THE COURT:   Yeah, he wants to argue that
16   Mr. Spira's allegedly false testimony as found by the state
17   appellate court is imputed to Mr. Vinegrad because they're
18   all the government.  The government is the government.  You
19   can't -- a prosecutor can't put on a witness say a police
20   officer and say I didn't know that he knew that this was
21   false.  The government's one person and in a Napu claim, if
22   one person knows the testimony is false, then the whole
23   government does.  That's Napu; right?
24           MR. DELGADO-RUCCI:   We have differences on that.  I
25   really can't give the Court a yes or no.  Yes, you can impute
```

1    it because I think there are differences when they are

2    witnesses as opposed to being part of the prosecution team

3    because Napu kinda goes under Brady as well so I have to

4    check on that to see if there is a difference between the

5    two.

6            THE COURT:  All right.  Thanks, Counsel.

7            MR. HENNESSEY:  May I make one additional brief

8    comment.  I appreciate the fact that the witnesses did

9    provide in answer to the Court's questions, I don't think we

10   can lose sight of the fact that the Court of Appeal in both

11   of its decisions in particular the one dealing with this

12   particular question where they made their factual finding,

13   they had before them ever single word spoken in both of those

14   proceedings not only the trial of Mr. Baca, but also the

15   sentencing of Mr. Melendez.  And we can't lose sight of the

16   fact that is in fact the record.

17           No matter how much the Attorney General's Office

18   seeks to change the that record existed, the testimony that

19   the jury heard, the testimony that may have influenced the

20   jury to find Mr. Baca guilty absent what I believe is

21   adequate cross-examination, investigation and perusal of

22   other things that could have further impeached Mr. Melendez,

23   again, I think we have to keep in mind and keep it focused on

24   what did the jury actually hear and did in fact that

25   transcript that the Court of Appeal reviewed support their

1  conclusion and I believe it very easily does support their

2  conclusion that the testimony was totally incorrect as to

3  what occurred and it was clear from that transcript from the

4  beginning that the Court of Appeal reviewed.

5          THE COURT:  Thank you, Counsel.

6          MR. HENNESSEY:  Thank you again.

7          THE COURT:  All right, gentlemen.  I'll look

8  forward to talking to you again in the spring.  Get me on the

9  phone if you need to.  Otherwise, we'll just be filing our

10  briefs after the transcript.  And Mr. Vinegrad, we're happy

11  to give you notice and if we're going to have a hearing and

12  you can participate by telephone.  Happy to allow you to do

13  that.  Best of luck to all of you.  Thanks a lot, gentlemen.

14          THE CLERK:  This court is adjourned.

15          (Proceedings were concluded at 2:20 p.m.)

16

17

18

19

20

21

22

23

24

25