UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOHNNY BACA,                      )  CASE NO. CV 08-683-MMM (PJW)
                                  )
            Petitioner,           )  REPORT AND RECOMMENDATION OF
                                  )  UNITED STATES MAGISTRATE JUDGE
      v.                          )
                                  )
DERRAL ADAMS, WARDEN,             )
                                  )
            Respondent.           )
_____)

     This Report and Recommendation is submitted to the Hon. Margaret
M. Morrow, United States District Judge, pursuant to 28 U.S.C. § 636
and General Order 05-07 of the United States District Court for the
Central District of California.  For the reasons discussed below, it
is recommended that the Petition be denied and the action be dismissed
with prejudice.

                                I.

                     SUMMARY OF PROCEEDINGS

A.   State Court Proceedings

     In 1997, a jury in Riverside County Superior Court found
Petitioner guilty of two counts of first degree murder.  (Lodgment No.
1 at 1-2.)  Petitioner appealed the conviction.  The California Court
of Appeal reversed, finding that defense counsel was ineffective when

he questioned Petitioner about prior arrests because it "opened the door" to the prosecutor questioning Petitioner about an arrest for raping and sodomizing a seven-year-old girl. (Lodgment No. 1 at 16-21.) Thereafter, Petitioner was retried and, again, found guilty of two counts of first degree murder. (Clerk's Transcript ("CT") 289-90, 349.) He was sentenced to 70 years to life in prison. (CT 373, 384.)

Petitioner appealed to the California Court of Appeal, which affirmed the judgment. (Lodgment Nos. 3-18.) He then filed a petition for review in the California Supreme Court, which was denied. (Lodgment Nos. 19, 20.)

B.   <u>Federal Court Proceedings</u>

On May 16, 2008, Petitioner, represented by counsel, filed a Petition for Writ of Habeas Corpus in this court, pursuant to 28 U.S.C. § 2254, raising the following claims:

1.   Defense counsel was ineffective for failing to obtain the transcript from the informant's sentencing hearing and use it to expose the fact that the informant had lied when he claimed that he had not received a sentence reduction in exchange for testifying against Petitioner.

2.   The prosecutor committed misconduct when he failed to produce the transcript from the informant's sentencing hearing and when he lied to the jury about the benefits that the informant received for testifying against Petitioner.

3.   Petitioner's Sixth Amendment right to confront a witness was violated when the trial court allowed police officers to

1        testify that the victim had identified Petitioner as the

2        shooter before he died.

3    (Petition at 5; Supplemental Memorandum in Support of Petition for

4    Writ of Habeas Corpus ("Supp. Memo.") at 2-8.[1])

5        Thereafter, Respondent filed an Answer and Petitioner filed a

6    Traverse.  On October 5, 2010, the Court held an evidentiary hearing,

7    after which the parties submitted further briefing.

8                                    II.

9                         STATEMENT OF FACTS

10   A.   The Offense Conduct

11       The following statement of facts was taken verbatim from the

12   California Court of Appeal's opinion affirming Petitioner's conviction

13   following the second trial:

14        This case involves the August 1995 murders of same-sex

15        companions John Adair and John Mix.  Adair hired

16        [Petitioner] as a live-in housekeeper and gardener a few

17        months before the murders.  About two weeks before the

18        murders, Valerie Millot, a close friend of Adair's, received

19        a telephone call from Adair, saying that he wanted

20        [Petitioner] to leave.  At Adair's request, Millot came over

21        to Adair's house and asked [Petitioner] to leave, which he

22        did.  In order to make sure that [Petitioner] did not come

23        back, Adair and Millot packed [Petitioner's] belongings and

24        put them in the driveway.  While packing [Petitioner's]

25        belongings, they found several items that contained

26

27        [1]   The Court has separated what Petitioner labeled as his first
     claim for relief into two claims, Grounds One and Two.  What
28   Petitioner had identified as his second claim, the Court has set forth
     in Ground Three.

1    information about [Petitioner].  Adair recorded the

2    information just in case there were further problems.

3         Adair had an adopted son named Tom, whom he had taken

4    in as a troubled teenager.  A short time after Adair and

5    Millot ejected [Petitioner] from the house, Tom called and

6    confronted Millot.  Tom was angry and yelled at Millot that

7    this was none of her business, she should not interfere, and

8    [Petitioner] was a good guy.

9         Tom was apparently successful in getting Adair to take

10   [Petitioner] back.  Millot continued to see [Petitioner] at

11   Adair's house and [Petitioner] told his other employer, a

12   Chinese restaurant, that he could keep working because his

13   landlord had taken him back.

14        On the day of the murders, Millot picked up Adair's

15   companion Mix at the airport and brought him to Adair's

16   house.  During the drive, Mix mentioned that he was afraid

17   of [Petitioner].  Millot stayed at Adair's house for a few

18   hours, and when she finally left, Adair and Mix were in good

19   spirits and seemed to be getting along well.

20        Later that day, Adair called 911 to report that he and

21   Mix had been shot.  When asked by the 911 operator to

22   identify the assailant, Adair was unable to do so.

23        The sheriff's deputies who responded to the 911 call

24   found Mix lying on the floor dead, with a single gunshot

25   wound to his face.  The deputies also found a .38-caliber

26   revolver lying on the floor just inside the door about six

27   to eight feet away from Mix's body.  The police were unable

28   to obtain fingerprints from the gun.

                              4

As the deputies proceeded into the house, they found Adair walking around holding a towel to his face, which was bleeding profusely from two gunshot wounds.  The deputies asked Adair to identify the assailant and he responded in a garbled voice with something that sounded like "Baca."  When the deputies asked for clarification, Adair clearly repeated "Baca" several times and spelled it.  Furthermore, after paramedics cleared Adair's mouth, he directed the deputies to a piece of paper that contained information about [Petitioner].

After Adair was taken to the hospital, a deputy was assigned to pick up his adopted son Tom and take him to the hospital.  While at the hospital, the deputy overheard Tom speaking on a telephone trying to locate [Petitioner].  When the deputy asked Tom to stop looking for [Petitioner], Tom got upset and yelled at the deputy, asking why he was forbidden from looking for the person who shot his father.  Tom wanted to leave, but the deputy would not allow that either.  After a second similar confrontation, the deputy arrested Tom for interfering with the investigation.

Adair died after a week in intensive care.  A few days later, police officers found [Petitioner] loitering in a park in Carson.  When the officers confronted [Petitioner], he tried to hide his identification.  But the officers retrieved his identification, discovered that he had an outstanding warrant, and arrested him.  The police found Adair's car in the area surrounding the park.

[Petitioner] was charged with the murders of Adair and Mix, and was initially convicted in August 1997.  However, [the state appellate court] reversed the convictions based on ineffective assistance of counsel.  (*People v. Baca* (Sept. 28, 1999, E021093) [nonpub. opn.].)

On retrial, the prosecution's evidence was largely the same as before, including the testimony of a jailhouse informant, who described a murder-for-hire plot involving Adair's adopted son Tom.  The informant claimed that while he and [Petitioner] were housed together awaiting trial, [Petitioner] mentioned that he was in jail for murdering a rich doctor.  [Petitioner] said he had been living and working at the doctor's house, in addition to working at a Chinese restaurant.  [Petitioner] said that he began working for the doctor after meeting the doctor's son, Tom, at the Chinese restaurant.  [Petitioner] said that he quickly discovered that the doctor was a homosexual and mentioned it to Tom, who said he knew and did not like it.  Shortly after that, Tom told [Petitioner] that they could get rich by killing the doctor.  The plan was for [Petitioner] to kill the doctor and his companion while they were together so that it would look like a love-triangle murder, then they could take the insurance proceeds.  [Petitioner] said he shot them both in the head using a .38-caliber gun that was provided to him by Tom.  When one of them did not die, [Petitioner] panicked and ran away, leaving the gun behind. [Petitioner] fled to his sister's home, called Tom, and told Tom that he had "fucked up."  Tom was angry and told

1    [Petitioner] to finish off the survivor, but [Petitioner]

2    refused.

3         In support of the murder-for-hire theory, Millot

4    testified that Adair had always provided Tom with a vehicle,

5    a job, and money.  Nevertheless, a couple months before the

6    murders, Adair told Millot that he intended to disinherit

7    Tom, leaving him with just enough for an education.  Adair

8    even read Millot the codicil changing his will.

9         Adair's brother testified that Adair was constantly

10   bailing Tom out of financial trouble.  But, a couple months

11   before the murders, Adair told his brother that he wanted to

12   remove Tom from his will and insurance policies because

13   their relationship had soured and Adair felt he was being

14   used by Tom.

15        After Adair died, Tom became the beneficiary of

16   $160,000 in insurance policies and investments.  Tom also

17   received most of the probate estate, including $300,000 in

18   real estate and furniture that would have gone to Mix.

19        [Petitioner] testified on his own behalf, claiming that

20   Tom asked him if he was interested in a job working at

21   Adair's house.  At Tom's request, Adair interviewed

22   [Petitioner] and recorded some personal information before

23   hiring him.  For the first couple of months, [Petitioner]

24   was alone in the house most of the time because Adair and

25   Mix were in the Los Angeles area.  During this time, Tom

26   visited regularly, and [Petitioner] and Tom frequently

27   talked on the telephone.

28

7

[Petitioner] admitted that Adair and Millot ejected him from the house a few weeks before the murders. At that time, [Petitioner] called Tom, who said [Petitioner] should call the police to see if he could get back in. The police talked to Adair, but ultimately told [Petitioner] that it would be best if he left. [Petitioner] did not mind leaving because he was unhappy with the situation, so he went to Tom's house and asked Tom to take him to his grandmother's house in the Los Angeles area. Tom agreed to do so, dropped [Petitioner] off at the Chinese restaurant for a last day of work, and went to get [Petitioner's] belongings from Adair. After work, Tom said that Adair wanted to talk to [Petitioner]. Adair apologized for throwing [Petitioner] out and took him back.

The day before the murders, Adair asked [Petitioner] to drive him to pick up Mix at the airport the next day and [Petitioner] agreed to do so. However, [Petitioner] went out that night with a girlfriend, had too much to drink, and did not make it home the next day. When [Petitioner] called Adair to say that he was unable to drive him to the airport, Adair was disappointed.

Later that day, Tom called [Petitioner], picked him up, and took him to Adair's house. Upon entering the house, [Petitioner] saw that Adair appeared to be showing [Petitioner's] room to a couple of women as if he intended to rent it to them. [Petitioner] thought Adair was upset about the airport and was going to eject him from the house

8

again.  [Petitioner] did not want any[]more headaches and was not making much money, so he began packing to leave.

While [Petitioner] was packing, Tom interrupted and asked [Petitioner] to go with him to an auto parts store. [Petitioner] agreed to go.  When Tom returned [Petitioner] to Adair's house, Adair and Mix were the only ones there. Adair asked [Petitioner] if he was planning to leave and he said yes.  Because Mix was there to pick up the car and drive it to Los Angeles, [Petitioner] asked Mix to drive him to his grandmother's house in the Los Angeles area.  Mix agreed to do so, so [Petitioner] got the car keys and began loading his belongings into the car.  While [Petitioner] was loading the car, Adair and Mix went into the bedroom and began arguing.  After waiting 20 minutes for them to finish, [Petitioner] decided to take the car himself, which he admitted was a bad idea.

[Petitioner] drove to Carson and stayed with some friends in that area.  [Petitioner] abandoned the car nearby with the keys in the ignition.  [Petitioner] claimed that when he was confronted by the police a few days later, he tried to hide his identification because he thought he would get in trouble for stealing Adair's car.

[Petitioner] claimed that he never met the jailhouse informant and had never seen the gun before.  [Petitioner] denied talking with Tom about Adair's money, but admitted that Tom mentioned that Adair was well-off.  [Petitioner] denied conspiring with Tom to kill Adair or Mix, denied

1    having any communications with Tom after the murders, and

2    denied getting any financial benefit from their deaths.

3  (Lodgment No. 18 at 3-8.)

4    The jury found Petitioner guilty of murdering Mix and Adair.

5  (CT 289-90, 349.)   The trial court sentenced him to 70 years to life

6  in prison.   (CT 373, 384.)

7  B.   The Evidentiary Hearing

8    Petitioner appealed his conviction, claiming that the informant

9  and the prosecutor lied at trial when they testified that the

10  informant had not received a benefit for testifying against

11  Petitioner.   Petitioner argued that his counsel was ineffective for

12  not obtaining the transcript and cross-examining them with it and that

13  the prosecutor violated his obligation to produce the transcript,

14  which would have revealed the lies.   The appellate court agreed with

15  Petitioner that the informant and the prosecutor had lied, but found

16  that there was no prejudice.   (Lodgment No. 18.)

17    Petitioner then filed a petition for review in the state supreme

18  court, which was denied.   He then filed a habeas corpus petition in

19  this court.   On October 5, 2010, without objection, the Court held an

20  evidentiary hearing to develop the record with respect to Petitioner's

21  claims of ineffective assistance of counsel and prosecutorial

22  misconduct.   Three witnesses testified at the hearing: prosecutor Paul

23  Vinegrad, defense counsel Anthony Silva, and Deputy District Attorney

24  Robert Spira, who had prosecuted the informant and who had testified

25  at Petitioner's trial.   (Reporter's Transcript of Evidentiary Hearing

26  ("EH RT") 1-132.)

27    Deputy District Attorney Spira testified that both he and

28  Vinegrad worked in the Riverside County District Attorney's Office,

10

but in separate branches.  (EH RT 6-7.)  He explained that he was
prosecuting Daniel Melendez for the murder of Mario Gomez about the
same time that Vinegrad was prosecuting Petitioner for the murders of
Mix and Adair.  (EH RT 7.)  Melendez initially agreed to a deal in
Spira's case in which he would plead guilty to voluntary manslaughter
in exchange for a 16-year sentence.  (EH RT 9-10, 38.)  Melendez later
agreed to provide information regarding accomplices in the Gomez
murder and so Spira agreed to further reduce his sentence to 14 years.
(EH RT 10-12, 39.)

     At the same time Melendez was providing information to Spira in
the Gomez case, he agreed to cooperate in Petitioner's case.  (EH RT
11-12.)  After Melendez testified against Petitioner in the first
trial, he moved for a further reduction in his sentence in exchange
for his cooperation.  Spira appeared on behalf of the prosecution at
this second sentencing hearing at which time Melendez's sentence was
reduced from 14 to 11 years.  (EH RT 17-20, 31-32.)

     In 2002, Petitioner was retried after the state appellate court
reversed his first conviction.  Petitioner had new counsel for his
second trial, Anthony Silva.  The transcript from the second trial
reveals that Silva had repeatedly asked the prosecutor to provide him
with a copy of Melendez's sentencing transcript and that, even during
trial, Silva was still asking for it.  (Reporter's Transcript ("RT")
11-14, 16-17.)  Silva never used the transcript to cross-examine
Melendez, however.  Petitioner, assuming that the prosecutor had never
produced it to Silva, argued on appeal that the prosecutor had
violated *Brady v. Maryland,* 373 U.S. 83 (1963), by failing to produce
it.  Petitioner also argued that Silva was ineffective for failing to
get the transcript on his own.

1   Silva testified in the evidentiary hearing, however, that,
2   despite his many requests for the transcript, even some during trial,
3   he, in fact, had a copy of it two years before the trial started and
4   simply did not know that he had it. (EH RT 57-58.) Silva explained
5   that, after discovering that he had it during trial, he reviewed it
6   and concluded that it was consistent with the prosecutor's
7   representations that Melendez's sentence had not been reduced in
8   exchange for his testimony against Petitioner. (EH RT 57-58, 61-63,
9   66-67, 73-76, 87-89.) Silva claimed that he made a tactical decision
10  not to impeach Melendez with the transcript because it could have
11  bolstered Melendez's testimony that the court unilaterally reduced his
12  sentence. (EH RT 67, 76-77.)

13      Prosecutor Vinegrad testified that he had not read the
14  transcript from Melendez's second sentencing hearing--in which
15  Melendez's sentence was reduced from 14 years to 11 years--prior to
16  Petitioner's trial. (EH RT 92.) He maintained that he did not know
17  that Melendez and Spira were lying at trial.[2] (EH RT 96-97.)

18      Six months after the evidentiary hearing, the Supreme Court
19  issued its decision in *Cullen v. Pinholster*, 563 U.S. ____, 131 S.Ct.
20  1388 (2011). In *Pinholster*, the Supreme Court explained that, except
21  in unusual circumstances, district courts should not hold evidentiary
22  hearings in state habeas cases. *Id.* at 1398. The Court concludes
23  that the case at bar is not one which would warrant an evidentiary
24  hearing under *Pinholster*. Thus, in addressing Petitioner's claim that
25  his counsel was ineffective for failing to obtain the transcript from
26
27      [2] At times, Vinegrad and Silva parroted the government's view
28  that Melendez's and Spira's testimony was accurate and that the Court
    of Appeal got it wrong when it found that it was false.

12

1  Melendez's sentencing hearing, the Court will not consider the fact
2  that defense counsel, in fact, had the transcript and chose not to use
3  it.   This same approach will be followed when dealing with
4  Petitioner's claim that the prosecutor violated *Brady* when he failed
5  to provide defense counsel with a copy of the transcript.   The Court
6  will assume for purposes of its analysis that the prosecutor had not
7  produced the transcript.

8                                 III.

9                        STANDARD OF REVIEW

10       The standard of review in this case is set forth in 28 U.S.C.
11  § 2254:

12       An application for a writ of habeas corpus on behalf of a
13       person in custody pursuant to the judgment of a State
14       court shall not be granted with respect to any claim that
15       was adjudicated on the merits in State court proceedings
16       unless the adjudication of the claim–

17            (1)  resulted in a decision that was contrary to,
18       or involved an unreasonable application of, clearly
19       established Federal law, as determined by the Supreme
20       Court of the United States; or

21            (2)  resulted in a decision that was based on an
22       unreasonable determination of the facts in light of the
23       evidence presented in the State court proceeding.

24  28 U.S.C. § 2254(d).

25       A state court decision is "contrary to" clearly established
26  federal law if it applies a rule that contradicts Supreme Court case
27  law or if it reaches a conclusion different from the Supreme Court's
28  in a case that involves facts that are materially indistinguishable.

                                 13

1   *Premo v. Moore*, 131 S. Ct. 733, 743 (2011) (citing *Bell v. Cone*, 535
2   U.S. 685, 694 (2002)).  To establish that the state court unreasonably
3   applied federal law, a petitioner must show that the state court's
4   application of Supreme Court precedent to the facts of his case was
5   not only incorrect but objectively unreasonable.  *Renico v. Lett*, 130
6   S. Ct. 1855, 1862 (2010).  Where no decision of the Supreme Court has
7   squarely decided an issue, a state court's adjudication of that issue
8   cannot result in a decision that is contrary to, or an unreasonable
9   application of, Supreme Court precedent.  *See Harrington v. Richter*,
10  131 S. Ct. 770, 786 (2011).

11      Petitioner raised all three of his claims in his petition for
12  review in the California Supreme Court.  (Lodgment No. 19.)  That
13  court denied the first and second claims without comment and the third
14  claim with a citation to governing state law.  (Lodgment No. 20.)  As
15  to the first two claims, Grounds One and Two, the Court will look to
16  the California Court of Appeal's reasoned decision (Lodgment No. 18),
17  which the Court presumes is the basis for the state supreme court's
18  subsequent decision denying them without comment.  As to Ground Three,
19  the Court will consider the state supreme court's decision.  In each
20  instance, the Court is not empowered to disturb the state court's
21  decision unless it concludes that "fairminded jurists" would all agree
22  that it was wrong.  *Richter,* 131 S. Ct. at 786.

23                              IV.

24                          DISCUSSION

25  A.   Ineffective Assistance of Counsel

26      Petitioner contends that his lawyer was ineffective because he
27  did not obtain the transcript from the informant's sentencing hearing
28  and cross-examine the informant with it about the fact that his

                              14

sentence was reduced in exchange for his testimony against Petitioner. (Supp. Memo. at 2, 6-7.)  Respondent contends that, as the California Court of Appeal found, there was no prejudice because Petitioner would have been convicted even if counsel had used the transcript to impeach the informant.  (Resp. Supp. Brief at 16-17.)  For the following reasons, the Court concludes that Petitioner is not entitled to relief on this claim.

In order to prevail on an ineffective assistance of counsel claim, Petitioner must establish that his counsel's performance fell below an objective standard of reasonableness and that Petitioner was prejudiced as a result of counsel's failures.  *Strickland v. Washington*, 466 U.S. 668, 687-88, 690 (1984).  Prejudice can be established by demonstrating a "reasonable probability" that, but for counsel's errors, the outcome of the trial would have been different. *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.  A claim of ineffective assistance must be rejected upon finding *either* that counsel's performance was reasonable *or* that the alleged error was not prejudicial.  *Id*. at 697.

Petitioner argues that counsel's failure to obtain the transcript and cross-examine Melendez with it was unreasonable.  The California Court of Appeal agreed.  It found that counsel's failure to be familiar with the transcript and to cross-examine the informant with the fact that his 14-year sentence had been reduced to 11 years in exchange for his testimony against Petitioner was below the standard required of reasonably competent defense counsel.  (Lodgment No. 18 at 19 ("Any reasonably competent attorney would have been

15

familiar with that evidence and used it to challenge the misleading testimony.").)   The Court agrees.

At Petitioner's second trial, Daniel Melendez testified that his sentence was not reduced in exchange for his testimony at Petitioner's first trial.  (RT 334, 345-46.)  That was not true.  And, unfortunately, the informant's story was corroborated by Deputy District Attorney Robert Spira, who testified that the informant had not asked for or received a reduction in his sentence in exchange for testifying against Petitioner.  (RT 306, 314-15.)  Spira falsely claimed that Melendez's sentence was reduced from 14 years to 11 years because of a change in the sentencing law that required a recalculation of Petitioner's sentence.  (RT 311-12.)  As the appellate court found:

> Unfortunately, the testimony from the second trial bears only a superficial resemblance to reality.  While it is true that an 11-year sentence was imposed on the informant in February 1998 and the CDC eventually noted an error in calculating credits, those two events were wholly unrelated.  As we have previously described, the informant was actually sentenced for the first time to 11 years in February 1998, while the credit calculation error did not even arise until February 2002, nearly four years later. And we find it difficult to believe that Spira accidentally confused these hearings.  Spira was actively involved in both hearings; the February 1998 sentencing hearing was peculiarly memorable; there was a lengthy gap of four years between the two hearings; and the February 2002 modification occurred just eight months before Spira

1    testified at [Petitioner's] second trial.  By conflating
2    these two entirely separate events, Spira managed to
3    conceal the only facts that were favorable to the defense
4    at the second trial: that the trial court unilaterally
5    reduced the informant's plea bargain as a reward for
6    testifying against [Petitioner], after assurances from the
7    prosecution that it would not seek review to enforce the
8    terms of the plea bargain.  Furthermore, the claim that
9    the informant never requested leniency for testifying
10   against [Petitioner] is sheer fantasy for the simple
11   reason that he actually got just that, which never would have
12   happened if he had not actively pursued it.
13   (Lodgment No. 18 at 13-14.)

14       The Court adopts the state appellate court's findings that
15   Melendez sought and received a sentence reduction for his testimony
16   against Petitioner and that Spira testified falsely as to the reason
17   for the sentence reduction.  *See* 28 U.S.C. § 2254(e)(1) ("[A]
18   determination of a factual issue made by a State court shall be
19   presumed to be correct.").  The fact that this finding was made by the
20   appellate court does not diminish its import.  *Bragg v. Galaza*, 242
21   F.3d 1082, 1087 (9th Cir. 2001) (noting the presumption of correctness
22   "is not altered by the fact that the finding was made by a state court
23   of appeals, rather than by a state trial court").  Respondent's
24   argument that the appellate court erred in this finding is
25   unpersuasive.  Thus, the Court agrees with the state appellate court
26   that counsel was ineffective for failing to be familiar with the
27   transcript and to confront the informant with it.
28

17

1   The next question is whether the error resulted in harm to
2   Petitioner.  The appellate court found it to be a "close question,"
3   but ultimately determined that there was no prejudice.  It based this
4   finding on the fact that the case against Petitioner "was strong even
5   without the informant's testimony."  (Lodgment No. 18 at 19-20.)  It
6   also focused on the fact that "Adair clearly identified [Petitioner]
7   as the shooter and [Petitioner] was found near Adair's missing car"
8   when he was arrested ten days after the shootings.  (Lodgment No. 18
9   at 20.)  The court also found that the impeachment value of Melendez's
10  three-year sentence reduction "was unlikely to have much [e]ffect on
11  the informant's credibility in the eyes of the jury" because, as it
12  explained, "[t]he very nature of a jailhouse informant renders his
13  testimony suspect even without any evidence of an explicit quid pro
14  quo."  (Lodgment No. 18 at 20.)

15      Were this Court tasked with determining *de novo* whether there
16  was prejudice from defense counsel's deficient performance, it would
17  depart from the appellate court's finding and conclude that there was.
18  The informant's testimony was the backbone of the prosecutor's murder-
19  for-hire theory, which this Court is not the first to recognize.  As
20  the state appellate court noted in reversing Petitioner's conviction
21  the first time:

22          In our view, the resolution of this case depended on
23          whether the jury believed [Petitioner] and Tom Adair or
24          the informant, Daniel Melendez.  . . .  It was only
25          Melendez' testimony about [Petitioner's] alleged
26          confession that corroborated the prosecution theory about
27          the motive for the murders and laid out the way in which
28          the murders occurred.  Furthermore, Melendez' testimony

18

1   provided evidence of deliberation and premeditation, which
2   is one of the prima facie elements of first degree murder.
3   [¶]  Without Melendez, the prosecution has not presented
4   any direct evidence of [Petitioner's] motive for the
5   murder or how the crime occurred.
6   (Lodgment No. 1 at 18-19.)

7   Exposing the fact that Melendez was lying would have undermined
8   his testimony and, as a result, seriously undermined the prosecution's
9   case.  Moreover, it would have also exposed the fact that Deputy
10  District Attorney Spira had lied when, in an effort to bolster
11  Melendez's testimony, he testified that Melendez's sentence had not
12  been reduced in exchange for his testimony against Petitioner.  In
13  fact, Spira not only testified that the informant had not received any
14  benefit, he concocted a story to explain away the three-year sentence
15  reduction.  (RT 311, 314-15.)  Exposing this fact in combination with
16  the fact that Melendez had lied would surely have had the jurors
17  wondering about the government's case.

18  In reaching the opposite conclusion, the appellate court pointed
19  out that the informant knew where Petitioner worked and the caliber of
20  the gun used in the murders, concluding, it seems, that that meant
21  that he must have been telling the truth about the confession.  The
22  Court is not so convinced.  Melendez and Petitioner were in a cell
23  together in August 1995, but Melendez did not tell the prosecutor (or
24  anyone else, apparently) for a year that Petitioner had confessed.
25  (RT 344-45.)  Further, the fact that Petitioner shared details of his
26  life with Melendez, including the fact that he and Tom Adair were
27  friends, and details of the way the crime was committed does not
28  necessarily prove that Petitioner, while housed in an eight-man cell

19

with Melendez and six other inmates, confessed to Melendez that he murdered the victims for money. *See, e.g., Maxwell v. Roe*, 628 F.3d 486, 502-03 (9th Cir. 2010) (chronicling informant's practice of obtaining details of crimes of cellmates and lying at trial about alleged confessions they made to him).[3]

Though the Court would agree with the appellate court that the prosecutor established that Petitioner had shot the victims and drove away in their car, that alone does not resolve the question of prejudice. Petitioner was not charged with simply killing the victims. He was charged with premeditated, deliberate murder. To prevail on this charge, the prosecution had to prove that Petitioner acted with malice aforethought, i.e., that he planned to kill the victims and that he deliberated about his plan. (CT 320-21 (Jury Instruction defining Deliberate and Premeditated Murder).) The evidence of premeditation came solely from Melendez. He testified, in essence, that Petitioner murdered the victims as part of a murder-for-hire plot dreamed up by Tom Adair so that Adair could inherit his father's estate, which he would then split with Petitioner. (RT 330-31.) The testimony from the other witnesses that proved that Petitioner had shot and killed the victims, including the statements from victim Adair, did nothing to support the prosecution's theory that this was a contract killing. This evidence came solely from Melendez.

Further, and something the appellate court did not focus on, the issue regarding prejudice is not limited to deciding whether

---

[3] Although Melendez testified that Petitioner told him the details on several occasions over the course of two to four weeks (RT 337-38), the evidence established that Petitioner and Melendez were housed together for only three days. (RT 268, 270.)

Petitioner would have been acquitted, i.e., whether all 12 jurors would have found him not guilty.  Rather, the issue is whether one juror would have changed his or her vote.  *See Cone v. Bell*, 129 S.Ct. 1769, 1786 (2009) (noting that, in analyzing importance of suppressed evidence on jury's verdict, focus should be on whether one juror would have changed his or her mind).  That was all he needed to avoid conviction.  It is hard to imagine that, had the jury learned that the informant and the prosecutor had lied at trial, not one juror would have changed his or her view of the government's case.  For all these reasons, were this *de novo* review, the Court would conclude that Silva's failure to become familiar with the transcript from Melendez's sentencing hearing and to impeach him, the only witness to testify about the murder-for-hire plot, with evidence that he was lying about his deal with the prosecutor was prejudicial.[4]

The question before the Court, however, is whether the state court's conclusion that the error was not prejudicial was objectively unreasonable.  *See Mitchell v. Esparza,* 540 U.S. 12, 18 (2003) (stating habeas relief may be granted only if the state appellate court "applied harmless-error review in an 'objectively unreasonable' manner") (citation omitted).  Recently, the Supreme Court defined what "objectively unreasonable" means in the context of state court findings of prejudice stemming from ineffective assistance of counsel claims.  *See Richter*, 131 S. Ct. at 791-92 (unanimously reversing grant of habeas corpus on ineffective assistance of counsel grounds

---

[4]  Had Melendez not testified, it is safe to say that the prosecution would not have presented a murder-for-hire case.  In fact, the District Attorney's Office has never charged Tom Adair with anything, despite the office's belief that Petitioner murdered the victims in furtherance of a plot hatched by Adair.

because state court was not unreasonable in finding lack of prejudice); *Premo*, 131 S. Ct. at 743-44 (unanimously reversing grant of habeas corpus, noting that federal courts on habeas corpus review must give significant "[d]eference to the state court's prejudice determination").  In these cases, the Supreme Court made clear that a state court's finding that there was no prejudice may not be overturned by a federal court unless the federal court concludes that no fairminded jurist would agree with the state court's decision.  *See Richter*, 131 S. Ct. at 786, 792.  As the court explained, it is, and was meant to be, a difficult standard to meet.  *Id.* at 786.  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id.*  Rather, habeas relief is available only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."  *Id.*  The court further explained that, by limiting relief to these cases, the purpose of habeas corpus--to "'guard against extreme malfunctions in the state criminal justice systems'"-- is preserved.  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).  Thus, for Petitioner to prevail on this issue, he would have to convince this Court that the state court's finding that there was no prejudice "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 786-87.

     Clearly, that is not the case here.  The California Court of Appeal found that counsel's deficient performance did not result in prejudice because the evidence that Petitioner was the murderer was strong, because jailhouse informants by their very nature are suspect,

1  because the jury would not have discounted Melendez's testimony if it
2  knew that he was given an 11-year sentence instead of a 14-year
3  sentence, and because the informant had information about the crime
4  that only an insider, i.e., Petitioner, would know.  (Lodgment No. 18
5  at 19-20.)  Despite the Court's misgivings about these findings and
6  the ultimate conclusion as set forth above, it cannot conclude that
7  the appellate court's decision is so lacking in justification that
8  there is no possibility that fairminded jurist would disagree.  *See*
9  *Richter*, 131 S. Ct. at 786.  This view is certainly bolstered by the
10  fact that three state appellate court justices have reached the
11  conclusion that there was no prejudice.  For these reasons, this claim
12  is denied.

13  B.    Prosecutorial Misconduct

14       In Ground Two, Petitioner contends that the prosecutor committed
15  misconduct when he failed to produce the transcript of Melendez's
16  sentencing hearing and when he used false evidence--i.e., the
17  testimony from Melendez and Spira that Melendez had not asked for or
18  received a benefit for testifying--to gain the conviction.  (Petition
19  at 5.)  For the following reasons, these claims are rejected.

20       1.    *Brady Violation*

21       Petitioner contends that the prosecutor violated his rights
22  under *Brady* when he failed to produce the transcript from the
23  informant's sentencing hearing, which would have shown that the
24  informant was lying when he testified that he had not asked for or
25  received any benefit from the government for testifying against
26  Petitioner.  (Supp. Memo. at 2, 6-7.)  For the reasons set forth
27  below, the Court finds that this claim does not warrant a new trial.
28

The Due Process Clause requires the prosecution to disclose exculpatory evidence to the defense. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987); *Brady*, 373 U.S. at 87. A *Brady* violation occurs when the prosecution fails to turn over evidence that is "favorable to an accused" and "material either to guilt or to punishment." *Brady*, 373 U.S. at 87. "Favorable evidence" includes evidence that can be used to impeach the credibility of a government witness. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is "material" if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* at 682. When a defendant "has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government." *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991).

Petitioner contends that the prosecution violated *Brady* when it failed to turn over the sentencing transcript from the informant's sentencing hearing. The appellate court disagreed, finding that there was no *Brady* violation because: (1) the claim was waived when Petitioner failed to raise it in the trial court; (2) the prosecutor offered to make his "entire file" available for review, which offer was accepted by defense counsel; and (3) the transcript from the informant's sentencing was a matter of public record and, therefore, the prosecutor had no obligation to disclose it. (Lodgment No. 18 at 18.)

Focusing on the appellate court's last reason, the Court concludes that Petitioner is not entitled to relief on this claim. Defense counsel was aware of the existence of the transcript and it was, apparently, a public record. Further, Petitioner's appellate

24

counsel had asked the appellate court to take judicial notice of the transcript during the appeal following Petitioner's first trial. Thus, the appellate court's finding that the prosecutor's failure to produce it did not violate *Brady* is not a misapplication of federal law or a misreading of the facts and is entitled to deference.  *See* 28 U.S.C. § 2254(d); *Layton v. Phillips*, 340 Fed. Appx. 687, 689 (2d Cir. 2009) (finding prosecutor's failure to disclose civil lawsuit against defendant did not violate *Brady* where court records from civil suit were part of public records that defense counsel should have known about but failed to obtain due to lack of diligence on his part); *Owens v. Guida*, 549 F.3d 399, 418 (6th Cir. 2008) (noting state courts do not unreasonably apply *Brady* when "the information not disclosed could have been deduced by looking at public records").

### 2. *False Evidence*

In a related claim, Petitioner argues that the prosecutor committed misconduct by presenting false evidence, namely, the informant's and the Deputy District Attorney's testimony that the informant did not ask for or receive a benefit for testifying against Petitioner.  (Supp. Memo. at 2-6.)  As explained more fully below, the Court concludes that, though the prosecutor used false testimony to obtain the convictions, the Court defers to the California Court of Appeal's finding that there was no prejudice.

A conviction obtained by the knowing use of false evidence or perjured testimony is fundamentally unfair and violates a defendant's constitutional rights.  *United States v. Agurs*, 427 U.S. 97, 103 (1976); *see also Napue v. Illinois*, 360 U.S. 264, 269-70 (1959) ("A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and

1   duty to correct what he knows to be false and elicit the truth."

2   (internal quotation marks omitted)).   To merit habeas relief, a

3   petitioner must show that the testimony was actually false, that the

4   prosecutor knew or should have known that it was false, and that the

5   falsehood was material to the case.   *Jackson v. Brown*, 513 F.3d 1057,

6   1071-72 (9th Cir. 2008).   A *Napue* violation is material if there is

7   any reasonable likelihood that the false testimony could have affected

8   the jury's decision.   *Libberton v. Ryan*, 583 F.3d 1147, 1164 (9th Cir.

9   2009), *cert. denied,* 130 S. Ct. 3412 (2010).

10        The California Court of Appeal found that Melendez's and Deputy

11   District Attorney Spira's testimony was false.   (Lodgment No. 18 at

12   14, 16-17.)   Nevertheless, it concluded that there was no prejudice.

13   (Lodgment No. 18 at 9.)   Petitioner claims that the court erred in

14   finding no prejudice.

15        Respondent disagrees.   He contends that, even if Melendez and

16   Deputy District Attorney Spira testified falsely at trial, a point he

17   does not concede, Prosecutor Vinegrad did not know it and, therefore,

18   did not violate the Constitution.   (Resp. Supp. Brief at 12-13.)

19        As to Melendez, there is no evidence in the record to suggest

20   that Deputy District Attorney Vinegrad knew that Melendez was lying.

21   Although Petitioner urges the Court to find that Vinegrad should have

22   known that Melendez's testimony was false by uncovering the fact that

23   Melendez was lying, the Supreme Court has never specifically imposed

24   any such duty on prosecutors.   As such, the Court will not hold Deputy

25   District Attorney Vinegrad responsible for Melendez's lies because

26   Vinegrad did not know about them when Melendez testified.   *But see*

27   *Jackson,* 513 F.3d at 1075 (finding prosecutor liable for informant's

28   lies because prosecutor had a duty to investigate and turn over

1   impeachment evidence under *Brady* and, therefore, should have known

2   that the informant was lying).

3       As to Deputy District Attorney Spira's false testimony, however,

4   the Court finds this to be a much more complicated issue.  There is no

5   evidence that Vinegrad actually knew that Spira was testifying

6   falsely.  The question then is whether, in the absence of such

7   knowledge, Vinegrad is responsible for Spira's false testimony.  Not

8   surprisingly, the Court was unable to find a case on all fours, i.e.,

9   where a prosecutor falsely testified about an informant's deal and the

10  defendant later claimed that the prosecutor who elicited the testimony

11  had violated *Napue*.  The closest the Court found was a case in which a

12  federal prosecutor called a cooperating witness to the stand who

13  testified that he had not been offered consideration for his testimony

14  and, unbeknownst to the prosecutor, another prosecutor in his office

15  had promised the cooperating witness he would not prosecuted if he

16  testified.  *Giglio v. United States*, 405 U.S. 150 (1972).  There, the

17  Supreme Court found that a prosecutor's office is a single entity and,

18  as such, a promise to a cooperating witness by one prosecutor in the

19  office was attributable to another prosecutor in the same office even

20  though the other prosecutor did not know about the promise.  *Id.* at

21  154-55.  Applying the reasoning from *Giglio* to the facts in the case

22  at bar, the Court concludes that, when Riverside County Deputy

23  District Attorney Vinegrad presented Riverside County Deputy District

24  Attorney Spira's false testimony, the fact that Spira knew his

25  testimony was false is imputed to Vinegrad.  *Jackson*, 513 F.3d at 1075

26  ("*Napue* and *Giglio* make perfectly clear that the constitutional

27  prohibition on the 'knowing' use of perjured testimony applies when

28

27

1  *any* of the State's representatives would know the testimony was
2  false." (emphasis in original)).

3      Respondent points to two cases, which he argues reached a
4  different result, *Smith v. Massey*, 235 F.3d 1259 (10th Cir. 2000), and
5  *Barajas v. Knowles*, 2010 WL 3190645 (9th Cir. 2010).  The Court
6  concludes that neither is on point.  In *Smith*, the Tenth Circuit
7  refused to impute a state chemist's false testimony to the prosecutor
8  because the Supreme Court had not applied *Napue* in the context of
9  expert testimony.  *Smith,* 235 F.3d at 1270-72.  In *Barajas*, the Ninth
10 Circuit refused to impute a victim's false testimony to the
11 prosecutor.  *Barajas*, 2010 WL 3190645, at *2.  Thus, neither case
12 involved shielding a prosecutor from the false testimony of another
13 prosecutor from his office.

14     Respondent argues in the alternative that, even if Vinegrad
15 knowingly presented false evidence, there was no constitutional
16 violation because defense counsel chose not to correct it.  (Resp.
17 Supp. Brief at 14.)  In this instance, however, the California Court
18 of Appeal found (and this Court agrees) that defense counsel was
19 ineffective for failing to impeach Melendez and Deputy District
20 Attorney Spira with evidence that Melendez received a sentence
21 reduction for his cooperation.  As such, the Court will not allow the
22 government to hide
23  behind defense counsel's failings to shield the prosecutor from his
24 misconduct.

25     For Petitioner's claim to succeed, however, he must also
26 demonstrate that Spira's testimony was material, in other words, that
27 there is a reasonable likelihood that it affected the jury's verdict.
28 *See Jackson*, 513 F.3d at 1075-76.  The California Court of Appeal

28

found no prejudice in a somewhat cryptic note: "Although we agree that some of the prosecution's testimony falsely bolstered the informant's credibility, we find no resulting prejudice." (Lodgment No. 18 at 9.) This finding does not appear to be unreasonable, particularly in light of the appellate court's finding that Melendez's false testimony was not prejudicial. As such, it is entitled to deference. 28 U.S.C. § 2254(d). Further, this Court implicitly resolved this issue in Respondent's favor when it concluded that Silva's failure to impeach Melendez--and concomitantly Spira--with the sentencing transcript did not result in prejudice. It reaffirms that ruling here. Though there is a difference between a jailhouse informant lying at trial and a deputy district attorney doing the same thing, the difference is not so great in the context of this case as to cause the Court to conclude that the outcome of the trial would have been different had the prosecutor's false testimony been exposed. *See, e.g., Libberton*, 583 F.3d at 1163-64 (rejecting *Giglio* and *Napue* claims that the prosecution failed to reveal an agreement that a witness would not be tried as an adult in exchange for his testimony against the defendant because any such deal was not material); *but see Maxwell*, 628 F.3d at 508 (finding false testimony was material because witness was the "make-or-break" witness for the prosecution and almost no other evidence linked defendant to the murder). As such, Petitioner is not entitled to relief here. *See Richter,* 131 S. Ct. at 786.[5]

_____

[5] The Court also notes that it is highly unlikely that defense counsel would have been able to adequately unravel the tall tale Deputy District Attorney Spira spun at trial to such a degree that the jury would have been able to see through Spira's testimony. To this day, Spira, Vinegrad, Silva, and the Deputy Attorney General tasked with defending their actions maintain that Spira and Melendez were telling the truth when they testified that Melendez's sentence had not

1  C.   Confrontation Clause

2        In his final claim, Petitioner contends that the trial court

3  violated his Sixth Amendment right to confront victim Adair when the

4  court allowed the police to testify that he had identified Petitioner

5  as the shooter even though he died before trial and Petitioner's

6  counsel was unable to cross-examine him at trial.  (Petition at 5;

7  Supp. Memo. at 7-9.)  Respondent argues that the state court's

8  findings--that the statements were admissible as spontaneous

9  utterances and not in conflict with the right to confront witnesses

10  under the doctrine of forfeiture by wrongdoing--were not contrary to

11  clearly established federal law at the time and, therefore, should be

12  affirmed.  (Respondent's Memo. at 25-37.)  For the reasons set forth

13  below, the Court finds that the state court's decision that the

14  admission of the victim's statements did not violate Petitioner's

15  right to confront the witness is not contrary to clearly established

16  federal law.

17        After Mix and Adair were shot, Adair dialed 9-1-1 and reported

18  the shooting.  The 9-1-1 operator asked him who had shot them and he

19  told her that he did not know.  (*See* CT 113-14.)  Police arrived at

20  Adair's house 20 to 30 minutes later.  Four of them, at different

21  times, asked Adair who shot him.  Adair told them that it was "Baca."

22  (RT 111-12, 134, 159-60, 356-57.)  Adair died 12 days later from the

23  shooting.  The trial court ruled that Adair's statements identifying

24  Petitioner as the shooter were admissible as spontaneous utterances.

25  (RT 16.)  Thereafter, the prosecution called the four officers, who

26  testified that Adair had told them that Petitioner was the shooter.

27  ────────────────────

28  been reduced for testifying against Petitioner and that the appellate
   court was simply mistaken when it came to the opposite conclusion.

1  Petitioner claims that this testimony should not have come in because

2  he was unable to challenge it through cross-examination of Adair.

3        The Supreme Court has recently clarified that, when the primary

4  purpose of police questioning is to enable the police to meet an

5  "ongoing emergency," statements by the victim of a crime to the police

6  identifying the assailant are admissible at trial, even where the

7  victim dies before trial and is not available for cross-examination.

8  *Michigan v. Bryant*, 131 S. Ct. 1143, 1154-55 (2011).  In *Bryant*,

9  police officers responded to a call that a man had been shot and found

10 him lying on the ground, bleeding from a gunshot wound.  *Id.* at 1163.

11 The shooter was not present.  *Id.*  When a police officer asked the

12 victim who shot him, he identified the defendant.  *Id.* at 1163-64.

13 The victim later died, but his statement identifying the defendant as

14 the shooter was introduced at the defendant's trial through the police

15 officer.  The Supreme Court held that the victim's statement was not

16 testimonial because the circumstances surrounding the questioning

17 demonstrated that the primary purpose of the questioning was to enable

18 the police to meet an ongoing emergency--locating an armed assailant--

19 not to obtain evidence for trial.  *Id.* at 1165-67.  As a result, the

20 court held that the admission of the victim's statement did not

21 violate the Confrontation Clause.  *Id.* at 1167.

22       The facts in the case at bar mirror those in *Bryant*.  The police

23 responded to the scene of a shooting in which one person was dead and

24 another mortally wounded.  Several officers informally questioned

25 Adair at the scene to, at least in part, find out what had happened,

26 who had done it, and whether they or others were in danger.  Under

27 these circumstances, it is reasonable to conclude that the questioning

28 was intended to address an ongoing emergency and not to procure

31

testimony for a future prosecution.   Thus, the admission of Adair's
statements did not violate the Confrontation Clause because they were
not testimonial in nature.   For this reason, the state court's
decision denying this claim will be upheld.

V.

THE COMBINED FAILURES OF THE PROSECUTION AND THE DEFENSE
IN THIS CASE ARE REGRETTABLE

I would be remiss if I did not voice my utter disappointment
with the lawyers in this case.   Though the evidence established that
Petitioner killed Adair and Mix, the case as to why is not as
compelling because it is grounded in the testimony of a jailhouse
informant who lied.   Sadly, the informant's lies were bolstered by a
Deputy District Attorney, who also lied.   What is obvious from
reviewing the record in this case is that the Riverside County
District Attorney's Office turned a blind eye to fundamental
principles of justice to obtain a conviction in this case, which the
Court finds regrettable.

In the first trial, the prosecutor concluded that defense
counsel had "opened the door" to questions about Petitioner's prior
arrest for raping and sodomizing a seven-year-old girl and went so far
as to ask Petitioner to tell the jury what he had done to her.
(Lodgment No. 1 at 12.)   No seasoned prosecutor could honestly believe
that a door had ever been opened that wide in a trial.   Naturally,
that conviction was unanimously reversed by the state appellate court
(based on ineffective assistance of counsel not prosecutorial
misconduct).   (Lodgment No. 1.)   But Presiding Justice Hollenhorst, a
former Riverside County Deputy District Attorney himself, was not

satisfied with simply reversing the conviction on this ground.[6]  He
took the time to write a seven-page concurrence aimed directly at
Deputy District Attorney Vinegrad, explaining to him that, in his
view, the conviction had to be reversed not because of ineffective
assistance of counsel, as the majority had concluded, "but because
[Justice Hollenhorst found] the trial to be an unfair one due to
prosecutor misconduct . . . ."  (Lodgment No. 1, Concurrence at 2.)
He began with an admonition about a prosecutor's role in the criminal
justice system and went on to chronicle numerous acts of misconduct by
Vinegrad during the trial (in addition to the questions about the rape
and sodomy arrest), including improperly maligning the defense,
improperly questioning witnesses, and misstating the law.  (Lodgment
No. 1, Concurrence at 3-7.)

     One might think that such a criticism of a prosecutor's
performance by the presiding justice of the state appellate court
would bring condemnation, or at least counseling.  Not in the
Riverside County District Attorney's Office.  It did not even bring a
yawn.  According to Vinegrad, no one in that office ever spoke to him
about Justice Hollenhorst's pointed criticisms.  (EH RT 95-100.)

     In trial two, Vinegrad presented false testimony from a
jailhouse informant and, even more surprisingly, from a fellow
prosecutor, Deputy District Attorney Spira.  Vinegrad made literally
no effort to determine if these witnesses were telling the truth.
This failure is inexplicable, particularly in light of the importance

---

     [6]  Justice Hollenhorst was a Deputy District Attorney in the
Riverside County District Attorney's office from 1972-1981.
(www.appellatelaw.net/ca/judges/thomashollenhorst.htm.)

of the informant's testimony and the fact that Justice Hollenhorst had reminded Vinegrad in this very case to seek justice, not convictions.

In its decision affirming the second conviction, the state appellate court, without using the word "lied," found that Deputy District Attorney Spira had lied at trial. (Lodgment No. 18 at 13-14.)  It described his testimony as "sheer fantasy," "bear[ing] only a superficial resemblance to reality," and "conceal[ing] the only facts that were favorable to the defense."  It noted that Spira's testimony falsely bolstered the informant's credibility.  (Lodgment No. 18 at 9.)  Again, pretty harsh criticism of a prosecutor from an appellate court, which one would think would bring condemnation from his superiors.  Not in Riverside.  Spira had never even read the opinion until he found out seven years later that he had to appear in district court for an evidentiary hearing in this case.  (EH RT at 8.)  And no one from his office ever spoke to him about it.[7]  (EH RT at 8-9.)

The prosecutors' trampling of the rules in this case was aided and abetted by defense counsel in the second trial who failed to offer a vigorous defense.  Counsel presented an alibi defense.  In addition to Petitioner, he called one witness, a lifelong friend of Petitioner, who claimed that Petitioner was with him at the time of the murders. (RT 522-33.)  This testimony was immediately undermined by the government's rebuttal witness, an investigator who testified that he had interviewed the alibi witness a week before he testified and that the witness had told him that he did not remember what date he had

_____

[7]  The Court wonders out loud whether Spira testified in any other cases since the state appellate court questioned his credibility in 2004 and failed to give notice to defense counsel that his credibility had been called into question.

been with Petitioner.  (RT 535.)  Not surprisingly, the transcript
from the trial reveals that defense counsel had spoken to the alibi
witness only once, briefly, and that that conversation had taken place
after the trial had begun.  (RT 529-33.)

Comparing Petitioner's defense in the first trial to his defense
in the second trial, obvious questions arise.  In the first trial,
defense counsel presented a murder-suicide defense, contending that
Adair had murdered Mix in a lover's quarrel and then shot himself.
(Lodgment No. 1 at 8.)  Counsel introduced evidence to establish that
Adair's blood alcohol level was .25 at the time of the shooting and
that he had traces of benzodiazepine, a depressant, in his system.
(Lodgment No. 1 at 8.)  Adair's psychologist from the Betty Ford
Clinic testified that Adair was an alcoholic with a depressive
disorder and a histrionic personality disorder.  (Lodgment No. 1 at
8.)  He noted that Adair entertained suicidal thoughts on numerous
occasions and that he had tried to kill himself two weeks before
coming to the Betty Ford Clinic.  (Lodgment No. 1 at 8.)  Adair's
psychiatrist also testified, confirming that Adair had suicidal
tendencies.  (Lodgment No. 1 at 8.)  None of this evidence was
presented in the second trial.

Tom Adair testified in the first trial that he had not conspired
with Petitioner to kill Adair and Mix.  (Lodgment No. 1 at 8.)
Defense counsel never called Tom Adair in the second trial.  Assuming
Adair would have refused to testify, counsel could have introduced his
testimony through the transcript from the first trial.

In the first trial, counsel attempted to undermine the police
officers' testimony that Adair had identified Petitioner as the
shooter by calling two California Department of Forestry officers who

35

arrived 20 minutes before the police officers and who testified that Adair never identified the shooter to them. (Lodgment No. 1 at 8.) These witnesses were not called in the second trial.

In the first trial, defense counsel located three witnesses, presumably Petitioner's and Melendez's cellmates, to undermine Melendez's testimony that Petitioner had confessed to him while the two shared a cell with six other inmates. (Lodgment No. 1, Concurrence at 4.) These witnesses had been excluded from the first trial because defense counsel failed to timely disclose their names to the prosecution. (Lodgment No. 1, Concurrence at 4.) They were not called in the second trial.

When asked about his reasons for not presenting any of this evidence, Silva was unable to offer any coherent explanation. (EH RT at 68-71, 79-90.) The best he could do was to claim that it somehow contradicted his defense that someone other than Petitioner had shot Mix and Adair. (RT 79-80.) But that really makes no sense. Petitioner's defense in the second trial was that he was not there when the shootings occurred. Implicit in this defense is the fact that someone else shot the victims. The possibility that Adair shot Mix and then himself was not inconsistent with that theory. Further, and more importantly, Petitioner was faced with victim Adair's statement to police that Petitioner had shot them. This was powerful evidence. Establishing that Adair's blood alcohol level was .25, that he was depressed, suicidal, had a histrionic personality, and had failed to inform the first officers on the scene that Petitioner was the shooter might have gone a long way towards undermining Adair's later statements to police that Petitioner was the shooter.

36

1    Deputy District Attorney Vinegrad quipped during his testimony
2    at the evidentiary hearing that this defense strategy was unsuccessful
3    in the first trial, suggesting, it seems, that there was no point in
4    trying it again in the second trial.  But that ignores the fact that
5    this defense was never truly given a chance to succeed in the first
6    trial when Vinegrad asked Petitioner about raping and sodomizing a
7    seven-year-old girl.  No defense lawyer yet has developed a strategy
8    to overcome the damage from that type of questioning, which is why it
9    is not admissible in a trial.

10   The only explanation for Silva's poor performance that the Court
11   can glean from this record is that he was completely unprepared to try
12   this case.  This is certainly supported by the tepid defense at trial.
13   It is bolstered by the fact that, though in Silva's mind this case
14   turned on an alibi witness, he prepared for trial, made his opening
15   statement, and conducted the better part of the trial before he got
16   around to calling the alibi witness to talk to him.  It is further
17   bolstered by the fact that Silva was looking for the Melendez
18   transcript after the trial began and did not know that he had it--
19   along with presumably a lot of other evidence--until some time after
20   the trial started.  (EH RT 64-67.)  As Silva explained, two years
21   before he tried this case, he was given two boxes of materials, one
22   from the District Attorney's Office and one from the Public Defender's
23   Office.  (EH RT 64-67, 74-75.)  As he prepared for trial, however,
24   Silva had forgotten that there were two boxes of materials and was
25   preparing his case with only one box, the one from the District
26   Attorney's Office.  (EH RT 74-75.)  That is why he continued to ask
27   the prosecutor for the Melendez transcript even though he already had
28   it in the box from the Public Defender's Office.  Some time during

trial, Silva came upon the second box, the one from the Public Defender's Office, and, realizing that the transcript was in there, stopped asking for it. (EH RT 75.)  Thus, in preparing for this trial, Silva used only the materials that the prosecutor had given him and did not use anything that the Deputy Public Defender had developed in the first trial.  By the time Silva discovered the box from the Public Defender's Office in the middle of trial, it was obviously too late to use the evidence at trial because Silva had not provided notice to the prosecution about the witnesses or the evidence identified in that box.

In the end, though I find that the law dictates that Petitioner's habeas corpus petition be denied, this case leaves a sour taste in my mouth.  Both sides failed in their mission to pursue justice here.  Though I believe that Petitioner is guilty of killing Mix and Adair, I think that he may have been able to mount a compelling defense to undermine the prosecution's premeditation theory if the prosecutor had presented a level playing field and Petitioner's counsel had presented a vigorous defense.

VI.

RECOMMENDATION

For these reasons, IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and

38

(2) directing that Judgment be entered denying the Petition and dismissing this case with prejudice.[8]

DATED: June _22__, 2011.


/S/ PATRICK J. WALSH_____
PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-State Habeas\BACA, J 683\R&R.wpd

---

[8]   The Court is inclined to issue a Certificate of Appealability in this case with respect to the ineffective assistance of counsel claim and the *Napue* claim.  *See* Federal Rules Governing Section 2254 Cases, Rule 11 ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").  If the parties have a different view, they should explain why in their Objections to this Report and Recommendation.